Vol 2 of 3    HG

COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___MONTGOMERY___ COUNTY, ALABAMA

CIRCUIT COURT NO.  CC 99-327

CIRCUIT JUDGE   SALLY GREENHAW

Type of Conviction / Order Appealed From: ___STALKING___

Sentence Imposed: _20 years_

Defendant Indigent:  [X] YES   [ ] NO

John Willie Minnifield

NAME OF APPELLANT

_JOSEPH BURKHART_           _262-4800_
(Appellant's Attorney)
472 S. Lawrence Street    Suite 206    (Telephone No.)
(Address)
Montgomery, AL   36104
(City)          (State)              (Zip Code)

V.

STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

COPY

1                  IN THE CIRCUIT COURT

2                        OF

3             MONTGOMERY COUNTY, ALABAMA

4

5       State of Alabama,

6           Plaintiff,

7       vs.                 CASE NO:   CC-99-327

8       JOHN WILLIE MINNIFIELD,

9           Defendant.

10

11

12

13              * * * * * * * * * * *

14              PROCEEDINGS in the above-styled

15   cause before the Honorable Sally M. Greenhaw,

16   Presiding Judge, in Courtroom 3-C, Montgomery

17   County Circuit Court, 251 South Lawrence Street,

18   Montgomery, Alabama, commencing on Monday, January

19   10 and February 7, 2000.

20             * * * * * * * * * * *

21

22

23

24

25       Meridith D. Newman, CSR
          Official Court Reporter

```
 1                          APPEARANCES

 2

 3

 4            FOR THE STATE:

 5            Mr. Daryl Bailey
              Montgomery County District Attorney
 6            251 South Lawrence Street
              Montgomery, Alabama  36104
 7

 8            FOR THE DEFENDANT:

 9            Mr. John Wiley Hartley
              Attorney at Law
10            312 Scott Street
              Montgomery, Alabama  36104
11

12            Also Mr. Minnifield went pro se.

13                 *  *  *  *  *  *  *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        TRIAL INDEX

 2

 3      COURT'S OPENING REMARKS . . . . . . . .  44

 4      OPENING STATEMENTS . . . . . . . . . .  59

 5

                    WITNESSES FOR THE STATE:
 6

        CLEMMITHA PETACE
 7          DIRECT EXAMINATION BY MR. BAILEY  . .  70
            CROSS-EXAMINATION BY MR. MINNIFIELD .  73
 8
        PETE ROSE
 9          DIRECT EXAMINATION BY MR. BAILEY  . .  75
            CROSS-EXAMINATION BY MR. MINNIFIELD .  81
10
        VONCIEL MINNIFIELD
11          DIRECT EXAMINATION BY MR. BAILEY  . .  87
            CROSS-EXAMINATION BY MR. MINNIFIELD . 120
12          REDIRECT EXAMINATION BY MR. BAILEY  . 135

13      G. L. SISSON
            DIRECT EXAMINATION BY MR. BAILEY  . . 138
14          CROSS-EXAMINATION BY MR. MINNIFIELD . 143

15      ROSEBUD BROWN
            DIRECT EXAMINATION BY MR. BAILEY  . . 147
16          CROSS-EXAMINATION BY MR. MINNIFIELD . 153

17      LAWANDA BENSON
            DIRECT EXAMINATION BY MR. BAILEY  . . 157
18          CROSS-EXAMINATION BY MR. MINNIFIELD . 171

19      LESTER GLAXTON
            DIRECT EXAMINATION BY MR. BAILEY  . . 181
20          CROSS-EXAMINATION BY MR. MINNIFIELD . 185

21      TIMOTHY BROWN, JR.
            DIRECT EXAMINATION BY MR. BAILEY  . . 190
22          CROSS-EXAMINATION BY MR. MINNIFIELD . 194

23      ASHLEY ELIZA COOK
            DIRECT EXAMINATION BY MR. BAILEY  . . 198
24          CROSS-EXAMINATION BY MR. MINNIFIELD . 202

25
```

DANA COOK
        DIRECT EXAMINATION BY MR. BAILEY  .  . 208
        CROSS-EXAMINATION BY MR. MINNIFIELD . 214
        REDIRECT EXAMINATION BY MR. BAILEY   . 220

NICHOLAS WASHINGTON
        DIRECT EXAMINATION BY MR. BAILEY  .  . 223
        CROSS-EXAMINATION BY MR. MINNIFIELD . 227

                    WITNESSES FOR THE DEFENDANT:

SHERRY MELTON
        DIRECT EXAMINATION BY MR. MINNIFIELD  236

JOHNNIE SULLIVAN
        DIRECT EXAMINATION BY MR. MINNIFIELD 243
        CROSS-EXAMINATION BY MR. BAILEY  . . 245

KAREN BLANCH
        DIRECT EXAMINATION BY MR. MINNIFIELD 246

RONNIE WATERS
        DIRECT EXAMINATION BY MR. MINNIFIELD 249
        CROSS-EXAMINATION BY MR. BAILEY  . . 253

GLORIS PERDO
        DIRECT EXAMINATION BY MR. MINNIFIELD 254
        CROSS-EXAMINATION BY MR. BAILEY  . . 258

JOHN MINNIFIELD
        EXAMINATION OF HIMSELF . . . . . . 261
        CROSS-EXAMINATION BY MR. BAILEY   . . 280
        EXAMINATION OF HIMSELF . . . . . . 288

                    REBUTTAL FOR THE STATE

CASSANDRA WILLIAMS
        DIRECT EXAMINATION BY MR. BAILEY . . 296


CLOSING ARGUMENTS . . . . . . . . . . 311

JURY CHARGE . . . . . . . . . . . . 335

VERDICT   . . . . . . . . . . . . . 354

SENTENCING  . . . . . . . . . . . . 357

1

2                              STATE'S EXHIBITS:

3       EXHIBIT NO. 1-AFFIDAVIT/COMPLAINT   . . . . . .   95

4       EXHIBIT NO. 2-AFFIDAVIT/COMPLAINT   . . . . . .  103

5       EXHIBIT NO. 3-AFFIDAVIT/COMPLAINT   . . . . . .  104

6       EXHIBIT NO. 4-TWO AUDIOCASSETTE TAPES  . . . .  304

7       EXHIBIT NO. 5-HANDWRITTEN LETTER . . . . . . .  114

8       EXHIBIT NO. 6-HANDWRITTEN NOTE ON SCRATCH PAPER 116

9       EXHIBIT NO. 7-HANDWRITTEN NOTE ON SCRATCH PAPER 117

10      EXHIBIT NO. 8-HANDWRITTEN NOTE ON PAPER  . . . . 118

11      EXHIBIT NO. 9-MIRANDA RIGHTS FORM  . . . . . .  299

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Good morning.  Y'all can

2    be seated.  I'm Judge Sally Greenhaw, and we're

3    about to start a case.  It's a criminal case, and

4    it's the State of Alabama versus John Minnifield.

5    Mr. Minnifield is charged with stalking a Vonciel

6    Minnifield by allegedly following, harassing, or

7    threatening her, which is alleged to have occurred

8    back in the fall of '98 in the vicinity of 770

9    Washington Avenue around the RSA Plaza.  And I'm

10    mentioning that to you because I'm going to ask you

11    shortly if you know or if you've heard anything

12    about the case.

13         But before I do that, I'm going to introduce

14    you to everyone seated at counsel table.  The State

15    today is represented by Daryl Bailey and seated

16    next to him is Vonciel Minnifield.  And down at

17    this end is John Minnifield and his attorney, Wiley

18    Hartley.  And now that I've introduced them to you,

19    it's going to be a good time for you to introduce

20    yourselves to us.  I know this information is on

21    your questionnaire, but it's a good time for the

22    attorneys to put your face with your questionnaire.

23    When the clerk calls your name, if you would please

24    stand.  If you're employed, tell us where.  If

25    you're married, where your spouse is employed.  Or

1    if you're retired -- lucky enough to be retired --

2    the occupation from which you're retired, and that

3    would also apply to your spouse.

4                    THE CLERK:  Richard Lamkin.

5                    PROSPECTIVE JUROR:  My name is

6    Richard Lamkin.  I'm employed by Sears Roebuck and

7    Company.  My wife is a housewife.

8                    THE CLERK:  Dorothy Lee.

9                    PROSPECTIVE JUROR:  My name is

10   Dorothy Lee.  I'm employed by the Board of

11   Education and also Dairy Queen.

12                   THE CLERK:  Heather Leonard.

13                   PROSPECTIVE JUROR:  I'm Heather

14   Leonard.  I'm a self-employed counselor, and my

15   husband is employed by Alabama Crown Distributing

16   Company.

17                   THE CLERK:  Rachelle Leslie.

18                   PROSPECTIVE JUROR:  I'm Rachelle

19   Leslie.  I'm employed with Regions Bank, and my

20   husband is employed with Friedman's Jewelry.

21                   THE CLERK:  Sarah Lewis.

22                   PROSPECTIVE JUROR:  My name is Sarah

23   Lewis.  I'm employed at True Divine Daycare -- I

24   teach a daycare at True Divine on Virginia Loop

25   Road.  My husband is the produce manager of the

1    Calhoun Foods.

2                    THE CLERK:  Linda Livingston.

3                    PROSPECTIVE JUROR:  My name is Linda

4    Livingston.  I'm currently unemployed.  My husband

5    is on an operator line originating from Decampton,

6    California.

7                    THE CLERK:  Henry Longmire.

8                    PROSPECTIVE JUROR:  I'm Henry

9    Longmire employed with Charles Trucking Company.

10   My wife is employed with Russell Incorporation.

11                   THE CLERK:  Claudia Lowe.

12                   PROSPECTIVE JUROR:  I'm Claudia

13   Lowe, and I teach second grade, and I'm single.

14                   THE CLERK:  Gwendolyn Lusane.

15                   PROSPECTIVE JUROR:  I'm Gwendolyn

16   Lusane.  I'm single.  I'm employed temporary with

17   Unclaimed Property.

18                   THE CLERK:  Wanda Mack.

19                   PROSPECTIVE JUROR:  I'm Wanda Mack.

20   I'm employed with Macon County Board of Education.

21   I'm a kindergarten teacher.  And my husband works

22   for the Department of Youth Services.

23                   THE CLERK:  Frances Mangum.

24                   PROSPECTIVE JUROR:  Pronounced

25   Mangum.  Frances Mangum.  I'm retired AT&T, and I'm

1   a widow.

2                    THE CLERK:  Yuri Manuel.

3                    PROSPECTIVE JUROR:  I'm Yuri Manuel,

4   employed (inaudible.)

5                    THE CLERK:  Joellen Marshall.

6                    PROSPECTIVE JUROR:  I'm Joellen

7   Marshall.  I'm employed by Venture Travel, and my

8   husband is with Liberty International.

9                    THE CLERK:  Charlie Martin.

10                   PROSPECTIVE JUROR:  My name is

11  Charlie Martin.  I'm employed by Longforce Baptist

12  Church, and my wife is employed by Macon East

13  Montgomery Academy.

14                   THE CLERK:  Roger Martin.

15                   PROSPECTIVE JUROR:  I'm Roger

16  Martin.  I'm employed Retirement Systems of

17  Alabama, and I'm single.

18                   THE CLERK:  James McIndoe.

19                   PROSPECTIVE JUROR:  McIndoe.  James

20  McIndoe.  I'm employed by the State of Alabama,

21  Department of Environmental Management, and my wife

22  is a housewife.

23                   THE CLERK:  Gwendolyn McKenney.

24                   PROSPECTIVE JUROR:  I'm Gwendolyn

25  McKenney.  I'm employed by the State of Alabama,

1    Department of Transportation.  My husband is

2    employed with the Montgomery County Board of

3    Education and the City of Montgomery.

4                    THE CLERK:  Lilian McNiven.

5                    PROSPECTIVE JUROR:  I'm Lilian

6    McNiven.  I'm a housewife, and my husband is

7    employed in St. Louis with Flight Safety

8    International.

9                    THE CLERK:  John Mitchell.

10                   PROSPECTIVE JUROR:  My name is John

11   Mitchell.  I'm employed by Montgomery Board of

12   Education.

13                   THE CLERK:  Sharon Neely.

14                   PROSPECTIVE JUROR:  My name is

15   Sharon Neely.  I'm single, and I work for Bylaw

16   Communications.

17                   THE CLERK:  Edward Ogwynn.

18                   PROSPECTIVE JUROR:  I'm employed by

19   Wilson Price Barranco, and Billingsley in

20   Montgomery.  My wife is a housewife.

21                   THE CLERK:  Catherine Ortega.

22                   PROSPECTIVE JUROR:  Ortega.

23   Catherine Ortega.  I'm single, and I work for the

24   State of Alabama, Department of Youth Services.

25                   THE CLERK:  Daisy Patton.

1    PROSPECTIVE JUROR:  Daisy Patton.

2  I'm retired and a widow.

3    THE CLERK:  David Penn.

4    PROSPECTIVE JUROR:  My name is David

5  Penn.  I work full-time for the Alabama National

6  Guard, and my wife is a homemaker.

7    THE CLERK:  Nellie Perry.

8    PROSPECTIVE JUROR:  My name is

9  Nellie Perry.  I work were the U. S. Postal

10  Service, and I'm divorced.

11    THE CLERK:  Lee Peters.

12    PROSPECTIVE JUROR:  I'm Lee Peters.

13  I'm divorced, and I work part-time on weekends

14  nursing -- doing private nursing.

15    THE CLERK:  Lawrence Phipps.

16    PROSPECTIVE JUROR:  I'm Lawrence

17  Phipps.  I'm employed by Longforce Baptist Church,

18  and my wife is the weekly preschool director at

19  Longforce Baptist Church.

20    THE CLERK:  Donald Porter.

21    PROSPECTIVE JUROR:  I'm Donald

22  Porter.  I'm retired from civil service, computer

23  specialist.  Currently doing part-time work for

24  Capital Chevrolet as a courtesy driver, and my wife

25  works as a court specialist in family court.

1          THE CLERK:  Mary Pouncey.

2          PROSPECTIVE JUROR:  I'm Mary

3  Pouncey.  I'm a retired Federal employee, and I'm a

4  widow.

5          THE CLERK:  Telissa Preston.

6          PROSPECTIVE JUROR:  My name is

7  Telissa Preston.  I'm employed by Kim Baking

8  Industry.

9          THE CLERK:  Lori Pritchett.

10          PROSPECTIVE JUROR:  I'm Lori

11  Pritchett.  I work for Regions Financial Corp; and

12  my husband is employed with Knology, Incorporated.

13          THE CLERK:  Franklin Reynolds.

14          PROSPECTIVE JUROR:  Frank Reynolds.

15  I currently work for Yellow Freight System,

16  tractor-trailer operator.  Also general

17  firefighter.  My wife is a bank employee at Regions

18  Bank.

19          THE CLERK:  That's it, Judge.

20          THE COURT:  Okay.  I'm going to

21  be -- excuse me, that time of the year.  I'm going

22  to be asking some questions.  If anyone needs to

23  respond, if you would please stand, give your name

24  again and any details that may be helpful.

25      When I refer to family members, I'm referring

```
 1    to someone in your immediate family, your spouse,

 2    children, grandchildren, brother, sisters, parents,

 3    or grandparents.  Or if there's a particular close

 4    friend that you think it would be helpful for the

 5    attorneys to have that information about, that

 6    would be okay as well.

 7         I've introduced you to everyone seated at

 8    counsel table.  And now I'm going to ask the same

 9    question about each of them.  And I'll start again

10    with Daryl Bailey.  Is anyone here related to him

11    by blood or marriage or know Mr. Bailey?

12              (No response.)

13              THE COURT:  Our DA in Montgomery

14    County is Ellen Brooks.  Anyone know Ms. Brooks or

15    related to her by blood or marriage?

16              (No response.)

17              THE COURT:  I'm not going to repeat

18    the same question, but what I need to know about

19    all of the people at counsel table or witnesses is

20    if you do know any of them or related to them.

21    And, again, down at this end is Vonciel Minnifield.

22              (No response.)

23              THE COURT:  And at this end is John

24    Minnifield and his attorney, John Wiley Hartley.

25              (No response.)
```

1                    THE COURT:  And I'm going to go over

2  a number of witnesses who may be called and, again,

3  if you know any of them --

4                 (Juror raises hand.)

5                 MR. HARTLEY:  Judge --

6                 THE COURT:  Okay.

7                 PROSPECTIVE JUROR:  Judge, my name

8  is Edward Ogwynn.  I know the defendant.  He worked

9  for our firm.

10               THE COURT:  Okay.  We may need to

11  talk to you in private.

12     Anyone else?

13               PROSPECTIVE JUROR:  Excuse me, you

14  asked about Ellen Brooks.

15               THE COURT:  Yes, ma'am.

16               PROSPECTIVE JUROR:  My name is Lee

17  Peters.  I nurse her aunt.

18               THE COURT:  Okay.  So you would just

19  know her -- you don't visit --

20               PROSPECTIVE JUROR:  I don't know her

21  personally, no.

22               THE COURT:  Okay.  Thank you.

23     I'm going to read out a number of potential

24  witnesses.  They probably will not all testify, but

25  I need to know if you do know them or related.  And

```
 1      some of their names just may be mentioned during

 2      the course of the trial.  If you're not sure

 3      whether you know anyone, the attorneys may be able

 4      to help us out about where they work or live.  But

 5      these are potential witnesses.  Tim Brown?

 6                      (No response.)

 7                      THE COURT:  Rosebud Brown?

 8                      (No response.)

 9                      THE COURT:  Ashley Cook?

10                      (No response.)

11                      THE COURT:  Elester Claxton?

12                      (No response.)

13                      THE COURT:  Lawanda Benson?

14                      (No response.)

15                      THE COURT:  Nicolas Washington?

16                      (No response.)

17                      THE COURT:  Pete Rose -- not the

18      baseball player.

19                      (No response.)

20                      THE COURT:  Cassandra Williams?

21                      (No response.)

22                      THE COURT:  G. L. Sisson?

23                      (No response.)

24                      THE COURT:  Glemmitha Petace?

25                      (No response.)
```

1            THE COURT:  Johnnie Sullivan?

2            (No response.)

3            THE COURT:  Ronnie Waters?

4            (No response.)

5            THE COURT:  J. L. Harris?

6            (No response.)

7            THE COURT:  Dana Cook.

8            PROSPECTIVE JUROR:  I work with Dana

9    Cook occasionally.

10            THE COURT:  Okay.  Wait just a

11    minute.  Is it on a daily basis or --

12            PROSPECTIVE JUROR:  No.  She's on my

13    floor.  She is in my building.

14            MR. BAILEY:  Judge, Dana Cook is

15    Ms. Minnifield's daughter.  She's a juvenile.  I

16    don't think it's the same one.

17            THE COURT:  It's probably not the

18    same one.  Thank you.

19            PROSPECTIVE JUROR:  What about

20    Johnnie Sullivan?

21            THE COURT:  He has the restaurant --

22    he has restaurants.  Is that the same one?

23            MR. HARTLEY:  Yes, Judge.

24            THE COURT:  Okay.  And do you know

25    him?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Is it of a patron of the

3    restaurant or --

4          PROSPECTIVE JUROR:  Well, I've known

5    him pretty much all my life.

6          THE COURT:  Okay.  So you've just

7    known him through the years?  Do you visit in each

8    other's home?

9          PROSPECTIVE JUROR:  (Prospective

10   juror nods.)

11         THE COURT:  And he may be more of a

12   character witness.  I don't know for either side.

13   Will he be a fact witness as well?

14         MR. HARTLEY:  I think he

15   characterizes, Judge, mostly character.

16         THE COURT:  Well, let me just ask,

17   that you know him, would you give his testimony any

18   more weight than anyone else simply because you

19   know him?

20         PROSPECTIVE JUROR:  I don't think

21   so.

22         THE COURT:  So you could sit

23   impartially on this jury?

24         PROSPECTIVE JUROR:  Sure.

25         THE COURT:  Ed Excites.  I think

```
 1        he's also in the restaurant business and may be
 2        there at the RSA Plaza.  And you're nodding.  Do
 3        you know him also just --
 4                        PROSPECTIVE JUROR:  I know Ronnie
 5        Waters as well.
 6                        THE COURT:  And does he work there
 7        too?
 8                        PROSPECTIVE JUROR:  They're in the
 9        restaurant.
10                        THE COURT:  Do you know them simply
11        as a patron or do you visit in each other's home?
12                        PROSPECTIVE JUROR:  I have socially,
13        you know, been with them.  But it's no big
14        relationship.  I just know who they are.
15                        THE COURT:  Okay.  Would it just be
16        on occasion at somewhere there would be quite a
17        number of other people present?
18                        PROSPECTIVE JUROR:  Right.
19                        THE COURT:  And, again, their
20        testimony may be more in the nature rather than a
21        fact witness as to what they observed.  I don't
22        know, but more of a character witness.  Would that
23        be correct?
24                        MR. HARTLEY:  Judge, they may know
25        some facts depending on how far the case goes.
```

1      MR. BAILEY:  Mr. Waters would be the

2 only fact witness out of those that you called.

3      THE COURT:  Well, that you know

4 them, would that --

5      PROSPECTIVE JUROR:  I just know

6 who -- I've just been with them a couple of times.

7 It's not major relation.

8      THE COURT:  That would not have any

9 impact with you sitting on this jury?

10      PROSPECTIVE JUROR:  Not at all.

11      THE COURT:  Is this Gloria or Glen

12 Purdue?

13      THE DEFENDANT:  Gloris.

14      THE COURT:  Okay.

15      (No response.)

16      THE COURT:  Karen Carter Branch,

17 Kitty Carter, and Keisha Carter?

18      (No response.)

19      THE COURT:  Don Thomason, Thomas

20 Hicks, Joy Dennington, and Sherry Milton?

21      (No response.)

22      THE COURT:  Have I overlooked -- are

23 there any other potential witnesses?

24      MR. HARTLEY:  I don't think so,

25 Judge.

```
 1                    THE COURT:  Has anyone here heard
 2     anything whatsoever about the facts or
 3     circumstances surrounding the case?
 4                    (Juror stands.)
 5                    PROSPECTIVE JUROR:  And you
 6     mentioned that you knew him, and we'll talk with
 7     you briefly.
 8                    THE COURT:  Has anyone here or
 9     anyone in your immediate family -- I don't think,
10     though, that we have any police -- do we have any
11     police officers testifying?
12                    MR. BAILEY:  Yes, Your Honor.
13     There's a Cassandra Williams --
14                    THE COURT:  Okay.
15                    MR. BAILEY:  -- Detective Williams,
16     who is now with the Alabama State Troopers, and
17     J. L. Sisson, who is with the Montgomery Police
18     Department and Officer --
19                    THE COURT:  Okay.  Well, there are a
20     number.  I know you've already given -- told
21     information on your questionnaire about past
22     contact or employment with police or law
23     enforcement agencies.  There are going to be some
24     police officers testifying.  Would anyone here
25     automatically give a police officer or law
```

1    enforcement officer's testimony more weight than

2    you would any other witness simply because of the

3    position they hold?

4                    (No response.)

5                    THE COURT:  Does anyone here have

6    any interest whatsoever in the conviction or

7    acquittal of defendant or made any promises or

8    given any assurance that he or she will convict or

9    acquit?

10                   (No response.)

11                   THE COURT:  Does anyone here have a

12   fixed opinion as to the guilt or innocence of the

13   defendant which would bias your verdict?

14                   (No response.)

15                   THE COURT:  The next question, if

16   you had rather not answer in front of everyone, we

17   probably -- we'll probably need to talk to a couple

18   of you in private anyway -- but I do need to know

19   if anyone in your immediate family has been charged

20   with or a victim such as stalking.  And I would

21   include that to mean any type of domestic -- this

22   matter does -- in fact, I think the parties are

23   still married at this time.  But a domestics type

24   relation -- if you've ever been charged with or

25   convicted of any offense that would arise out of

1    that type situation or stalking or harassment?

2                    (Juror raises hand.)

3                    THE COURT:  And had you rather talk

4    to us in private?

5                    (Juror nods.)

6                    THE COURT:  I'll let anyone talk

7    with us in just a moment.  Just stay in here.

8         Mr. Bailey, do you have additional questions?

9                    MR. BAILEY:  Just a few, if I may,

10   Your Honor?

11        Of course, Your Honor has stated, I'm Daryl

12   Bailey, and I represent the State of Alabama in

13   this case.  I work for Ellen Brooks, who is the

14   district attorney for Montgomery County.  And I am

15   the deputy district attorney for Montgomery County.

16   As Judge Greenhaw has stated, this case is about

17   stalking.  And I just want to ask you a few

18   questions.  And if any of you don't feel

19   comfortable answering these questions amongst the

20   whole group, if you would, please just say after

21   you're dismissed, and we'll talk to you at that

22   time.  Is there anyone here in this group -- I'm

23   sorry, ma'am?

24                    (Juror raises hand.)

25                    PROSPECTIVE JUROR:  I'm sorry.  I

1    think I know him -- I think I know you.  Is your

2    wife Tracey Bailey?

3                  MR. BAILEY:  (Attorney nods.)

4                  PROSPECTIVE JUROR:  I know him -- I

5    know his wife.

6                  THE COURT:  You must not know him

7    too well.

8                  PROSPECTIVE JUROR:  I've seen you

9    once, but I work with your wife.  I don't know if

10   that's a problem or not.

11                 THE COURT:  Would that have any

12   impact with you sitting on this jury?

13                 PROSPECTIVE JUROR:  I don't think

14   so.

15                 THE COURT:  We would -- you don't

16   see him on a regular basis and you don't visit with

17   him?

18                 PROSPECTIVE JUROR:  No, ma'am.

19                 THE COURT:  Okay.

20                 MR. BAILEY:  Is there anyone here in

21   this group that would need to be one hundred

22   percent sure that the defendant committed the crime

23   of stalking in this case or in any case before you

24   would be willing to convict?

25                 THE COURT:  Let me say this.  If

```
1    any -- if you're selected for the jury, the Court
2    is going to charge you on reasonable doubt.  And I
3    think that's what Mr. Bailey is going to get into.
4    But there will be certain standards, and that will
5    be explained to you, the burden of proof.  Go
6    ahead.
7                MR. BAILEY:  Is there anyone that
8    would have to be convinced a hundred percent sure
9    that a defendant committed a crime before you would
10   convict?
11               (No response.)
12               MR. BAILEY:  Anybody?  And it's all
13   right if you feel that way.  Mr. Hartley and I just
14   need to know the answers.  Does everyone, then,
15   realize that the standard of proof in this criminal
16   case and every other criminal case that's ever been
17   tried in this country is beyond a reasonable doubt?
18   It's not beyond all doubt, but beyond a reasonable
19   doubt.  And the Judge, as she just stated, is going
20   to instruct you on that at the end of this case.
21       But in order for someone to be a hundred
22   percent sure that someone committed a crime, you
23   would have had to have been a witness of the crime
24   and, therefore, that would disqualify you as
25   serving as a juror.  Does everyone understand that?
```

1          (No response.)

2          MR. BAILEY:  Is there anyone in this

3    venire, this group, that has a problem of sitting

4    in judgment of another person, whether it be for

5    religious reasons or any other type reason?  Do you

6    have a problem judging another person on acts that

7    they may have committed?

8          (No response.)

9          MR. BAILEY:  I know some of you may

10   have mentioned that in your questionnaire.  Yes,

11   sir?

12         PROSPECTIVE JUROR:  I don't really

13   like to judge people myself, but it all depends on

14   the situation.

15         THE COURT:  Can you stand up?  She

16   has to take everything down -- and are you

17   Mrs. Manuel.

18         PROSPECTIVE JUROR:  I don't really

19   like to judge nobody, but it depends on the

20   situation.

21         THE COURT:  Well, let me ask this.

22   As a juror, if you're selected, you'll be sworn in

23   to do your duty.  Could you put aside briefly, for

24   these purposes, your personal opinions and be able

25   to sit on this jury?

1           PROSPECTIVE JUROR:  Yeah.

2           THE COURT:  Okay.  Go ahead.

3           MR. BAILEY:  Is there anyone else

4  that feels that way, feels that you would have a

5  problem of sitting in judgment of another person?

6  If you're selected as a juror, that's what you

7  would be asked to do.  Anyone else?

8           (No response.)

9           MR. BAILEY:  Do any of you have any

10  type of personal beliefs?  And, again, this can be

11  personal beliefs or religious beliefs, or any other

12  beliefs that would prevent you from finding the

13  defendant guilty in a criminal case if you were

14  convinced beyond a reasonable doubt.  Anybody have

15  any type of beliefs that would prevent you from

16  doing that?

17           (No response.)

18           MR. BAILEY:  Okay.  Is there anyone

19  here in this group that has negative feelings about

20  the Montgomery Police Department, got a speeding

21  ticket you didn't think you deserved or just don't

22  like police officers --

23           THE COURT:  Don't ask that or for

24  some other reason.

25           MR. BAILEY:  Is there anyone here

1    that has negative feelings about the Montgomery

2    Police Department or any other law enforcement

3    department for that matter?

4              (No response.)

5              MR. BAILEY:  No one has any negative

6    feelings about the police department?  Okay.

7         Anyone here that have any negative feelings --

8    and the reason I'm asking this -- I noticed a lot

9    of you put on your questionnaires that you were

10   victims of crimes.  Is there anyone that has any

11   negative feelings or negative dealings with the

12   district attorney's office, with Ellen Brooks or

13   any previous district attorney's office?

14              (No response.)

15              MR. BAILEY:  Do -- and I know that

16   quite of few of you are going to answer in the

17   affirmative to this question.  But do any of you

18   regularly watch court television or any other shows

19   which commonly depict court situations?  And that's

20   not only court TV, but Judge Judy and other things

21   of that nature.

22              (Jurors raise hands.)

23              MR. BAILEY:  Probably quite a few of

24   you watch that.  Those that have answered that you

25   do watch that, do you understand that the laws that

are depicted on those TV shows may not be the same
law as it is here in Alabama?  And some of those,
like in Law and Order and shows like that, may not
be the law anywhere.  Does everyone understand
that?

(Jurors nod.)

MR. BAILEY:  Judge, I believe that's
all the questions I have at this time.

THE COURT:  Mr. Hartley?

MR. HARTLEY:  Thank you, Judge.

I guess one of the most common criticisms of
lawyers is that they repeat things, and I'm fixing
to start off by repeating something that y'all
heard just a minute ago, but it won't take but one
question.  And when Judge Greenhaw was asking y'all
general questions, I want to reiterate that point
that she made at the very last about whether or not
anyone in this panel, you know, or someone you're
related to was a victim of possible stalking.  And
I want y'all to remember that.  It will be a matter
that can be brought up in a one-by-one basis after
we adjourn back to the jury assembly room.  But I
want y'all to think broadly about that because the
stalking area of law is one of those things that
kind of has some vague orders on it.  So if you

1  believe that even in the broadened sense that you

2  might have had some connection with an issue

3  involving stalking in your life, and it might be

4  relevant to this case, I sure would like to ask you

5  to stay and tell us about it so we can weigh it in

6  how it might affect you being a potential juror.  I

7  think y'all heard the Judge do it -- ask you the

8  question, and she did an excellent job, but she

9  made it sort of compound.  And I want to ask

10  anybody that may have had that type of thing in

11  their life to please stay with us and let us find

12  out about it.  That's the only thing I wanted to

13  repeat.  Thank you.

14           THE COURT:  Okay.  Let me see the

15  attorneys for just a minute.

16     I know, Mr. Ogwynn, we're going to need to

17  talk with you.  And, I think, Ms. Lee, you also

18  raised your hand.  And if anyone else is going to

19  need to stay in here, you can also.

20     Is there anyone y'all need to talk to?

21           MR. BAILEY:  Other than those you

22  have, no, ma'am.

23           THE COURT:  At this time, I'm going

24  to let all of you, except the two I called -- and

25  if there's anyone else that for some reason you

1    want to talk with us in private about a matter, if

2    you'll stay in here as well.

3        The rest of you, I'm going to let go.  It will

4    probably be about thirty minutes, and we'll try to

5    let you know who's going to be on this jury.  We'll

6    keep you posted.  You can go back to the jury

7    assembly room.

8                          (Out of the presence of the jury.)

9                          (In the presence of Mr. Edward

10                         Ogwynn.)

11                        THE COURT:  Mr. Ogwynn, you

12   indicated that Mr. Minnifield worked for your firm?

13                        PROSPECTIVE JUROR:  Uh-huh.

14                        THE COURT:  So do you know something

15   or have you heard something about the case or --

16                        PROSPECTIVE JUROR:  Uh-huh.

17                        THE COURT:  -- maybe the entire

18   situation?

19                        PROSPECTIVE JUROR:  I have.

20                        THE COURT:  And that may pose a

21   problem because you do have some -- whether it's

22   correct or incorrect -- some information about it,

23   and I'm sure it might have been discussed even at

24   the office at times?

25                        PROSPECTIVE JUROR:  It has.

```
 1                        THE COURT:  And I don't know that
 2   you would be able to serve on this jury.  Do you
 3   want --
 4                        MR. BAILEY:  We would make a motion
 5   to --
 6                        MR. HARTLEY:  Judge, I would like to
 7   ask him some questions before the Court rules on
 8   that motion.
 9       Mr. Ogwynn, would you be able to set aside
10   whatever you've heard and act as a fair and
11   impartial juror and decide the case only on what
12   was presented in the courtroom?  Would that be
13   possible for you to do that?
14                        PROSPECTIVE JUROR:  Well, I've known
15   John Minnifield for three years and, you know, I
16   think I could do that, but him being a friend of
17   mine, I'm not comfortable.
18                        MR. HARTLEY:  Okay.  So it's more
19   than you've just seen him.  You actually feel like
20   you have a relationship?
21                        PROSPECTIVE JUROR:  Well, he worked
22   for us for three years.
23                        MR. HARTLEY:  Judge, I --
24                        THE COURT:  And we understand it
25   would be a difficult.  And I'm going to go ahead
```

1    and excuse you.  If you would ask Mr. Merrill what

2    you need to do.

3                    PROSPECTIVE JUROR:  Okay.  Thank

4    you.

5                    (Mr. Edward Ogwynn excused.)

6                    (In the presence of Ms. Lee Peters.)

7                    THE COURT:  Okay.  Ms. Peters, what

8    did you need to bring to our attention?

9                    PROSPECTIVE JUROR:  I was stalked

10   one time, and I had to go to a lawyer to get it

11   stopped, but that's been a long time ago.

12                   THE COURT:  How long ago was it?

13                   PROSPECTIVE JUROR:  Say, eighteen

14   years.

15                   THE COURT:  Was it someone you knew

16   personally or --

17                   PROSPECTIVE JUROR:  My ex-husband.

18                   THE COURT:  Your ex-husband?

19                   PROSPECTIVE JUROR:  Uh-huh.

20                   THE COURT:  And did it go to court?

21                   PROSPECTIVE JUROR:  No.  We -- he

22   settled it -- my lawyer settled it.

23                   THE COURT:  So you never filed

24   charges against him?

25                   PROSPECTIVE JUROR:  No, huh-uh.  I

1    went and talked to my lawyer, and he said, Let me

2    talk to him and see if we can keep it out of court.

3    It had been going on for three or four or five

4    years, I reckon.  Everywhere I go, he would follow

5    me and make a scene.  And I get home, and he would

6    be sitting on the doorsteps making a scene.  You

7    know, just harassment --

8                    THE COURT:  You know, that

9    evidentially occurred over a number of years.  Can

10   you put that out of your mind and give the

11   defendant here just as fair a trial as you would

12   the State?

13                    PROSPECTIVE JUROR:  Yeah, because

14   there are two sides.

15                    MR. HARTLEY:  May I ask?

16                    THE COURT:  Do you have any

17   questions?

18                    MR. BAILEY:  I don't have any

19   questions.

20                    MR. HARTLEY:  Let me ask, suppose

21   the evidence in this case after a lot of evidence

22   came down to a very, very close call on the issue

23   of his guilt or innocence on the issue of stalking.

24   Do you think that your experience might make you

25   prone to possibly lean more toward the side of the

1    State or the victim because you, yourself, were a

2    victim?

3                    PROSPECTIVE JUROR:  No.

4                    MR. HARTLEY:  Are you absolutely

5    certain?

6                    PROSPECTIVE JUROR:  Uh-huh.

7                    MR. HARTLEY:  Okay.

8                    PROSPECTIVE JUROR:  I mean, either

9    you do or you don't.  Right is right and wrong is

10   wrong.  If it's right, I'm for it.  If it's wrong,

11   then I'm against it.

12                   MR. HARTLEY:  Yes, ma'am.  But would

13   your experiences possibly make you lean --

14                   PROSPECTIVE JUROR:  No.

15                   MR. HARTLEY:  -- because you were

16   the victim yourself of stalking as you believe it

17   to be?

18                   PROSPECTIVE JUROR:  No.  It's like a

19   bad dream.  With time you push it out of your mind.

20                   THE COURT:  But it wouldn't have any

21   impact --

22                   PROSPECTIVE JUROR:  No, ma'am.

23                   MR. HARTLEY:  And also, your

24   association with Ms. Brooks' aunt would not have

25   any effect --

1    PROSPECTIVE JUROR:  I don't even

2    know her or her daddy or mother.  I know who they

3    are.

4    MR. HARTLEY:  Yes, ma'am.

5    PROSPECTIVE JUROR:  And that's all.

6    THE COURT:  Thank you for letting us

7    know.  If you'll go back to the jury assembly room.

8    (Out of the presence of Ms. Peters.)

9    MR. HARTLEY:  Judge, just for the

10   record, I would like to object on that last case

11   because of what she said and the fact --

12   THE COURT:  Well, I'm going to take

13   that up --

14   (In the presence of Ms. Dorothy

15   Lee.)

16   THE COURT:  Ms. Lee, you raised your

17   hand and indicated you needed to bring something to

18   our attention, and we needed to know.

19   PROSPECTIVE JUROR:  Okay.  When you

20   asked about stalking, I've had a sister in that

21   case.

22   THE COURT:  And when did that occur?

23   PROSPECTIVE JUROR:  That has

24   occurred recent within the last year.

25   THE COURT:  Does it involve someone

1    she knows or a stranger or --

2                        PROSPECTIVE JUROR:  Her husband.

3                        THE COURT:  Her husband?

4                        PROSPECTIVE JUROR:  (Prospective

5    juror nods.)

6                        THE COURT:  Are they still married?

7                        PROSPECTIVE JUROR:  No.  They're

8    divorced.

9                        THE COURT:  Has she -- has it gone

10   to court over any --

11                        PROSPECTIVE JUROR:  Yeah, they have

12   gone to court.

13                        THE COURT:  You said they were

14   divorced.  Was this something that was addressed in

15   the divorce matter or did she bring separate

16   charges?

17                        PROSPECTIVE JUROR:  Well, it was

18   separate charges because they was divorced when it

19   happened.

20                        THE COURT:  Okay.  Would that have

21   any impact on you sitting on this jury?  And I

22   really want to know can you give Mr. Minnifield a

23   fair trial with what has happened with your sister?

24                        PROSPECTIVE JUROR:  Yes, I can.

25                        THE COURT:  So you can put that out

```
 1        of your way and it wouldn't have any impact on this

 2        case?

 3                          PROSPECTIVE JUROR:  Yes.

 4                          THE COURT:  Mr. Bailey?

 5                          MR. BAILEY:  No questions.

 6                          MR. HARTLEY:  I would just like to

 7        ask you, suppose after hearing all the testimony,

 8        it seemed to be a very, very close call on

 9        Mr. Minnifield as to being guilty or not guilty.

10        Do you think that your experience that you went

11        through -- that was actually your sister's

12        experience -- could have any possible bearing on

13        you maybe being more likely to find him guilty than

14        not guilty?

15                          MR. HARTLEY:  No.

16                          MR. HARTLEY:  And you're absolutely

17        certain on that?

18                          PROSPECTIVE JUROR:  I'm certain.

19                          MR. HARTLEY:  Okay.

20                          THE COURT:  Thank you, ma'am.  You

21        can go back to the jury assembly room.

22                          (Out of the presence of Ms. Dorothy

23                          Lee.)

24                          THE COURT:  For the record, I struck

25        Mr. Ogwynn.  Did you have any motions about the
```

```
1    other two jurors?
2                      THE LAW CLERK:  Judge, we have one
3    more.
4                      THE COURT:  Oh, we do?  Okay.
5                      MR. HARTLEY:  Yeah, I was going to
6    move to exclude Ms. Lee Peters.
7                      (In the presence of Ms. Catherine
8                      Ortega.)
9                      THE COURT:  And you're Ms. Ortega?
10                     PROSPECTIVE JUROR:  Uh-huh.
11                     THE COURT:  What did you need to
12   bring to our attention?
13                     PROSPECTIVE JUROR:  I have two
14   boyfriends in the past that wouldn't let go, so I
15   didn't -- I don't think it would make me impartial,
16   but --
17                     THE COURT:  Well, did you file any
18   charges against either one of them?
19                     PROSPECTIVE JUROR:  No.
20                     THE COURT:  How long ago was that?
21                     PROSPECTIVE JUROR:  1992.
22                     THE COURT:  You said both --
23                     PROSPECTIVE JUROR:  One was in '92
24   and one was in '86.
25                     THE COURT:  So it's been some time
```

1    ago?

2                    PROSPECTIVE JUROR:  Yeah, some time.

3                    THE COURT:  And you didn't bring any

4    type charges?

5                    PROSPECTIVE JUROR:  No.

6                    THE COURT:  Whatever occurred to

7    you, could you put that aside and --

8                    PROSPECTIVE JUROR:  Yeah.  I don't

9    think it would make me impartial, but I just --

10                    THE COURT:  Okay.  In other words,

11    are you telling the Court you can give

12    Mr. Minnifield just a fair trial as you can the

13    State?

14                    PROSPECTIVE JUROR:  Uh-huh.

15                    THE COURT:  Mr. Bailey?

16                    MR. BAILEY:  No questions.

17                    MR. HARTLEY:  I would like to ask

18    the same question and I usually phrase it like

19    this.  Suppose the evidence came down very close,

20    the evidence almost equal on both sides as to

21    whether he was guilty or not.  Could your

22    experience possibly make you lean toward the

23    State's side because you, yourself, have an

24    experience similar to what the State would have

25    had?

1                PROSPECTIVE JUROR:  I don't think

2  so.

3                  MR. HARTLEY:  You say you don't

4  think so.  What if you got in there and it did have

5  an effect?  We've got to know before you go to the

6  jury room.

7                  PROSPECTIVE JUROR:  I think I could

8  be fair.

9                  MR. HARTLEY:  But if you say you

10  think you could, that means there's some

11  possibility that you might not be fair.

12                PROSPECTIVE JUROR:  No.  I would be

13  fair.

14                MR. HARTLEY:  You're absolutely

15  certain?

16                PROSPECTIVE JUROR:  Uh-huh.

17                MR. HARTLEY:  We want to be sure we

18  get the clearest answer we can, and I thank you.

19                THE COURT:  If you would go back to

20  the jury assembly room.

21                (Out of the presence of Ms. Ortega.)

22                THE COURT:  Okay.  Mr. Hartley, do

23  you have some motions?

24                MR. HARTLEY:  Judge, I would make a

25  motion to excuse for cause Juror No. 255, that

```
 1    lady, Ms. Catherine Ortega, and also Ms. Lee
 2    Peters, I believe, was the other one.  I think
 3    you've already ruled on that, though.
 4              THE COURT:  Well, they both said, as
 5    well as Ms. Lee, that whatever had happened to
 6    them -- or Ms. Lee, her sister, would have no
 7    impact, and that they could make a fair decision.
 8    And I'm not going -- don't think that's challenge
 9    for cause, and I'm going to deny your motion.
10         How many strikes?
11              THE CLERK:  We have an odd number.
12              THE COURT:  I'll -- this number from
13    the bottom.
14              THE CLERK:  Okay.
15              THE COURT:  No. 5.  It looks like
16    that's Donald Porter.
17              THE CLERK:  Okay.  It would be nine
18    strikes apiece.
19              THE COURT:  And I think we need an
20    alternate.
21              MR. BAILEY:  I would ask for one.
22              THE COURT:  How long is this case
23    going to take?  Y'all had all those witnesses.
24              MR. BAILEY:  I would anticipate
25    it -- I know taking today.
```

1          THE COURT:  Okay.  We'll just get

2     one alternate.  I think we'll be okay.  I'll give

3     y'all a moment.

4          MR. HARTLEY:  You said nine strikes

5     apiece?

6          THE CLERK:  Nine apiece.

7          (Brief recess.)

8          THE COURT:  I'll certainly let him

9     do that, but he needs to know he's got to follow

10    the same procedures and rules as everyone else.  Go

11    ahead.  Who is your first strike?

12         (Started striking jurors.)

13         THE COURT:  You know, he accepted

14    you as appointed counsel, and I don't -- if you

15    aren't going to participate in the trial, then I

16    need to know.

17         MR. HARTLEY:  Your Honor, I was

18    expecting -- I'm not trying to withdraw.  I just

19    think he has filed some handwritten motions asking

20    to be allowed to act as his own counsel, but not --

21         THE COURT:  Well, there's a

22    difference in acting as his own counsel and having

23    you still as his retained counsel.  You can't have

24    it both ways.  If he wants to represent himself,

25    then I need to treat that differently than if you

1    continue as appointed counsel.  Let's get through

2    with the striking, and then I'll address it.

3                    MR. HARTLEY:  Thank you, Judge.

4                    (Finish striking the jurors.)

5                    THE CLERK:  I'll read the remaining

6    numbers.  197, 200, 206, 207, 211, 215, 217, 221,

7    227, 233, 265, 267, and 268.

8                    MR. BAILEY:  Which one was the

9    alternate?

10                   THE CLERK:  217.

11                   MR. HARTLEY:  I thought 287 was the

12   alternate.

13                   THE COURT:  217.

14                   THE CLERK:  217 was the last struck.

15                   THE COURT:  I've looked through this

16   file, and I don't see him filing anything about

17   representing himself.

18                   THE DEFENDANT:  I filed it --

19                   THE COURT:  When did you file it?

20                   THE DEFENDANT:  It was back in June.

21                   THE COURT:  The only motion I see is

22   a writ of mandamus.  But it does not appear to ask

23   that you represent yourself in a trial and that you

24   want to waive your attorney.

25                   THE DEFENDANT:  Well, I had filed

```
 1        that in with the circuit clerk.

 2                    THE COURT:  Well, they don't have

 3        it, and they have everything in here that's been

 4        filed to date.

 5             Go ahead and get the jury, and then we'll take

 6        that up.

 7                         (In the presence of the jury.)

 8                    THE COURT:  If you'll go to one of

 9        the end of the rows and remain standing, she's

10        going to swear you in.

11                    THE CLERK:  Would you raise your

12        right hand, please?

13                         (Jurors sworn.)

14                    THE COURT:  Okay.  You can be

15        seated.  Before we start the trial, I'm going to

16        briefly explain to you the procedures and the

17        duties of the Court and the duties of the jury.

18        First of all, as trial judge, it's my duty to

19        instruct the orderly conduct of the trial, to rule

20        on questions of law as they may arise from time to

21        time, and at the end of the case, instruct you on

22        the law that applies.

23             Now, you, as the jury, you're the sole and

24        exclusive judges of the evidence.  It's your duty

25        to listen to the evidence and from it determine the
```

1    true facts, and then apply the law of the case as
2    given to you by the Court to the facts as you find
3    them to arrive at your verdict.
4        Now, the procedure that we'll be following is,
5    first of all, counsel for the State will make an
6    opening statement, and then defense will respond.
7    Each side, at this time, is confined to a statement
8    of what they expect the evidence to show.  Now,
9    these statements, they are not evidence.  They're
10   simply given to familiarize you with the case.
11       Following opening statements, then evidence
12   will be presented by witnesses and there may also
13   be some exhibits.  During the course of the trial,
14   there will be objections.  That's what the
15   attorneys or the parties are supposed to do.  And
16   it's up to the Court to rule on those objections.
17   But you should not concern yourself with any of the
18   reasons for my rulings, as they're controlled and
19   required by law.  You're also not to speculate as
20   to any possible answers to questions which are not
21   required to be answered.  In addition, the
22   overruling of any objection is not intended to
23   indicate the weight to be given such evidence.
24       Following the close of the evidence, then the
25   attorneys will address you again and make closing

1     arguments.  And at that time, they will discuss the

2     evidence that's been presented and all reasonable

3     inferences to help guide you to your verdict.

4          Now, we'll be taking breaks during the course

5     of the trial.  And it may depend on where we are

6     with a particular witness, but if you do need to

7     take a break, if you'll raise your hand, I'll try

8     to be watching and we can do so.

9          I think I've introduced you to everyone

10    involved in the trial except Meridith Newman, as

11    our court reporter.  She's taking everything down.

12    And you've already met Ms. Cook.  And we also have

13    Deputy Harris with us.

14         I want to caution you at this time not to

15    discuss the case with anyone.  That includes a

16    fellow juror.  In fact, you're not even to consider

17    the matter until you've heard all of the evidence.

18    You're also not to make any investigations on your

19    own, such as go to a scene or consult any legal

20    periodicals.

21         Finally, if the Court, parties, witnesses, the

22    attorneys, if we don't talk to you during the

23    course of the trial, don't think we're being

24    unfriendly.  But it would just be improper to have

25    any contact with you until this matter is

1    concluded.

2         And I apologize for my voice.  It sort of goes

3    and comes.  As I said, it's just this time of the

4    year.  We're going to take an early break today

5    because there are a number of things we need to

6    take up outside the presence of the jury.  And

7    hopefully, when you come back, we'll be able to

8    start promptly and go more quickly.  But I'm going

9    to give you a long break until one o'clock.  And at

10   that time, if you'll report to the jury assembly

11   room, we'll get you at one o'clock.  Thank you.

12                  (Out of the presence of the jury.)

13             THE COURT:  Now, Mr. Minnifield, I

14   need to know whether you're requesting at this time

15   to represent yourself or do you want your

16   court-appointed attorney?

17             THE DEFENDANT:  I would like to

18   represent myself.

19             THE COURT:  Mr. Minnifield, before I

20   let you do that, I need to ask you a number of

21   things.

22         And has he discussed this possibility with

23   you, Mr. Hartley?  I know you've been involved with

24   this case for some time.  And, for the record --

25   and I think you've been very instrumental and

1    helpful in looking at alternatives and over the

2    course of it, different ways of resolving this

3    matter, including this morning. But, evidently, he

4    has mentioned to you that he wanted to represent

5    himself?

6                     MR. HARTLEY: Yes, Your Honor. In

7    the course of my contact with Mr. Minnifield over a

8    long period of time, I do recollect that he

9    indicated that he wanted to do some parts of the

10    questioning of witnesses and to present --

11                     THE COURT: Well, he can't just do

12    some parts, you know. You can't pick and choose

13    which questions you're going to ask a witness.

14    Even if you have two attorneys, only one gets a

15    witness.

16                     MR. HARTLEY: Oh, I meant that,

17    Judge. He understood that he would have to carry

18    any particular witness all the way through, and

19    there would be no ability for us to swap back and

20    forth like that. I think that he wants to conduct

21    the examination possibly of the State's principal

22    witness, Ms. Vonciel Minnifield.

23                     THE COURT: Well, let me hear from

24    you, Mr. Minnifield. Do you want to represent

25    yourself in this case?

```
 1                    THE DEFENDANT:  I do prefer to
 2   represent myself entirely, and I'm qualified.
 3                    THE COURT:  Well, I'm going to ask
 4   you some questions.  And, first of all, do you
 5   understand that you're charged with stalking and
 6   what the elements of that offense are?
 7                    THE DEFENDANT:  Sure.
 8                    THE COURT:  Now, you have a right to
 9   represent yourself, but you also have a right to
10   have an attorney.  And I have previously appointed
11   Mr. Hartley, and he's been very involved in the
12   case and as an attorney.  And the Court has had the
13   opportunity to have Mr. Hartley in the court for a
14   number of years, and I know that he has skills and
15   experiences that you do not.  Why do you want to
16   represent yourself?
17                    PROSPECTIVE JUROR:  I want to
18   represent myself due to the fact that in the past,
19   there have been some dealing and understanding that
20   I didn't go along with between Mr. Hartley and the
21   State.
22                    THE COURT:  Give me an example.
23                    THE DEFENDANT:  For instance, like,
24   I got locked up November '98, and my bail was set
25   at hundred thousand dollars.  I go for a bail
```

1   hearing and Judge Bright set my bail -- reduced my

2   bail of forty thousand dollars.

3                   THE COURT:  Well, that was before

4   Judge Bright and would have been involved before

5   Mr. Hartley got in the case.  And I do --

6                   THE DEFENDANT:  That was right.

7                   THE COURT:  -- know that you made an

8   oral notice to reduce the bond.  And there does

9   seem to -- there has been one motion filed, but

10  that was in December by -- that's not in the file,

11  by Mr. Minnifield, and I'll look it over in just a

12  moment.

13                  THE DEFENDANT:  It was December '98

14  when the bail was reduced to forty thousand

15  dollars, but --

16                  THE COURT:  Mr. Minnifield, what

17  occurred before Judge Bright does not concern

18  Mr. Hartley or this Court.  Were you involved --

19                  MR. HARTLEY:  Yes.

20                  THE DEFENDANT:  Yes, he was.

21                  THE COURT:  You were?

22                  MR. HARTLEY:  Yes, Judge.  I don't

23  have a real complete recall, but I was involved

24  because -- I forget why we had to have Judge

25  Bright's involvement in it.  But it seemed to me

1    that she did agree to a reduction of forty

2    thousand. And there was some delay, Judge, in

3    getting, I think, it possibly recorded in the jail.

4    There may have been something, and I think

5    Mr. Minnifield was disturbed about that.

6                    THE COURT: Now, Mr. Minnifield,

7    what is your age?

8                    THE DEFENDANT: Sixty.

9                    THE COURT: And could you briefly

10   give -- set out your work experience?

11                   THE DEFENDANT: Yes. My work

12   experience was the last job I had was contractor,

13   construction, heavy equipment operator, and

14   etcetera.

15                   THE COURT: And what other types of

16   work have you done?

17                   PROSPECTIVE JUROR: I have been a

18   currier, and I've been chief maintenance man at

19   Wilson and Price. I've been a truck driver.

20                   THE COURT: Have you ever been

21   treated for any mental disease or mental health?

22                   THE DEFENDANT: No, I haven't. I

23   went and -- when --

24                   THE COURT: And the Court is aware

25   that I did -- when you were out on bond, the EVEN

1    program, but other than that?

2                    THE DEFENDANT:  I did go to mental

3    health just to see was I -- what everybody -- what

4    peoples think.

5                    THE COURT:  And when was that?

6                    THE DEFENDANT:  That was in

7    August -- September, I believe it was.

8                    THE COURT:  And that's while you

9    were out on bond?

10                    THE DEFENDANT:  That's while I was

11    out on bond.  And I voluntarily went there.

12                    THE COURT:  And did you undergo any

13    course of treatment?

14                    THE DEFENDANT:  I had one session

15    that they gave me a counselor.  Then they let me

16    seen a doctor, and I had a thirty-day waiting

17    period before I could go back.  But before I could

18    go back, I was locked up two days before I went

19    back.

20                    THE COURT:  Did they make any

21    diagnosis?

22                    THE DEFENDANT:  Well, they were

23    going to diagnosis and put me on medication when I

24    went back.

25                    THE COURT:  Do you know what type --

```
 1    did they discuss any -- are you on any medications
 2    now?
 3                  THE DEFENDANT:  No, I'm not.
 4                  THE COURT:  What about any prior
 5    felony convictions -- do you have any prior felony
 6    convictions?
 7                  THE DEFENDANT:  I have prior
 8    convictions goes back during the mid and late '70s.
 9                  THE COURT:  Well, you need to be
10    aware even if they're old cases that they may be
11    used for the purposes of the habitual offender act,
12    and if you are found guilty, there would be an
13    enhance penalty.  Therefore, the consequences of
14    conviction, if there is one here, is much greater
15    than as if this had been your first offense.
16                  THE DEFENDANT:  I understand.
17                  THE COURT:  And I think this is a
18    Class C felony, so if there have been -- how many
19    prior felony convictions?
20                  MR. BAILEY:  He has tons.
21                  THE COURT:  Well, let's just say if
22    you have three or more felony convictions, and if
23    you are found guilty, the minimum sentence is
24    fifteen years and it can go up to life or
25    ninety-nine.  Do you understand that?
```

1          THE DEFENDANT:  I understand that.

2          THE COURT:  Now, you understand that

3    you would be required to comply with all the rules

4    of procedure and rules of evidence?

5          THE DEFENDANT:  Right.

6          THE COURT:  And you do have a right

7    to cross-examine the State's witnesses.  But if you

8    cross-examine them, you cannot testify at that

9    time.

10         THE DEFENDANT:  Right.

11         THE COURT:  You have the right to

12   have witnesses also appear on your behalf.  Do you

13   understand that?

14         THE DEFENDANT:  Right.

15         THE COURT:  Now, you have the right

16   to testify, if you choose to.  But you also have

17   the right to remain silent; that is, not testify.

18   And that cannot be considered against you.  Do you

19   understand that?

20         THE DEFENDANT:  I understand.

21         THE COURT:  But if you do choose to

22   testify, then the State has a right to

23   cross-examine you and may also ask you about prior

24   convictions.

25         THE DEFENDANT:  Right.

1    THE COURT:  And do you still want to

2    represent yourself?

3    THE DEFENDANT:  Sure.

4    THE COURT:  Mr. Hartley, I'm going

5    to still have you available during the trial, and

6    you can sit there at counsel table.

7    Mr. Hartley may offer suggestions during the

8    course of the trial.

9    And, Mr. Hartley, you might -- at the

10   appropriate time, if you make any suggestions and

11   Mr. Minnifield does not take your advice, at some

12   point you may want to put that on the record.

13   So I'm going to ask you again.  Do you still

14   want to represent yourself?

15   THE DEFENDANT:  Sure.

16   MR. HARTLEY:  Your Honor, may I put

17   this on the record?

18   THE COURT:  Yes.

19   MR. HARTLEY:  I certainly want to be

20   as much of assistance as I can.  I'm not in the

21   business of abandoning my clients.  I sure like to

22   be right here and help him as much as I can

23   throughout the trial and throughout breaks.  I have

24   had access to the file, and he's had access to the

25   file also for considerable periods of time.  To

1    help him with documents, I want to be as much

2    assistance as I can possibly be.

3                    THE COURT:  Well, at this time, I'm

4    going to find Mr. Minnifield -- let me say one

5    other thing, Mr. Minnifield.  I am aware that some

6    time ago you had a city appeal where you

7    represented yourself; is that correct?

8                    THE DEFENDANT:  Sure.

9                    THE COURT:  And I do recall that it

10   was a verdict in your favor.  But this is a much

11   more serious matter, and I'm not sure that the City

12   attorney was as prepared as Mr. Bailey would be and

13   certainly nothing came up about any prior

14   convictions during the course of that.  And I think

15   some of the witnesses that might have wanted to be

16   called by the City, your family, did not want to

17   testify.  You have a different situation here, so

18   don't think just because you did it once, you

19   understand that it may not be the same result?

20                   THE DEFENDANT:  I understand.

21                   THE COURT:  Well, I'm going to

22   explain to the jury that you're representing

23   yourself and that you do have the right to do so,

24   and that Mr. Hartley will be sitting at counsel

25   table and be available for any advice or

1    suggestions you may want to ask.

2        And, as you know, it's the Court's duty to

3    ensure the orderly conduct of the trial.  And I

4    don't expect any problem, but if something does

5    develop, I will certainly have to take that up at

6    the appropriate time.  So I guess we'll recess

7    unless there's anything else anyone wants to say?

8        If we could have him back here by a quarter

9    till one.  Do we need to call the jail?  In case

10   there's anything else we need to put on the record?

11               THE BAILIFF:  I'll just tell them to

12   keep him on the first floor.

13               THE COURT:  And if there's anything

14   else we need to bring up, we can.

15       Mr. Bailey, is there anything you want to put

16   on the record?

17               MR. BAILEY:  I don't believe so,

18   Your Honor.

19                    (Out of the presence of the

20                    defendant.)

21                    (Witnesses line up in front of the

22                    Judge.)

23               THE COURT:  I know that all of you

24   had rather be somewhere other than here, but you're

25   required to be here.  You've been subpoenaed.  And

1    we're slower getting started than we normally are.

2    And you are under subpoena, and everyone needs to

3    be back here at one o'clock.  Do you understand

4    that?

5                    THE WITNESS:  I've got a question.

6    I've got -- my husband is -- I'm here by myself.

7    I've got three kids.

8                    THE COURT:  Wait just a minute.

9    What's your name?

10                   THE WITNESS:  I'm Clemmitha.  I'm a

11   witness.  And my child -- I've got a child in

12   school.  My sister has to be at work, and I have

13   nobody else to babysit.

14                   THE COURT:  Well, maybe you could

15   take her first.

16                   MR. BAILEY:  Okay.  Clemmitha.

17                   MR. HARTLEY:  Who were you?

18                   THE WITNESS:  Clemmitha,

19   C-l-e-m-m-i-t-h-a.

20                   MR. HARTLEY:  Can the other

21   witnesses just identify themselves just so I'll

22   know who they are?

23                   THE WITNESS:  I'm Rosebud Brown.

24                   THE WITNESS:  Pete Rose.  Also, I'm

25   a store manager.  I have to get to my store, if I

1    could go second or something?

2              THE COURT:  You've got an hour and a

3    half, and we'll try to accommodate everyone.

4              THE WITNESS:  Lawanda Benson.

5              (Witnesses excused.)

6              (In the presence of the jury.)

7              THE COURT:  In just a moment, you'll

8    hear opening statements.  After the break this

9    morning, Mr. Minnifield advised the Court that he

10   wanted to represent himself.  I appointed

11   Mr. Hartley to represent him, but Mr. Minnifield

12   has the right to represent himself and waive an

13   attorney, and he has done so.  So he will be

14   representing himself.  But I have asked Mr. Hartley

15   to remain in in the event Mr. Minnifield needs to

16   consult with him or that Mr. Hartley may have some

17   suggestions.

18        Mr. Bailey, are you ready at this time?

19              MR. BAILEY:  Yes, Your Honor.  May

20   it please the Court, counsel?

21        Control.  Ladies and gentlemen, that's why

22   we're here today.  That's why you're sitting here

23   today is because of control, because of a man's

24   desire to get control and undue desire to get

25   control.  And what happened when he failed to do

1    so?  That's what this case is all about.  That's

2    what generally stalking is all about.  And I expect

3    that during the course of this trial, you're going

4    to hear about the control that this man perpetrated

5    on this woman.

6         Vonciel Minnifield is here today, and she's

7    going to tell you about the events that happened

8    over a pretty long course of time, which makes up

9    the elements of the stalking case that's brought to

10   you today.  She's going to tell you that her and

11   Mr. Minnifield were married about approximately

12   October of 1994, and they stayed married, and are

13   still currently married.  She's filed for a

14   divorce -- but they stayed together for

15   approximately a little over three years, almost

16   four years.  And she's going to tell you about that

17   when they first met, everything was lovely, as it

18   is in most normal relationships.  She had no idea

19   that the man that she was about to marry, would

20   marry, was going to turn out the way he did.  No

21   clue.

22        She'll tell you that everything rocked along

23   pretty good in their marriage, and then little by

24   little, they started having problems.  She started

25   noticing his want to control her, to know where she

1   was at all times.  She'll tell you that he began to

2   become verbally abusive to her, to intimidate her.

3   She'll tell you what happened one day when her and

4   her kids had gone somewhere.  It was a stormy

5   day -- stormy night --

6               THE COURT:  Mr. Bailey, wait just a

7   minute.  Are you a witness in this matter?

8               MR. BAILEY:  She's with our office,

9   Judge.

10               THE COURT:  Okay.

11               MR. BAILEY:  -- stormy night, and

12   she and the kids came home to their marital home

13   and found that all the doors in the house, the

14   locks had been changed.  They had nowhere to go.

15   They couldn't get him to let them in, so her and

16   the kids decided to go find another place to live.

17       And it was at that time that Vonciel decided

18   that their marriage couldn't be saved, that she

19   wasn't going to stay in the marriage that she was

20   in.  And she decided finally to do something about

21   it, Vonciel thinking that finally maybe this is the

22   break that she needed to get her life back on

23   track, to get away from all this control and all

24   this intimidation and all this harassment.  But

25   little did she know that was only the beginning,

1    only the beginning of her nightmare.

2        Now, during the course of my career of

3    prosecutor, I don't find very much the victims are

4    ever really happy to come into court, really feel

5    good about coming into court.  But I know I can say

6    this about Vonciel -- and I'm not saying that she

7    enjoys this process -- but for the Grace of God,

8    ladies and gentlemen, I would be standing up before

9    you right now, and this table would be empty and I

10   would be telling you about murder in the first

11   degree, but for the Grace of God.

12       Ladies and gentlemen, what happened after

13   Vonciel and her children left the marital home?

14   The defendant began to call her on the telephone.

15                THE DEFENDANT:  Object.

16                THE COURT:  I'm going to overrule

17   your objection if this is what --

18                MR. BAILEY:  The evidence will

19   show --

20                THE COURT:  -- you expect the

21   evidence to show.

22                MR. BAILEY:  The evidence will show

23   in this case that the defendant began to call her

24   on the telephone, harassing, threatening her life.

25   The defendant would show up her at workplace --

```
 1                    THE DEFENDANT:  I'm objecting on

 2     that.

 3                    THE COURT:  I'm overruling.  He has

 4     a right to tell the jury what he expects the

 5     evidence to show.  And you will be able to tell the

 6     jury what you expect the evidence to show.

 7          Go ahead.

 8                    MR. BAILEY:  The defendant would

 9     show up at her workplace telling her co-workers

10     quite frankly that she better watch out, that he

11     was going to get her.

12          He would show up at her babysitter's house.

13     He even showed up at one of her babysitter's house

14     with a gun.  We expect Lawanda Benson to come in --

15                    THE DEFENDANT:  Object.

16                    MR. BAILEY:  -- and testify --

17                    THE DEFENDANT:  Object.

18                    THE COURT:  Mr. Minnifield, he has a

19     right to tell the jury what he expects the evidence

20     to show.

21          Go ahead.

22                    MR. BAILEY:  I expect Lawanda Benson

23     to come in and tell you what happened one night.

24     Mr. Minnifield showed up wanting to know where

25     Vonciel was.  He told Lawanda Benson what he was
```

going to do to Vonciel, and you can hear that for
yourself when she testifies.  He showed her a gun.
He's come to her church on multiple times harassing
her, trying to find her, threatening her.  He's
contacted her friends and her family on numerous
occasions.

We also expect the evidence to show that
during the course of these events that were being
perpetrated upon Vonciel, she filed several charges
against Mr. Minnifield down at the municipal
court -- charges such as harassment, reckless
endangerment for running her off the road at one
time.

And we expect the evidence to show, and
Ms. Minnifield will tell you, that the defendant
was found guilty down at the city court on those
charges.  The stalking case that's brought to you
today is done through a course of conduct.

Stalking is a law which encompasses a course
of conduct.  It's not just one incident as you
would have in any other case, such as a robbery, or
shoplifting, or a murder.  Stalking consists of a
whole course of conduct.  And that's what you're
going to hear today.  You're going to hear a whole
course of conduct that was perpetrated upon Mrs.

1    Minnifield.

2         Some of this conduct, the defendant has been

3    charged with.  Some of it was uncharged.

4    Mrs. Minnifield will tell you at the beginning that

5    she was scared to file charges on him and didn't on

6    most of the things that he had done, but then it

7    got to the point where she had to do something.

8         So some of the events that you will hear of,

9    he's been charged with and some of the events he's

10   been uncharged with.  But they all go together into

11   the course of conduct that you will see.

12        This case today is brought to us by the course

13   of an indictment -- by the way of an indictment.

14   The Judge will tell you at the end of the case that

15   the indictment is not to be considered by you as

16   evidence in this case when weighing the defendant's

17   guilt or innocence.  It's simply a vehicle by which

18   the case is brought to you today, to let you know,

19   let the defendant know, what he is charged with.

20        At this time, I want to read the indictment

21   that was brought forward by the Montgomery County

22   grand jury in this case.  It reads, "The State of

23   Alabama, Montgomery County, Circuit Court of

24   Montgomery County, February term A.D., 1999.  The

25   grand jury of said county charged that before the

1    finding of this indictment, John Willie Minnifield,

2    alias, John Willie Minnifailed; alias, Willie

3    Minnifield; alias, John W. Minnifailed; alias, John

4    W. Minnifelt; alias, J. W. Minnifailed; alias, John

5    Minnifield; alias, John Willie Minnifiled; alias

6    Willie John Minnifelt, whose name is otherwise

7    unknown to the grand jury, John Willie Minnifield,

8    alias did intentionally and repeatedly follow or

9    harass Vonciel Minnifield and made a credible

10   threat, either expressed or implied, with the

11   intent to place that person in reasonable fear of

12   death or serious bodily harm in violation of

13   Section 13A, 690 of the Code of Alabama against the

14   peace and the dignity of the State of Alabama.  And

15   that is signed by Eleanor I. Brooks, District

16   Attorney, for the 15th Judicial Circuit of

17   Alabama."

18        Ladies and gentlemen, I expect that the State

19   will prove to you exactly what is contained within

20   this indictment through the testimony, through

21   exhibits, during the course of this trial.

22   Something that I did read in the indictment that I

23   want you to consider throughout the course of this

24   trial -- and those were some of the last words that

25   I read -- against the peace and the dignity of the

1    State of Alabama.  Keep that in your mind, and I

2    will address that at a later time.

3         But ladies and gentlemen, the evidence in this

4    case is going to show that Mr. Minnifield

5    perpetrated a course of conduct which the State of

6    Alabama has labeled stalking on Mrs. Minnifield.

7    And once you have been able to hear all the

8    evidence, see all the evidence that's introduced,

9    based on the evidence, I feel that you will find

10   the defendant, Mr. Minnifield, guilty of the crime

11   stalking.  Thank you.

12             THE COURT:  Mr. Minnifield, if you

13   want to, at this time, you can tell the jury what

14   you expect the evidence to show.

15             THE DEFENDANT:  Thank you.

16        My name is John Minnifield.  I wish to explain

17   to you all -- and I'm going to show you the

18   evidence -- that this is not a stalking charge.  My

19   wife and I, we did have some disagreement.  And

20   that disagreement, I'm going to bring up to show

21   you why this occurred.  I'm going to show you my

22   wife was cheating.  I'm going to show you that my

23   wife was on drugs, and she's still on drugs.  I've

24   got in evidence, I'm going to show you several men

25   that she gave diseases to --

```
 1                    MR. BAILEY:  Judge, I object.

 2                    THE DEFENDANT:  -- including me.

 3                    THE COURT:  Wait just a moment,

 4     Mr. Minnifield.  I'm sustaining the objection and

 5     disregard the comment about other men.  That is not

 6     admissible evidence.  Go ahead.

 7                    THE DEFENDANT:  The witnesses -- the

 8     witnesses that I have here today will tell you that

 9     John Minnifield was a loving husband who worked

10     four and five jobs to satisfy his family, that at

11     no time John Minnifield ever put his hand on

12     Vonciel Minnifield.  He have never.  And any kind

13     of threat, nothing but a loving way.  I will pass

14     on down to you, I came from a violent family.  I've

15     seen abusive.  This was never to happen to me and

16     my family.

17         I never locked her out of the house.  I'm

18     going to show you that Vonciel, every day, she was

19     just running, running, running.  Come in at twelve

20     and one o'clock at night.  I worked too hard.  I

21     couldn't stand it.  My wife left me.  I went and

22     searched for her to bring her back.  She did come

23     back, but she couldn't keep -- let the street go.

24     She was constant running out there just every

25     night.  There was a 13-year-old and a 14-year-old
```

1    girl in school. And that, I implied, that they get

2    an education. They cannot get an education staying

3    out twelve and one o'clock at night and coming in

4    with her. I get up in the morning. I go to work

5    four and five o'clock in the morning. She's late

6    for work every day, if she go to work. I want you

7    all to see this pattern. All this evidence is

8    going to unfold here.

9        As far as a weapon concern, John Minnifield

10   has had his hand on a gun in thirty years or

11   better. I have no violent past, and I'm not about

12   to start now. I'm sixty years of age. I loved my

13   family, and I felt though this was the last of the

14   row, but I could not stand drugs and what she was

15   doing no more than she could stand the alcohol that

16   I drank. But she drank. But it's not all right

17   for me to drank. But I didn't have a habit of -- a

18   drug habit, a lying habit. I didn't come in lying

19   to my family. I didn't cheat on my family, and I

20   didn't abuse my family.

21       I'm going to show you all of that as the

22   witness come through here. And if you all find

23   John Minnifield guilty, I want you to look at your

24   spouses when you go home --

25                MR. BAILEY:  Judge, I object to

1    that.

2                    THE COURT:  I'm sustaining the

3    objection.  Mr. Minnifield, just what you expect

4    the evidence to show.  Anything else?

5                    THE DEFENDANT:  I'm going to show

6    you this.  I just want y'all to sit back and listen

7    to the evidence as it unfolds.  And there's no way

8    you could find John Minnifield guilty of stalking.

9    Thank you.

10                   THE COURT:  Okay.  Your first

11   witness?

12                   MR. BAILEY:  Your Honor, the State

13   would call Clemmitha Petace.

14                   CLEMMITHA PETACE

15      The witness, having first been duly sworn or

16   affirmed to speak the truth, the whole truth, and

17   nothing but the truth, testified as follows:

18                   DIRECT EXAMINATION

19   BY MR. BAILEY:

20      Q.   Good afternoon, ma'am.  Could you please

21   tell the ladies and gentlemen of the jury your

22   name?

23      A.   Clemmitha Petace, C-l-e-m-m-i-t-h-a,

24   P-e-t-a-c-e.

25      Q.   And, Ms. Petace, do you know Vonciel

```
1    Minnifield and John Minnifield?

2         A.    Yes, I do.

3         Q.    Okay.  And how do you know them?

4         A.    Vonciel is my sister, and John is her

5    husband.

6         Q.    Now, Ms. Petace, I want to get right to

7    the point and direct your attention to the case at

8    hand -- actually, I want to back up for just a

9    second and direct your attention back to October of

10   1998.  During that time frame, did you witness

11   anything that occurred with Mr. Minnifield that you

12   would find unusual?

13        A.    Yes.  I had -- he had -- at the time --

14   after the incident where I had to bring -- you

15   know, lead y'all into what had happened --

16        Q.    Well, just tell me what you know and what

17   you observed and what you heard and saw.

18        A.    Okay.  What I heard and saw.  Okay.

19              THE COURT:  Now --

20        Q.    From the defendant.  I'm sorry.

21        A.    After the incident that happened when he

22   came to her house with an ax and knocked down the

23   door.  He had come to my house --

24              THE DEFENDANT:  Object.

25        Q.    Did you have --
```

1          THE DEFENDANT:  Object.

2          THE COURT:  Overruled.

3      Q.    Did you have an opportunity to see the

4  defendant?

5      A.    Yes, I did.

6      Q.    Okay.  Tell us what happened when --

7      A.    Well, I was leaving out that morning, and

8  I got in my car.  I was headed to Superlube to get

9  my oil change.  And he was coming in and I was

10 going out.  I stay in an apartment complex.  And he

11 was waving me down.  I told him I had to hurry up

12 and get an oil change.  So he followed me to

13 Superlube, and he told -- basically told me that he

14 did -- just got out of jail.  And he told me, I

15 just went to your sister's house last night, and I

16 had knocked the door.  And I chased her around the

17 house with an ax.  And he said, I hit your niece,

18 and I'm sorry about that.  I didn't mean to do

19 that, but -- and then he's like, well -- he got a

20 little beep on his pager --

21         THE COURT:  Let's get a little more

22 question and answer.

23     Q.    Okay.  Is that all that he told you?

24     A.    No.  He was -- I couldn't really

25 understand him because he was drunk at the time.

1    He was intoxicated.  You could smell the alcohol on

2    his breath, and so I really couldn't understand

3    everything he was saying.  But he did -- you know,

4    I did understand about the ax, and he said he did

5    have it in the trunk of his car right now.  And he

6    had got a pager -- a page, and he had went to use

7    the phone.  And I was still at Superlube.  By the

8    time he made it back, I had already left.

9         Q.   Okay.  Now, let me back up because I'm

10    not sure -- if you would, slow down so everybody

11    can understand you.  You said, I believe, he had

12    something in his trunk?  He told you that?

13         A.   He had an ax in his trunk.

14         Q.   Ax?

15         A.   He said, I have it right now.  He

16    basically told me what happened.  And I couldn't --

17    he did tell me more, but I couldn't really

18    understand, so I can't question on that.  But he

19    did say that he had, and he did broke in her house

20    and chase and strike one of her daughters in the

21    face, so I can testify --

22         Q.   And that was in October of '98?

23         A.   '98.

24              MR. BAILEY:  Thank you.  No further

25    questions from this witness.

1      THE COURT:  Do you want to ask her

2    anything?

3                THE DEFENDANT:  Yes.

4                CROSS-EXAMINATION

5    BY THE DEFENDANT:

6      Q.   Clemmitha, I did come to your house and

7    talk to you.  I never told --

8                MR. BAILEY:  Judge, I'm going to

9    object to him testifying.

10               THE COURT:  You can ask her

11   questions.  You cannot testify.  Just ask her

12   questions.

13               THE DEFENDANT:  Okay.

14     Q.   I did come to your house, and I did ask

15   you question, had you seen my wife.  I didn't go --

16               THE COURT:  Wait just a moment.

17   What is your question?  Did she -- he asked you if

18   you had seen his wife?

19               THE DEFENDANT:  My wife, right.

20     Q.   I only asked her -- did I ask you not,

21   did you see my wife?  Have you seen my family?

22     A.   I don't remember that.  You had asked

23   me -- you had said a lot.  Like I said, I couldn't

24   really understand what you were saying because you

25   were intoxicated at the time, so I really can't

1    speak on that.  But I know you did follow me to

2    Superlube.

3         Q.   And did I follow you to Superlube?

4         A.   Yeah.  I know you remember that.  You did

5    follow me to Superlube, and you sat down beside me.

6    And you was carrying on about how you were sorry,

7    but you did strike one of her daughters in the face

8    and you did break in her house that night, and you

9    had just got out of jail.  You did tell me that, so

10   I can speak on that.

11                   THE COURT:  Okay.  You've answered

12   it.  Do you have another question?

13                   THE DEFENDANT:  No.

14                   THE COURT:  Do you have anything

15   else for her?

16                   MR. BAILEY:  That's all I have for

17   her.

18                   THE COURT:  You can step down, and

19   you are excused.

20                   (Witness excused.)

21                   THE COURT:  Your next witness?

22                   MR. BAILEY:  Your Honor, this is

23   Pete Rose.

24                        PETE ROSE

25      The witness, having first been duly sworn or

1   affirmed to speak the truth, the whole truth, and

2   nothing but the truth, testified as follows:

3                        DIRECT EXAMINATION

4   BY MR. BAILEY:

5        Q.   Would you please tell the ladies and

6   gentlemen of the jury your name?

7        A.   Pete Rose.

8        Q.   If you could --

9             MR. BAILEY:   If I may approach to

10  adjust his microphone for him?

11       Q.   If you could, speak into that so

12  everybody can hear you.   It's kind of hard to hear

13  sometimes.   What was your name again, sir?

14       A.   Pete Rose.

15       Q.   And how are you employed, sir?

16       A.   I'm a store manager at Autozone.

17       Q.   Okay.   And that's here in Montgomery?

18       A.   Yes, sir.

19       Q.   Get right to the point.   Do you know a

20  person by the name of Vonciel Minnifield?

21       A.   Yes, sir.

22       Q.   How do you know her?

23       A.   I came in contact with Mrs. Minnifield.

24  She came in the store and inquired on a part one

25  afternoon.   I just remember the whole thing, but we

1    talked and talked and talked and we finally became

2    friends, and it was just a friendship that we had.

3        Q.    Okay.

4        A.    Basically, that's how we met.  She came

5    in and inquired on a part.

6        Q.    Okay.  I'm sorry.  I'm not understanding

7    what you're saying.  She came in to do what?

8        A.    Inquire on a part.

9        Q.    Okay.  Inquiring on a part.  Now, did --

10   during the course of the time that you knew

11   Mrs. Minnifield, did you have an opportunity to

12   know a person by the name of John Minnifield?

13       A.    Yes, sir.

14       Q.    Okay.  And can you tell us any dealings

15   that you have had with him, any incidents where you

16   had come into contact with him -- let me ask you

17   this.  How many times did you come in contact with

18   him?

19       A.    Once.

20       Q.    Can you tell the ladies and gentlemen of

21   the jury about that one time that you did come into

22   contact with him?

23       A.    Well, Mr. Minnifield entered the store,

24   and I didn't exactly know who he was.  He came in

25   and asked me who I was, and I told him who I was,

```
 1      and he explained to me that I knew him.  I asked
 2      him -- we walked back in the back, and he explained
 3      to me that he was Mrs. Minnifield's husband.  And
 4      in so many other ways he told me to leave her
 5      alone.  They were going through some problems, and
 6      he told me to leave her alone.  I just told him we
 7      didn't have any -- there wasn't any dealings with
 8      me and her.  She came in and asked for a part, and
 9      that was it.  And he just told me to leave her
10      alone.  Don't fool with her.  Just leave her alone.
11      And he said some more things that I don't think I
12      should say in court.
13          Q.   Now, if you don't mind.  I understand --
14      the jury understands --
15                   THE COURT:  Can you set a time
16      frame?
17          Q.   Yeah.  What time frame is this we're
18      talking about approximately?  I don't mean the
19      exact date, but can you tell us approximately --
20          A.   Within weeks.
21          Q.   Okay.  But I'm talking about time frame.
22      What year?
23          A.   Couple years ago -- a year ago, something
24      like this.
25          Q.   Would this be '98?
```

```
1          A.    Yes.

2          Q.    Okay.  Time frame when in 1998?

3          A.    That's going to be hard.

4          Q.    Spring, summer, winter?

5          A.    Spring, because it was hot.

6          Q.    Now, I was going to ask you about some

7     statements that you said Mr. Minnifield had made to

8     you that you didn't feel that you could repeat --

9          A.    Uh-huh.

10         Q.    -- but the jury understands that you're

11    just repeating things he said.  Now, if you could

12    please tell us exactly what he said.

13         A.    Well, he came in and he told me that

14    Mrs. Minnifield was a carrier of a venereal disease

15    and if I was dealing with her, just leave her alone

16    because she gave him this particular venereal

17    disease, and she's a carrier.  And I'm telling him,

18    Why are you telling me this?  This is your wife.  I

19    don't have no problem with that.  But he went on to

20    tell me that she's a carrier of this disease, and

21    she gave him the disease and, you know, it would be

22    to my best interest to leave her alone.  And she's

23    trouble.  She's trouble, trouble.  I think I made

24    my own judgment because Mrs. Minnifield came in

25    just like a regular customer, like all my other
```

1    customers do, and there wasn't anything going on.

2    But he came in and basically, boastfully, told me

3    to leave her alone because she's a carrier.  And I

4    think he had -- I knew he had a lot of anger.  He

5    went on to try to tell me some more personal

6    things, and I told him point-blank, that's not my

7    business.  I don't want to hear about it.  He tried

8    to boastfully tell me, and I just told him I didn't

9    want to hear about it.

10        Q.   Did anything else transpire?

11        A.   No.

12        Q.   Okay.  Did he then leave the business?

13        A.   Yes.

14        Q.   Do you have any idea how he came into

15    contact with you -- any personal knowledge?

16        A.   I think the mechanic that Mrs. Minnifield

17    brought in the store --

18              THE COURT:  Now, you can't go into

19    what somebody else might have known or told you.

20        Q.   I guess what I'm asking you, Mr. Rose,

21    did he advise you when he first starting talking to

22    you or any time during the conversation as to how

23    he got your name or how he wound up at your

24    location?

25        A.   Like I said, the mechanic that

1    Mrs. Minnifield brought in, I think.  The mechanic

2    and Mr. Minnifield either was working partners

3    or --

4                    THE DEFENDANT:  Objection on that.

5                    THE COURT:  I'm going to sustain as

6    to what they -- if he didn't say anything just --

7                    MR. BAILEY:  That's fine.

8         A.   For Mr. Minnifield to know my name, I

9    wear it like it's on here now.

10        Q.   Had you ever seen Mr. Minnifield with

11   anybody else with that business -- associated with

12   that business -- your business, I guess?

13        A.   No.

14                   MR. BAILEY:  I don't think I have

15   any other questions of Mr. Rose.

16                   CROSS-EXAMINATION

17   BY THE DEFENDANT:

18        Q.   Mr. Rose, I want you to think hard.  I

19   want you to think back the first time you seen me.

20                   THE COURT:  Okay.  What's your

21   question?

22        Q.   The question is:  Whom asked who do they

23   know each other?  I know you.  I know you.  Can you

24   remember those words?

25        A.   No, sir.

```
 1          Q.   I know you.  I know you.

 2          A.   I wouldn't have a reason to ask you, I

 3    know, I know you, Mr. Minnifield.

 4          Q.   You wouldn't have a reason to ask?

 5          A.   No, sir.

 6          Q.   But you heard my voice.  I have a

 7    distinct voice that once a person hear my voice,

 8    they never forgot that voice.

 9               THE COURT:  Now, what is your

10    question, Mr. Minnifield?

11               THE DEFENDANT:  I'm fixing to ask it

12    now.

13          Q.   Okay.  That's what shook your conscious?

14          A.   What do you mean shook by conscious?

15          Q.   That voice --

16               THE COURT:  Are you asking him if he

17    recognized --

18               THE DEFENDANT:  I'm asking him --

19               THE COURT:  -- your voice from some

20    other occasion?

21               THE DEFENDANT:  Yes.

22               THE COURT:  Did you recognize his --

23               THE WITNESS:  I didn't know him then

24    until when he came in.  His voice, his looks, or

25    nothing is not distinct to me.
```

```
 1              Q.   And I came in boastfully, is that what
 2      you're saying?
 3              A.   Yes, you did.
 4              Q.   You didn't tell me nothing about my wife
 5      car that was sitting out there in front of your
 6      blazer?
 7              A.   No, I didn't tell you anything about
 8      that.
 9              Q.   Think now.  Think now.
10              A.   I don't have to think.  I don't have to
11      think.
12              Q.   And why it was there?
13              A.   No, sir.
14              Q.   Okay.  I'm going to get off right now,
15      but you're going to be called back up here.
16                        THE COURT:  No, sir.  You need to
17      ask him whatever you're going to ask now.
18                        THE DEFENDANT:  There's some more
19      that's got to come in, and then I got to put --
20                        THE COURT:  Mr. Minnifield, whatever
21      you want to ask him, ask him now because I'm going
22      to excuse him.
23                        MR. HARTLEY:  Your Honor, he is
24      under subpoena as defendant's witness.
25                        THE COURT:  Well, I have told this
```

1    witness that I would let him go.  They're taking

2    him out of order because he has to get back to

3    business.  I'll take this up in a moment.  Have you

4    got a phone number where you can be reached?

5                        THE WITNESS:  Yes, ma'am.

6                        THE COURT:  I'm going to have him on

7    call.  You're still under subpoena.  And if it's

8    not connected up, I'm not going to let him just --

9    what else do you need --

10                       THE DEFENDANT:  As long as he can be

11   called back in because as some other testimony goes

12   around, then it's going to show where this man is

13   purgering himself.

14                       THE COURT:  Mr. Minnifield, that is

15   an inappropriate comment, and I'll ask that the

16   jury disregard it.  You're excused at this time.

17                       (Witness excused.)

18                       THE COURT:  I'm going to take a

19   short break.  It may help the procedure.  So we'll

20   take about a ten-minute break.

21                       (Out of the presence of the jury.)

22                       THE COURT:  Mr. Minnifield, I want

23   you to make an offer of what you expect the

24   evidence to show that would require this witness to

25   be brought back in.

1    THE DEFENDANT:  I'm going to show

2    the evidence where Pete Rose and the night -- and I

3    never denied this -- that I did kick her door in

4    and the reason I kicked her door in was Pete Rose

5    was the guy in the closet, and that's where he

6    heard my voice from.

7    THE COURT:  Well, I don't know why

8    you couldn't have asked all of that right now.

9    THE DEFENDANT:  He's sitting up

10    there saying one thing, but --

11    THE COURT:  I don't know why you

12    couldn't ask him that at this time.

13    THE DEFENDANT:  Right.  Because I

14    wanted to bring in this other person first, that go

15    along with and tell the same thing, and he know

16    that he was in that apartment.  But he is purgering

17    himself --

18    THE COURT:  And, Mr. Minnifield, I'm

19    going to caution you right now not to characterize

20    any witness's testimony in that way.  I'm about to

21    make a determination that you're not competent to

22    represent yourself and require Mr. Hartley to do

23    so.  As I say, you've got to follow the same rules

24    and procedure.  And I expect when a witness is

25    called for you to follow up and ask all the

1   questions that can be asked of that witness at that
2   time.
3        One thing I did not put on the record that
4   needs to be put on the record is that
5   Mr. Minnifield, I found at that time, had
6   intelligently waived his right to have counsel.  Of
7   course, for the record, Mr. Minnifield, you realize
8   that at any time you can change your mind and
9   request Mr. Hartley to represent you in this case.
10  I don't think that you are helping your case by the
11  way it's being tried, and I would ask -- I'm going
12  to take a short break and, Mr. Hartley, maybe you
13  can just discuss briefly with him about asking
14  questions.
15       Mr. Minnifield, you cannot testify when you
16  ask questions.  You just need to ask the questions.
17  And, again, I'm not going to let witnesses just be
18  brought back and forth with something that can be
19  taken up at the time they testify.  And I don't
20  know why that could not have been asked of that
21  witness.  Let's take about a ten-minute recess.
22                  (Brief recess taken.)
23              THE COURT:  Mr. Minnifield, let me
24  put something on the record.  In your opening
25  statement, you made reference to your wife

1    allegedly having a sexually transmitted disease,

2    and the Court sustained the State's objection to

3    that.  I did not see that it was relevant to this

4    charge.  But during the State's witness -- second

5    witness, that testimony -- there was testimony

6    regarding that, and you certainly would be able to

7    argue that in closing.  Okay.

8        Who is going to be -- you can be getting your

9    next witness.

10                    (In the presence of the jury.)

11                    MR. BAILEY:  Okay.  Your next

12    witness?

13                    VONCIEL MINNIFIELD

14        The witness, having first been duly sworn or

15    affirmed to speak the truth, the whole truth, and

16    nothing but the truth, testified as follows:

17                    DIRECT EXAMINATION

18    BY MR. BAILEY:

19        Q.  Would you please tell the ladies and

20    gentlemen of the jury your name?

21        A.  Vonciel Minnifield.

22        Q.  Mrs. Minnifield, let me get directly to

23    the case at hand.  Do you know the person by the

24    name of John Minnifield?

25        A.  Yes, I do.

1        Q.    And how do you know him?

2        A.    He's my husband.

3        Q.    When -- I just want to kind of get a

4    history of you and Mr. Minnifield.  When did you

5    and Mr. Minnifield meet?

6        A.    We met in 1992.

7        Q.    And did y'all date for a while?

8        A.    Yes, we did.

9        Q.    Okay.  How long did you date?

10       A.    Two years.

11       Q.    Two years.  And, eventually, you got

12    married?

13       A.    Yes.

14       Q.    And when did y'all get married?

15       A.    October 8th of '94.

16       Q.    During the time that you dated

17    Mr. Minnifield and subsequently married

18    Mr. Minnifield, did you ever have any serious

19    problems?

20       A.    Not at first, no.

21       Q.    Did you ever notice anything that would

22    cause you alarm about Mr. Minnifield?

23       A.    Once about two years after we were

24    married, there was an argument.  I can't recall

25    what it was, and he shoved me, and, you know, more

1    or less, I told him that I didn't want him putting

2    his hands on me.  But I didn't call the police or

3    anything.  And that kind of alarmed me.

4         Q.    So you were married in October '94,

5    correct?

6         A.    Yes.

7         Q.    And did y'all live together -- how long

8    did y'all live together as man and wife?

9         A.    Four years.

10        Q.    So, approximately, sometime in 1998,

11   y'all were no longer living together; is that

12   correct?

13        A.    Yes, sir.

14        Q.    Do you know approximately what time frame

15   that would be?

16        A.    I want to say July.

17        Q.    July of 1998?

18        A.    Yes, sir.

19        Q.    What event caused you two to stop living

20   together, if anything?

21        A.    There was an argument.  Normally, there's

22   always an argument when he's drunk.  And I didn't

23   want to subject my kids to it any longer, so I took

24   my kids and left, as I had done before.  We would

25   stay gone an hour or so.  And when we would come

1    back, he's normally passed out or asleep.  When we

2    came back that night, I remember it was raining and

3    the lock on the front door was changed.  And so we

4    went to the back door, and it was changed as well.

5    And the windows, we couldn't get in the windows,

6    and he wouldn't let us in.  So I left.  And my kids

7    and I stayed at a hotel for two weeks, and I didn't

8    go back.  I've never been back.

9        Q.   So from that point, did you -- I believe

10   you said it was July of 1998?

11       A.   I believe it was.

12       Q.   Okay.  You made a decision to separate

13   from Mr. Minnifield?

14       A.   Yes, sir.

15       Q.   Now, what I want to do at this point is

16   talk to you about the events that have occurred

17   since your separation with Mr. Minnifield, if it

18   was July of '98 -- whatever date -- since your

19   separation with him.  Can you remember,

20   approximately, the first contact that you had with

21   him after your separation?

22       A.   Yes, sir.  After living in a hotel for

23   two weeks, I found an apartment in Brookview

24   Apartments.  I believe it was the beginning of

25   October.  The first incident was where he came to

1   the apartment with a co-worker of mine, and I

2   wouldn't answer the door.  I think he questioned

3   some of the kids that were in the courtyard as of

4   where we were living, and they told him.  And I

5   wouldn't open the door.  Thereafter, one of my

6   neighbors came around and said, He's doing

7   something to your car, but I'm not sure what he's

8   doing.  And he had entered the car --

9              THE COURT:  Now, wait just a moment.

10  You can't testify to something you didn't

11  personally observe or that someone told you in

12  regard to that.  Just what you did.  Go ahead.

13              THE WITNESS:  Okay.

14       Q.    If you could, just tell me what you

15  personally observed or saw or heard from the

16  defendant.

17       A.    Okay.  I called the police because I

18  didn't know what was going on.  When the police

19  arrived, I went outside with the police and

20  actually saw them -- I opened the hood, and they

21  said that my wires had been disconnected.  My

22  co-worker was still there, and he said that John

23  had disconnected the wires.

24              THE DEFENDANT:  Object to that.

25              THE COURT:  Again, you can't go into

1    what a co-worker said. You can only testify to

2    what you saw and observed.

3              THE WITNESS: Okay.

4         A.   When I went out with the police, we

5    noticed that my husband was coming back into the

6    apartment complex. And I pointed out that that was

7    my husband, and the police stopped him and talked

8    with him and asked him not to come back into the

9    complex. That was the first incident.

10        Q.   Okay. And after that incident, were

11   there any more incidents that you would describe as

12   harassing or bothersome to you?

13        A.   Yes.

14        Q.   Can you tell us about those?

15        A.   I was taking one of my neighbors to pick

16   up his son in Millbrook one morning.

17        Q.   Do you know, approximately, when this

18   might be that you're telling us about? What year?

19        A.   It was '98. I believe it was early

20   October.

21        Q.   Okay.

22        A.   And encountered Mr. Minnifield riding on

23   the bypass. At first, I didn't see him. And when

24   I saw him, then he recognized me, and he proceeded

25   to follow us from the northern bypass all the way

1    to the Millbrook exit -- not the Millbrook exit --

2    65 North.  He tried to run us off the road several

3    times.

4        Q.    Okay.  When you said he tried to run you

5    off the road several times, tell us -- you know, if

6    you can paint a picture for the jury exactly what

7    was happening?

8        A.    First of all, I was in the lane to go

9    downtown because he was in the I-65 lane to exit.

10   Then he switched over behind me, and so I

11   immediately switched over to 65 because I didn't

12   want him to follow me.  He came back over.  A truck

13   ran off the ravine as an act of that.  I went on up

14   to I-65 North, and he came in an incident of two or

15   three different times maybe two feet from my car.

16   And he was yelling out of the window, I'm going to

17   get you.  I'm going to kill you.  And I was just

18   like, Leave me alone.  Leave me alone.

19        The only thing I could do, there's one turn

20   that you can turn off.  Before you go to Millbrook,

21   there's nowhere you can turn off, and I hit brakes

22   real fast and spun into the median, and that's the

23   only way I got away from him.  And I went straight

24   to the police department.

25        Q.    And at that time, did you sign a warrant

1    on him?

2         A.    Yes, sir.

3         Q.    Okay.  I want to show you what's been

4    marked as State's Exhibit No. 1.  I'm going to ask

5    you if you can identify this item.

6              (Showed defendant the exhibit.)

7         Q.    Once again, I'm going to show you what's

8    been marked as State's Exhibit No. 1, and ask you

9    if you can identify this document?

10        A.    Yes, sir.

11        Q.    Okay.  If you would, just take a minute

12   and look at that document.  And I believe there's

13   two pages there.

14        A.    (Witness complies.)

15        Q.    Okay.  Can you tell the ladies and

16   gentlemen of the jury what that document is?

17        A.    It's a reckless endangerment charge,

18   exactly what I just stated.

19        Q.    Okay.  And is that something that you

20   filled out?

21        A.    Yes, sir.

22        Q.    Okay.  And where did you fill that out

23   at?

24        A.    At the city police department.

25        Q.    So is that the report that you filled out

1    at the city police department?

2         A.    Yes, sir, it is.

3         Q.    And does that have the date that you

4    filled that report out?

5         A.    Yes, sir.

6         Q.    And what is that date?

7         A.    November.

8         Q.    Okay.  Does it have the day?

9         A.    14th.

10        Q.    And year?

11        A.    '98.

12        Q.    And in that document, does it spell out

13   basically what you have told the ladies and

14   gentlemen of the jury about that incident?

15        A.    Yes, sir.

16        Q.    Now, if I could take this back for just a

17   second?

18        The document that you've identified as the

19   report that you gave to the police, did anything

20   ever happen with this?  Was a case ever filed or

21   anything like that?

22        A.    I think he was charged with it.  So much

23   has happened, I can't remember what he was charged

24   with or what he wasn't.  I believe he was charged

25   with it.

1              MR. BAILEY:  Your Honor, at this

2    time, we would move to admit State's Exhibit No. 1.

3    It's a certified document from the municipal court

4    signed by the administrator.

5              THE COURT:  Okay.  Admitted.

6              (State's Exhibit No. 1 was admitted

7              into evidence.)

8              MR. BAILEY:  Can I publish this to

9    the jury, Your Honor?

10        Q.   Okay.  Ms. Minnifield, you've testified

11   about this reckless endangerment.  Are there any

12   other events that have occurred between you and

13   Mr. Minnifield since your separation?

14        A.   Yes, sir.  There was one time when he

15   came to my apartment and --

16        Q.   Can you give me a time frame?

17        A.   It was -- I believe it was October 29th

18   of '98.  He came to my door.  It was around 9:30.

19   And he asked to come in, and I told him no.  He

20   stated that he wanted a vacuum cleaner that he had

21   bought for me previously.  I told him I didn't have

22   a problem with giving it back, but I wasn't going

23   to open my door.  I would take it to the accounting

24   firm where he worked the next morning, and he could

25   pick it up from there.  And he left.  Thereafter,

1    he came back around eleven, and he knocked again.

2    This time he was --

3              THE DEFENDANT:  Object to that, Your

4    Honor.

5              THE COURT:  Overruled.  Go ahead.

6         Q.   Okay.  You said he came back around

7    eleven?

8         A.   Around eleven.

9         Q.   Is this a.m. or p.m.?

10        A.   This is p.m.  This is at night.  Around

11   that time, I had just finished cooking dinner for

12   the next day, and the girls and I were in bed.  I

13   told him I wasn't going to open the door.  He said

14   he only wanted the vacuum cleaner and that was it.

15   I told him I didn't feel comfortable.  I would drop

16   it by his office.  He left.

17        He came back at 12:30, and he was irate.  He

18   sounded to be drunk, because I can tell when he's

19   drunk.  He said that if I didn't open the door, he

20   was going to come through the window.  Well, we

21   only have one bedroom at the time, and my baby girl

22   was in there.  So I woke her up and asked her to

23   come in the hallway so if glass started flying, she

24   wouldn't get hurt.  I told her to put some clothes

25   on because I could feel like something was going to

1    happen.  He was escalating.  He asked me again to

2    open the door, and I wouldn't.

3        At that time, he kicked my front door and the

4    chain caught it.  He kicked it a second time, and

5    he kicked the door in.  And when he came in, my

6    oldest daughter grabbed a hammer out of a drawer

7    and before she could do anything, he slapped her to

8    the ground.  She had just had scoliosis surgery,

9    like, three months before.

10       My youngest daughter got in between -- John

11   came up to me and grabbed me, and I was holding

12   him.  He was holding me.  I was trying to keep him

13   away from the girls.  I was yelling at them to run

14   out the front door and get help.  My youngest

15   daughter got in between the two of us, and she was

16   saying, Don't hurt my mom.  And my oldest daughter

17   got in between them, and it pushed me farther away

18   from him, and I couldn't no longer hold his hands.

19   And the next thing I remember is he said, I have

20   something for all of y'all.  And he reached in his

21   back right pocket, and I thought what I thought was

22   a gun, and I pushed my girls out -- to go out the

23   door, but they wouldn't leave me.  My youngest

24   daughter got pushed into the bedroom.  And my

25   oldest daughter got pushed back into the living

```
1    room.  And he pulled out a hatchet and everything
2    just happened from there.  I told my oldest
3    daughter to run out the door and keep help.
4                    THE COURT:  We need more question
5    and answer.
6        Q.    Okay.  You said he pulled out a hatchet.
7    Can you describe that for us?
8        A.    It was about twelve inches long.
9        Q.    Okay.  Did it have a blade on it?
10       A.    Yes, sir, it did.
11       Q.    After he pulled out the hatchet, what did
12   he do?
13       A.    I tried to close the bedroom door.  My
14   youngest daughter ran into the bathroom that was in
15   the bedroom and locked herself in.  He came in the
16   room.  He and I struggled, and we -- I was trying
17   to hold him.  And, eventually, he ended up throwing
18   me through the bedroom window.
19       Q.    Okay.  During the time that these events
20   were occurring, was he saying anything to you?
21       A.    Yeah, like, I'm going to kill you.  Who's
22   in here?  I'm going to kill you.  That's about it.
23            And he went to the bathroom door after he
24   threw me through the window.  And after he saw it
25   was my youngest daughter in there, he said, I'm not
```

1      going to hurt you.  It's not you I want to hurt,

2      but you better come out before I change my mind.

3      And she just couldn't move, and I told her to jump

4      out the window.

5          Q.   Which daughter was that?

6          A.   Ashley, my youngest.

7          Q.   As a result of him pushing you out the

8      window, did you incur any injuries?

9          A.   I had cuts, minor cuts.

10          Q.   Once he pushed you through the window,

11      were you on the outside of the house?

12          A.   I was.  My youngest daughter, I begged

13      her to jump out after he let her out of the

14      bathroom.  My oldest daughter came back in the room

15      to see what had happened.  And then he pulled the

16      hatchet up at her saying he was going to kill her

17      as well.  And I begged her to jump through the

18      window.  And as she jumped through, he swung the

19      hatchet at her.  She had to get stitches.  She got

20      cut as well.

21          Q.   What happened then?

22          A.   The girls ran to a -- a neighbor was

23      begging them to come inside.  She took the girls

24      inside.

25          Q.   Do you know that neighbor's name?