1          A.    Yes, sir.  Rosebud Brown.

2          Q.    Okay.

3          A.    John then came out the front door and

4    chased me with the hatchet around the apartment

5    complex.  She had yelled to me that she had already

6    called the police, so I just kept running around

7    until they got there.  I didn't know what else to

8    do.  And he was just chasing me around the complex

9    with the hatchet.

10         Q.    And did the situation essentially

11   resolve?

12         A.    Yes, sir, after the police got there.

13         Q.    So the police arrived on the scene?

14         A.    Yes, sir.

15         Q.    Was he still there when the police

16   department arrived?

17         A.    Yes.  I don't know -- we heard the

18   sirens, and then I didn't see him for a while.  And

19   then they came up and asked me what happened.  And

20   I tried to find him.  And eventually, he came

21   around the complex.  He didn't have the hatchet.

22   And then they locked him up.  And he struggled with

23   the police for a bit, and then they took him off.

24   And they told me to come down and sign warrants.

25         Q.    And did you?

1    A.    Yes, sir.

2    Q.    Okay.  This time I want to show you

3    what's been marked -- let me just show you one at a

4    time -- what's been marked as State's Exhibit No.

5    2, and I want to ask you if you can recognize this

6    document?

7                    THE DEFENDANT:  Yes, I recognize it.

8    Q.    Mrs. Minnifield, once again, this is

9    State's Exhibit No. 2.  I'm going to ask you if you

10   can identify this document.

11   A.    Yes, sir.

12   Q.    And what is that document?

13   A.    It's the one that I signed against him

14   when he kicked my door in.

15   Q.    The what?

16   A.    Harassment charge.

17   Q.    Okay.  Is that -- is that the report

18   you're referring to from the police department?

19   A.    Yes, sir.

20   Q.    And what is the date on that, ma'am?

21   A.    10/30/98.

22   Q.    And do you know if the -- a case ever

23   resulted as a result of this?

24   A.    Yes.

25   Q.    And what happened with this?

1      A.    He was charged with harassment.

2      Q.    Okay.  And did you ever go to court on

3  that case?

4      A.    Yes, sir.

5      Q.    And was there a result in the court

6  hearing?

7      A.    I can't remember.  But he -- they let him

8  out again.  I don't remember what happened.  So

9  much has happened.

10      Q.    Was he found guilty or not guilty on

11  these charges?

12      A.    Guilty.

13             MR. BAILEY:  Your Honor, at this

14  time, I would move to admit State's Exhibit No. 2,

15  which she has identified as a document from

16  municipal court that is authenticated and is

17  certified.

18             THE COURT:  Admitted.

19             (State's Exhibit No. 2 was admitted

20             into evidence.)

21             MR. BAILEY:  Let me publish this to

22  the jury.

23      Q.    Now, Mrs. Minnifield, I want to show you

24  what's been marked as State's Exhibit No. 3.

25             (Defendant looks at the exhibit.)

1          Q.    Once again, Mrs. Minnifield, this is

2    State's Exhibit No. 3, and I'm going to ask if you

3    can identify this document, please, ma'am?

4          A.    Yes.

5          Q.    Okay.  And what is that, please, ma'am?

6          A.    This is reckless endangerment charge.

7          Q.    And is that the charge you filed?

8          A.    Yes.

9          Q.    And what is the date on that document?

10         A.    10/30/98.

11         Q.    Is that also referring to the same

12   incident which you just testified about?

13         A.    Yes, sir.

14                   MR. BAILEY:  Your Honor, we would

15   move to admit State's Exhibit No. 3, which is a

16   municipal --

17                   THE COURT:  Have you seen it,

18   Mr. Minnifield?

19                   THE DEFENDANT:  Yeah, I seen it.

20                   THE COURT:  Okay.  Admitted.

21                   (State's Exhibit No. 3 was admitted

22                   into evidence.)

23         Q.    Okay.  Mrs. Minnifield, you have

24   testified about the events that happened there on

25   October 30th of 1998.  Are there any other

1    incidents that you can recall that have occurred

2    between you and your husband since your separation?

3         A.    He would come to martial arts practice

4    twice a week and sit outside.  Never really had

5    contact with him.  My instructor would go out and

6    stand until we got in our car and left.

7         Q.    Now, let me back up just a little bit.

8    You say he came to martial arts practice.  Were you

9    a part of that practice or your children?

10        A.    My children and I.

11        Q.    Okay.  And how many occasions did this

12   happen?

13        A.    Three or four.  I can't remember -- I

14   think it was three or four.

15        Q.    And what would happen?

16        A.    He would park across the street, about a

17   block or two, and just sit.  Just sit.  That's it.

18        Q.    Did he ever try to make any contact with

19   you?

20        A.    He pulled off behind us one time when we

21   left and the light caught him, and I left.  And I

22   didn't see him anymore after that.

23        Q.    And you stated that happened on three or

24   four occasions?

25        A.    Yes, sir.

1     Q.   And you saw Mr. Minnifield yourself?

2     A.   Yes, sir.

3     Q.   Now, is there any other incidents that

4 have happened between the time that you and

5 Mr. Minnifield were separated?

6     A.   Yes, sir.  We had to travel to -- the

7 company that I work for, every year we do a

8 tailgate party in Auburn that so many thousands of

9 people --

10    Q.   Let me stop you there.  What company do

11 you work for?

12    A.   Montgomery Catering, RSA Plaza.

13    Q.   And what do y'all do?

14    A.   We cater different banquet events.

15    Q.   Okay.  And I believe you were telling us

16 about some event you have in Auburn.

17    A.   Every year we do the last Auburn game.

18 And my husband has never gone there with me.  But

19 this particular time we were going through where he

20 was following me, so I hired someone from Vincent

21 Guard Service to go with me there.  And my husband

22 ended up showing up there.

23    Q.   Okay.  Let me stop you again.  You said

24 you hired someone from Vincent Guard Service?

25    A.   Yes, sir.

1        Q.   Who was this person?

2        A.   Lester Glaxton.

3        Q.   And what was the purpose of you hiring

4  Mr. Glaxton?

5        A.   Well, my boss had encouraged me to get

6  some protection because my husband was coming up to

7  the different sites that I work at.  And Vincent

8  Service does our security.  Mr. Glaxton is a

9  supervisor, who is there most of the time, and he

10  more or less watched out for me while I was at

11  work.  So I asked him and my boss asked him if he

12  would ride along with us just to make sure

13  everything was okay.

14        Q.   Did Mr. Glaxton agree to do this?

15        A.   Yes, he did.

16        Q.   Okay.  And did Mr. Glaxton go along with

17  you to Auburn?

18        A.   Yes, sir, he did.

19        Q.   Would you please tell the ladies and

20  gentlemen of the jury what happened once you

21  arrived in Auburn?

22        A.   I was there for about an hour, hour and a

23  half, and one of my co-workers says --

24               THE COURT:  Now, you can't go into

25  what your co-worker said.

1    Q.    Just what you observed.

2    A.    I was there for about an hour or hour and

3    a half, and I noticed my husband standing about

4    twenty yards away from me, just standing there

5    looking at me. And I went over and told the

6    security guard, Mr. Glaxton, that he was here. And

7    they took him -- they took him away from the scene,

8    and they talked to him. And, eventually, about

9    thirty minutes later, he left.

10    Q.    At that time, did Mr. Minnifield ever say

11    anything to you, make any type of contact with you

12    as far as -- I understand maybe visually -- but any

13    type of contact with you as type as verbally?

14    A.    Yes. He said, I want to talk to you.

15    Can you talk to me? And I just want to talk to

16    you. Will you stop and talk to me?

17    Q.    Had you given Mr. -- let me ask you the

18    same question about some of the other events you

19    talked about. Did you give Mr. Minnifield

20    permission to come to any of your karate practices?

21    A.    No.

22    Q.    Did you ever give him any permission to

23    come to the Auburn event?

24    A.    No, sir.

25    Q.    Did you ever invite him to either one of

1    those events?

2        A.    I was not communicating with him at that

3    time.

4        Q.    Are there any other incidents that have

5    occurred between you and Mr. Minnifield since the

6    date of your separation?

7        A.    Yes, sir.  He would sit outside of

8    church.  He did that a couple of times.

9        Q.    And where do you attend church?

10       A.    New Town Church of Christ.

11       Q.    And can you tell us about those

12   occasions, what would happen?

13       A.    My uncle, who is deceased now, asked

14   Mr. Minnifield, my husband, to come in, and they

15   would talk to him and counsel him.

16               THE COURT:  Now, again, you can't go

17   into what somebody else said or did.

18       Q.    Mrs. Minnifield, if you will, please --

19   it will help us move things along if you'll just

20   talk about things that you have observed the

21   defendant do or saw him do.  Don't tell us anything

22   that your uncle said or did or anybody else did

23   except for Mr. Minnifield.  Okay?

24       A.    He was sitting outside of church, and I

25   saw him come in with my uncle and go into the

1    pastor's room. And, therefore, I felt I had a

2    chance to leave, so I got my girls, and I left.

3        Q.    Was Mr. Minnifield a member of that

4    church?

5        A.    No, sir.

6        Q.    Had he ever been to that church with you?

7        A.    I got him to attend once.

8        Q.    But other than the time that he had

9    attended with you, had he ever been to that church,

10   to your knowledge?

11       A.    Not to my knowledge.

12       Q.    Okay. Now, you have testified about this

13   one event that he came to the church, and you saw

14   him, and when you saw him, you left. Were there

15   any other occasions you saw him at the church?

16       A.    No, sir.

17       Q.    Okay. So it was just that one occasion?

18       A.    It was two occasions, but I can't say

19   that because someone else saw him there and talked

20   to him.

21       Q.    Okay. Now, Mrs. Minnifield, are there

22   any other incidents that have occurred since you

23   and Mr. Minnifield have separated that you have not

24   told us about?

25       A.    I know that he's come to my job, but

1    that's someone else saying it, so I can't

2    elaborate.

3        Q.    Have you ever seen him at your job,

4    workplace, during this time frame?

5        A.    I've seen him parked outside my job, yes.

6        Q.    And how many occasions have you seen

7    that?

8        A.    Twice.

9        Q.    Have you ever received any type of phone

10    calls from Mr. Minnifield?

11        A.    No, sir, not directly.

12        Q.    When you would see him at your workplace,

13    I believe you said, he was sitting in the car?

14        A.    Yes, sir.

15        Q.    Where would he be parked -- let me back

16    up just a second.  Where is your workplace again?

17        A.    It's on the corner of Adams and Ripley

18    and Washington.

19        Q.    Okay.  Is that in a particular building?

20        A.    It's in the RSA Plaza downtown.

21        Q.    And where would Mr. Minnifield be

22    sitting?

23        A.    Once he was parked on Adams, and once on

24    Washington.

25        Q.    So that was on two different occasions

1      that you saw him?

2            A.    Yes, sir.

3            Q.    Has anything else occurred between you

4      and Mr. Minnifield since the date of your

5      separation?

6            A.    Not that I can recall at this time.

7            Q.    You said that you had not ever received

8      any direct phone calls from Mr. Minnifield; is that

9      correct --

10           A.    That's correct.

11           Q.    -- during this time frame?  Had you ever

12     received any type of written correspondence from

13     Mr. Minnifield?

14           A.    Yes, sir.

15           Q.    And can you tell us about those?

16           A.    When he was locked up, he wrote me a

17     letter -- I believe it was in December of '98 --

18     stating that he was very sorry for what had

19     happened in the October event, and that he just

20     wanted to -- for us to get on with our lives and

21     for the kids to be happy.

22           Q.    Mrs. Minnifield, at this time, I'm going

23     to show you what's been marked as State's Exhibit

24     No. 5.  I want to ask you if you can identify this

25     letter, please, ma'am?

1       A.   Yes.

2       Q.   Okay.  And what is that document?

3       A.   This is the letter I received in

4  December.

5       Q.   Okay.  And you know who that letter is

6  from?

7       A.   Yes, sir.

8       Q.   Who?

9       A.   My husband, John Minnifield.

10      Q.   And how do you know that that is from

11  Mr. Minnifield?

12      A.   It was postmarked from him, as well as I

13  know his writing.

14      Q.   Okay.  So you recognize the handwriting

15  on that letter as being Mr. Minnifield's?

16      A.   Yes, sir.

17               MR. BAILEY:  Your Honor, if it's

18  okay at this time, can she read the letter?

19               THE COURT:  I -- how long is the

20  letter?

21               MR. BAILEY:  It's a page and a

22  half -- or it's just a page.

23               THE COURT:  Why don't you just

24  direct her attention to --

25               MR. BAILEY:  Certain things?

1     THE COURT: Yes.

2   Q.  Okay. If I may, Mrs. Minnifield, is

3 there anywhere in the letter there that

4 Mr. Minnifield references the -- any of these

5 events that you have testified about?

6   A.  Yes.

7   Q.  In any way?

8   A.  He says, I surrender. You all do not

9 have to run and hide anymore. Put the girls back

10 in school and live peacefully. If I wanted to harm

11 you, I know where you're staying. And he also

12 stated that he know that he hurt the kids and he's

13 sorry for that.

14   Q.  Okay. If I could have this document?

15   A.  (Witness complies.)

16     THE DEFENDANT: Excuse me?

17     MR. BAILEY: Yes.

18     THE DEFENDANT: Could I see the date

19 on that?

20     MR. BAILEY: It's 11/18/98.

21   Your Honor, at this time I move to admit

22 State's Exhibit No. 5.

23     THE COURT: Admitted.

24     (State's Exhibit No. 5 was admitted

25     into evidence.)

1      Q.    Mrs. Minnifield, you've testified about

2   this letter that you received, and I believe that

3   you testified that that letter came through the

4   course of the mail?

5      A.    Yes, it did.

6      Q.    Have you received any other type of

7   written correspondence from the defendant?

8      A.    Yes, I have.

9      Q.    Okay.  Can you tell us about that?

10     A.    I received two letters on my car and --

11  well, all three were left on my car, two of them at

12  my place of residence, and one at my second job.

13     Q.    Okay.  And you said there was a total of

14  three letters?

15     A.    Yes, sir.

16     Q.    At this time, Mrs. Minnifield, I'm going

17  to show you what's been marked as State's Exhibit

18  6.  Do you recognize that?

19     A.    Yes, sir, I do.

20     Q.    And do you recognize the -- what --

21  identify what that is first.

22     A.    It's my apartment number.  I knew that he

23  knew the complex, but it's my apartment number.

24     Q.    So that's a document that has your

25  apartment number?

1    A.    Yes, sir.

2    Q.    And do you recognize the handwriting on

3  that particular document?

4    A.    Yes, sir.

5    Q.    And whose handwriting do you recognize

6  that to be?

7    A.    My husband's.

8              MR. BAILEY:  Okay.  Your Honor, at

9  this time, we move to admit State's Exhibit No. 6.

10             THE COURT:  Have you seen that,

11  Mr. Minnifield?

12             THE DEFENDANT:  Yes, I've seen it.

13             THE COURT:  Admitted.

14             (State's Exhibit No. 6 was admitted

15              into evidence.)

16   Q.    And you said this was your -- what's

17  depicted on this note is your apartment number?

18   A.    Yes, sir.

19   Q.    Does it say anything else?

20   A.    "You better see me today."

21   Q.    Mrs. Minnifield, I want to show you now

22  what's been marked as State's Exhibit No. 7, and

23  ask if you can identify this document?

24   A.    Yes, sir.

25   Q.    Okay.  What is that document, please?

1       A.   It's another note that was left by my

2   husband.  It's his handwriting.

3       Q.   And that was my next question.  Do you

4   recognize the handwriting of that note as well?

5       A.   Yes.

6       Q.   And whose handwriting is that?

7       A.   My husband's.

8       Q.   And can you please tell us what that

9   document says?

10      A.   "Tonight be at home 11:30."

11            MR. BAILEY:  Your Honor, at this

12   time, we move to admit State's Exhibit No. 7.

13            THE COURT:  Admitted.

14            (State's Exhibit No. 7 was admitted

15            into evidence.)

16            THE COURT:  Mr. Minnifield, unless

17   you say something, I'm going to assume you've seen

18   these.

19            THE DEFENDANT:  I've seen all of

20   them.  He just brought them to me.

21      Q.   Mrs. Minnifield, I now want to show you

22   what's been marked as State's Exhibit No. 8.

23      A.   Yes, sir.

24      Q.   What is that?

25      A.   It's a note by my husband, John.

1       Q.   And how do you recognize that as being a

2  note from your husband?

3       A.   I know his handwriting.

4       Q.   Okay.  And that was my next question.  So

5  you recognize the writing on that to be that of

6  your husband's?

7       A.   Yes.

8              MR. BAILEY:  Your Honor, at this

9  time, we would move to admit State's Exhibit No. 8.

10             THE COURT:  Admitted.

11             (State's Exhibit No. 8 was admitted

12             into evidence.)

13       Q.   And what is the context of that note,

14  ma'am?

15       A.   "Now the war is on, germ carrying

16  picture, do not lie."

17       Q.   "Germ carrying picture," is that what you

18  said?

19       A.   Yes.

20       Q.   Mrs. Minnifield, are there any other

21  incidents between you and your husband since the

22  date of your separation, written or verbal?

23       A.   He followed me to my second job one day.

24       Q.   And where is your second job?

25       A.   Shoney's.  Okay.  And he was telling me

1  something about insurance that he had gotten on the

2  home when he was broken into while he was locked

3  up, that he wanted to give me some money for me and

4  the kids, and I told him no.  We weren't supposed

5  to be speaking.  I didn't have anything to say to

6  him, for him to leave.  He said he just wanted to

7  talk to me, to give me some money.  And I asked him

8  to leave.  I went inside, and I told him if he

9  didn't leave, I was going to call the police.

10      Q.   And did he?

11      A.   And he left, yes.

12      Q.   Is there any other incidents that you can

13  recall?

14      A.   Not that I can recall at this time.

15      Q.   During these incidents -- and first of

16  all, let me ask you something about these

17  incidents.  The incidents that you have testified

18  about for the last forty-five minutes or so, have

19  all those incidents that you've testified about

20  occurred in Montgomery County?

21      A.   No, sir.

22      Q.   Okay.

23      A.   Except for the one in Auburn.

24      Q.   All the ones except for the one in Auburn

25  have occurred in Montgomery County?

1    A.    Yes, sir.

2    Q.    Okay.  During the time frame that we've

3  been talking about from the day of your separation

4  up until the present time, can you tell us what

5  threats have been made to you as far as from

6  Mr. Minnifield?

7    A.    He said he was going to kill me.

8    Q.    Okay.  How many occasions?

9    A.    Three that I can recall.

10    Q.    Okay.  The threats that were made to you

11  by Mr. Minnifield, specifically the threats to kill

12  you, did you take those threats seriously?

13    A.    Yes.

14    Q.    Did you feel that those were credible

15  threats?

16    A.    Yes.

17    Q.    One last question, I believe, Mrs.

18  Minnifield, and I'll be finished.  The person that

19  you have told the ladies and gentlemen of the jury

20  about, the person that you have testified committed

21  all of these acts upon you and these events that

22  you've testified about, is that person in the

23  courtroom today?

24    A.    Yes.

25    Q.    And can you please point him out to the

1  ladies and gentlemen of the jury and describe him?

2  A.  This is John Minnifield, my husband.

3  MR. BAILEY:  Let the record reflect

4  that she has identified the defendant in this case.

5  Mrs. Minnifield, I believe that's all the

6  questions I have for you at this time.  If you

7  would, answer Mr. Minnifield's questions.

8  THE COURT:  Okay.

9  CROSS-EXAMINATION

10  BY MR. MINNIFIELD:

11  Q.  Vonciel, we're going to start on the one

12  where you said that I'm asking you.  You said I had

13  accustomed you down the Northern Boulevard.  I

14  chased you.  You recognize me.  I tried to run you

15  off the road.

16  A.  Yes.

17  Q.  Could you tell me again where was that

18  at?

19  A.  It was on the Northern Boulevard.

20  Q.  Yes.  Tell me just what happened on the

21  Northern Boulevard.

22  A.  I noticed you on the Northern Boulevard

23  and I was -- you were in the lane going towards

24  downtown, so I switched over to I-65 North exit to

25  try to get away from you.  You followed me to the

1    I-65 exit towards Millbrook, and that's when you

2    tried to run us off the road.

3         Q.    Okay.  So you is the one that seen me,

4    right?  Now, on your statement here, you say that I

5    didn't see you.

6         A.    You saw me.

7         Q.    You said --

8         A.    You looked directly at me.

9                   THE COURT:  Wait.  Let him get

10   through with the question and let her get through

11   with the answer.  Go ahead.  Repeat your question.

12                  THE WITNESS:  I'm sorry.

13        Q.    You said in your statement right here on

14   Page 13 in the discovery here that Jody nudged me.

15   We was beside each other and Jody nudged me.  The

16   16-year-old kid was in the car with me.

17                  MR. BAILEY:  Judge, I'm going to

18   object.  He's testifying again and --

19                  THE DEFENDANT:  I'm not testifying.

20   I'm telling about what --

21                  THE COURT:  Wait just a moment.  Let

22   him get through with his objection.  What was your

23   objection?

24                  MR. BAILEY:  He's testifying again.

25   He's not asking a question.

1          THE COURT:  Mr. Minnifield, you're

2    going to get an opportunity to take the stand and

3    tell your side.  Just ask her questions about what

4    she's testified or did on those occasions.

5          Q.   I'm asking you, didn't you say on your

6    statement that Jody Lewis nudged me?

7          A.   That's correct.

8          Q.   And pointed to you?

9          A.   That's correct.  However, the Judge had

10   informed me that I can't say what someone else

11   said, so I had to say when I actually saw you.

12               THE DEFENDANT:  You're a

13   professional.

14               MR. BAILEY:  Your Honor, I'm going

15   to object.  That is totally uncalled for, his

16   comment.

17               THE COURT:  I did not hear it.  It's

18   probably a good thing.  If any of the jurors heard

19   it, then disregard it.  Go on to your next

20   question.

21         Q.   So you went on and filed charges against

22   me on that occasion, right?

23         A.   Yes, I did.

24         Q.   You also stated that I ran two cars off

25   the road, a car and a truck?

```
 1              A.    A truck.  Then a car.

 2              Q.    Okay.  Nobody reported it.  Okay.  Now,

 3      we're going here to the letter here, dated

 4      Wednesday, 11/18/98, 3:31, right?  You've seen that

 5      exhibit and the jury?  Where was this letter

 6      written from?

 7              A.    It was written from the jail.

 8              Q.    It was written from the jail?

 9              A.    Yes.

10              Q.    On 11/18/98, how could it possibly be

11      written from the jail?

12              A.    It was postmarked from the jail.

13              Q.    Do you have the envelope?

14              A.    I do.

15              Q.    Why wasn't the envelope on here?

16              A.    The address is on there.  I do have the

17      original envelope.  I don't have it with me, but I

18      do have it.

19                    THE DEFENDANT:  I ask the State to

20      remove this from evidence.

21                    THE COURT:  I'm going to deny.  You

22      can testify and -- concerning -- and you've asked

23      her questions.  It goes to the weight more than the

24      admissibility.  Go ahead, Mr. Minnifield.

25              Q.    Okay.  You said Mr. Glaxton, security
```

1    aiding for Vincent Security Service?

2         A.    Yes.

3         Q.    You said you hired him to look over you,

4    right?

5         A.    Yes.

6         Q.    Okay.  And that was for what reason?

7         A.    To protect me from you.

8         Q.    Well, on -- okay.  You said he accustomed

9    you to Auburn to protect you from me?

10        A.    Yes.

11        Q.    Have I ever, in my lifetime, put my hands

12   on you?

13        A.    Yes.

14        Q.    In what form?

15        A.    Like I stated earlier, you shoved me with

16   both hands.

17        Q.    And could you give me a time frame when

18   that were?

19        A.    I believe it was in '92.

20        Q.    In '92?

21        A.    Yes.

22        Q.    Is that the only time?

23        A.    That's the only time that you've ever

24   abused me physically.

25        Q.    Therefore, have we ever fought?  Have I

1    ever had the occasion to put my hands on you in a

2    physical way?

3        A.    I know that after that one time, I got my

4    point across that you wouldn't do it again.

5        Q.    Vonciel, didn't you state that you did

6    beat me up, right?  You punched me out on 11/16/97?

7    You punched me out and Dana called the police?

8        A.    That I punched you out?

9        Q.    Yes.

10       A.    I don't --

11       Q.    -- to keep you from hurting because you

12   wouldn't stop beating me, right?

13       A.    I don't recall ever saying that.  I was

14   always too busy running.  May I see that?

15       Q.    Oh, you're going to see it.

16              THE DEFENDANT:  Y'all have to

17   apologize for me in taking time because I --

18              THE COURT:  Mr. Minnifield, do you

19   want to take it up there and see -- I don't know

20   what it is.

21              THE DEFENDANT:  I'm trying to see if

22   that's the proper one.  I've got two of them here.

23   It's hard for me to see.  I've got -- excuse me

24   just a minute.

25              THE COURT:  Could you maybe go to

1    another area, and we could come back to that?  Let

2    Mr. Hartley look through that.

3        Q.    Okay.   If -- I want to ask you something.

4    When Mr. -- when I did come to Auburn, right, you

5    see me?  Like you say, did I show any kind of force

6    or, like, I was standing up just watching you?  Did

7    I try any threat or anything?

8        A.    No.   You just stood there and looked at

9    me -- just stood there and watched me.  And then

10   when you walked towards me, I walked towards the

11   security guard and informed him that you were

12   there.

13       Q.    And then what happened?

14       A.    Then they escorted you off the premises

15   because it was an invitation only party.

16       Q.    They just walked up to me and did that

17   or --

18       A.    They walked up to you, and you informed

19   them that you wanted to talk to me.  And my boss

20   and Mr. Glaxton, who is the security guard, told

21   you that you weren't going to talk to me, that you

22   were going to talk to them.  And they took you to

23   the street and talked to you.  I don't know what

24   was said.

25       Q.    Okay.  Vonciel, do you remember in your

```
 1    statement that you gave -- it's in one of these
 2    here, and we're going to find it in a few minutes.
 3    I'm going to let him find it due to my eyesight --
 4    that Ronnie Waters and the security guard gave a
 5    short foot chase in chasing me down?
 6         A.    They actually did.  Because before -- you
 7    walked away and they didn't know which direction
 8    you went.  I pointed you out to them and Ronnie did
 9    run to catch up with you.
10         Q.    Now, you're saying they gave a foot
11    chase.  Now, a few minutes ago, you said they just
12    walked up me?
13         A.    They did.  They did both.  Once they ran
14    and got you, they walked you to the street.
15         Q.    And forced me to leave, huh?
16         A.    I don't know if they forced you.  I don't
17    know what was said.  I wasn't at that point.
18         Q.    Okay.  It says here, "The security guard
19    and my boss, when they walked towards him, he
20    turned away and started walking away from the scene
21    real fast.  And they called his name and chased him
22    down.  They stood there and talked to him
23    approximately thirty minutes and told him that he
24    had to leave the premises."
25         A.    Yes.
```

1      Q.    Is that the statement you've given?

2      A.    That's correct.

3      Q.    Now, you said while ago, you said, you

4  know, they walked up to me?

5      A.    Well, it doesn't matter.  They walked and

6  they ran.  They had to run because you walked away

7  fast.  You didn't want to talk to them evidently.

8  When they ran and caught you, you guys stopped and

9  they walked you to the street, so it was a matter

10  of both.

11      Q.    Why didn't you file charges in Auburn?

12  There was plenty polices around.

13      A.    Yes, there was.

14      Q.    Why did you did not file charges or

15  notify the police there?

16      A.    In Auburn?

17      Q.    Sure.

18      A.    Because I thought -- and ignorant to the

19  fact of the law -- I thought I could come back and

20  do it here.  But when I came here, I went to the

21  city police to file charges, and they actually told

22  me I had to do it in Auburn.

23      Q.    It is no reason for ignorance of the

24  facts.

25                MR. BAILEY:  Your Honor --

1          THE COURT:  Don't comment.  Just go

2    to your next question.

3          Q.    Okay.  I'm coming back to Page 10.  Y'all

4    excuse me.  This is referring back to where she

5    pointed me out.

6                THE COURT:  Just go on to your next

7    question.

8          Q.    The question was:  There was also a

9    warrant for harassing that was signed November 16

10   of '97.  Do you have any idea?  Okay.  That could

11   have possibly been the time that --

12               THE COURT:  Wait.  What is your

13   question?

14               THE DEFENDANT:  The question is:  I

15   asked her about where she pointed me out.  She said

16   we had never made physical contact with each other.

17   But she told in here, says she points me out.

18         A.    The contact --

19         Q.    And I want to know how and why.

20               THE COURT:  Why don't you just read

21   that one portion?

22               MR. HARTLEY:  He's got it, Judge.

23               THE DEFENDANT:  That's what I'm

24   reading.

25               THE COURT:  Go ahead.

1          MR. BAILEY:  Your Honor, if I could?
2     If he could ask the question and then read the
3     entire answer.
4          THE DEFENDANT:  Okay.  I asked the
5     question on this.
6          MR. BAILEY:  I mean the question on
7     the sheet.
8     Q.    The question on Page 10.  "Did you say
9     that you had probably been this time that he showed
10    me and I punched him?
11    A.    The only time I can recall ever
12    physically having contact with you was the night
13    you came in with the hatchet.  And as I stated
14    earlier, I couldn't get you off me.  You couldn't
15    get me off you.  And that's the time we went round
16    and round.  That's the only time I can remember
17    physical contact.  And yes, I did hit you to
18    protect myself as well as you were hitting me.
19    Q.    On what night or day?
20    A.    That night was the night of the 29th.
21    The documents are stated the 30th because it was
22    the change of day.
23    Q.    Okay.
24          THE DEFENDANT:  I want this to go in
25    evidence as Page 10.

1                  THE COURT: Well, I think it's -- is

2    it already in or not?

3                  MR. BAILEY: That's her statement.

4                  THE DEFENDANT: That's her

5    statement.

6                  THE COURT: Okay. If you want to

7    get that marked as Defendant's Exhibit 1, you can

8    do so, and it will be admitted.

9                  THE DEFENDANT: Yes.

10                 MR. BAILEY: Judge, we would object

11    just to that portion. If he's going --

12                 THE COURT: Well, you can certainly

13    follow up.

14                 MR. BAILEY: What I'm saying, I

15    guess, Your Honor, is we would ask that the whole

16    statement be admitted.

17                 THE COURT: You can follow up and do

18    that.

19                 THE DEFENDANT: The whole exhibit is

20    Exhibit 1.

21                 MR. BAILEY: Are you offering the

22    whole statement?

23                 THE DEFENDANT: Yes.

24                 MR. BAILEY: I mean, the whole

25    statement?

1    THE DEFENDANT:  Sure, because the

2    whole statement --

3    THE COURT:  We'll take that up --

4    we'll have a break -- because I don't know what's

5    there.  Go on to your next question.

6    Q.    Okay.  Vonciel, on the night of October

7    30th, right, you said -- and I quote you -- are you

8    telling this jury here that I threw you out the

9    window?

10    A.    On the night of the 29th, you did.

11    Q.    On the 29th, yes.

12    A.    Yes, you did.

13    Q.    That I threw you out the window?

14    A.    Yes.

15    Q.    And then you got your daughters out?

16    A.    Eventually, yes.

17    Q.    Eventually.  Now, in your statement you

18    said that -- yes, you said I threw you out.  But

19    you also said I threw your daughter out the window?

20    A.    My oldest daughter was running from you

21    because you had a hatchet after her held up in the

22    air.

23    THE COURT:  His question was:  In

24    your statement, did you say that that happened to

25    your daughter?

1       Q.    That's right.  Did you said that?

2                 THE COURT:  Maybe you could show her

3       that page.  If you tell Mr. Bailey where you are,

4       he could go show it to her.

5                 THE DEFENDANT:  He'll find it right

6       in there.  And we'll go on to Ashley.

7       Q.    Did that you say that I tried to hit her

8       with the hatchet or what or --

9       A.    No, I did not.

10      Q.    What the statement you said on that as of

11      my age, I forget.

12      A.    What are you asking me?

13      Q.    I'm asking you about Ashley.  Did I

14      threaten her with the hatchet or what?  Only what

15      you're saying now, not what you say you heard.

16      A.    I can expect that she felt threatened

17      when she opened the bathroom door.  The reason she

18      opened the bathroom door is because --

19                THE COURT:  Wait just a minute.  I

20      think he's just asking -- and it might help the

21      jury.  You have two daughters.  And is Ashley what

22      age, and the younger one?

23                THE WITNESS:  Yes, ma'am.

24                THE DEFENDANT:  Ashley, 13.

25                THE COURT:  And he's just asking

1    whether or not you're saying he went after her with

2    the hatchet.

3         A.    I'm saying you threatened all of us that

4    night, yes.

5              THE COURT:  But now, listen to his

6    question.  Did he go after her with the hatchet,

7    the younger one?

8         A.    He went to the bathroom door with the

9    hatchet raised in the air, and she was in there.

10             THE DEFENDANT:  I'm satisfied with

11   that.  Your witness.

12             THE COURT:  Anything else from her?

13             MR. BAILEY:  I think I only have one

14   other question.

15                  REDIRECT EXAMINATION

16   BY MR. BAILEY:

17        Q.    Mrs. Minnifield, I can't remember if I

18   asked you this or not.  Have you actually filed for

19   a divorce against Mr. Minnifield?

20        A.    Yes, sir, just recently.

21        Q.    Okay.

22             MR. BAILEY:  That's all the

23   questions I have.

24             THE COURT:  Let's take another

25   fifteen-minute recess.  It might be one of the last

1    ones we take.  We'll get you in the jury assembly

2    room.  And I don't normally do this, but if anyone

3    does want to bring a coke or something in here to

4    drink, you can do so.

5                    (Out of the presence of the jury.)

6                    THE COURT:  Mr. Bailey, how many

7    more witnesses do you expect?

8                    MR. BAILEY:  Judge, if I can look at

9    my list?  The rest of the witnesses are going to be

10   just like the witnesses we had at the beginning,

11   very short.  There's probably only maybe five or

12   six.  Now, the only long witness is going to be

13   Detective Williams.  She's not here.

14                   THE COURT:  And what is her status?

15                   MR. BAILEY:  I don't know yet.  I

16   called her this morning, and she said, you know,

17   everything was still -- she called her doctor and

18   her doctor advised that -- she called her doctor on

19   Friday to see how long it was going to take, and

20   the doctor advised that he didn't know, but she

21   should be through by early afternoon.  And I

22   haven't heard from her since, but I'll go check and

23   see.  But she'll be fairly lengthy.

24                   THE COURT:  Well, we'll just see

25   where we are.

1        And, Mr. Minnifield, Mr. Hartley the other day

2    indicated that one witness may need to be done by

3    phone.

4                    MR. HARTLEY:  That would be

5    Mr. Xides.

6                    THE COURT:  I need to know.  You

7    know, of course, we aren't there yet, but we'll

8    have to set it up.  And with the new phone system,

9    it's not quite as easy.

10                   MR. HARTLEY:  Mr. Xides gave me,

11   Judge, home telephone number, which I have close by

12   here and promised that --

13                   THE COURT:  Well, it would not be

14   until tomorrow morning anyway.

15                   MR. HARTLEY:  I think he promised he

16   was not going anywhere because of the nature of his

17   treatment.  Judge, he said he wasn't going

18   anywhere.  It will be either 281-4508 or 269-6090,

19   and I'll figure out which of the two it is.

20                   THE COURT:  Mr. Minnifield -- and

21   this is the situation really in any criminal

22   case -- I'm going to certainly let you call, if you

23   want to, any character witnesses.  But what I may

24   do is if there are a number of them, have them come

25   in, identify themselves, and, you know, after

1    you've asked one or two or three if their testimony

2    would be the same, we can -- I don't know how many

3    you're planning to have.

4                    MR. HARTLEY:  Thank you, Judge.

5                    (Brief recess.)

6                    (In the presence of the jury.)

7                    THE COURT:  We aren't locking you

8    in, but it's disruptive when people come in and

9    out, so -- okay.  Your next witness?

10                   MR. BAILEY:  Your Honor, at this

11   time, the State would call G. L. Sisson with the

12   Montgomery Police Department.

13                   THE COURT:  Raise your right hand.

14                   G. L. SISSON

15       The witness, having first been duly sworn or

16   affirmed to speak the truth, the whole truth, and

17   nothing but the truth, testified as follows:

18                   DIRECT EXAMINATION

19   BY MR. BAILEY:

20       Q.    Good afternoon, sir.

21       A.    Good afternoon.

22       Q.    Would you please state your name for the

23   ladies and gentlemen of the jury?

24       A.    Officer Gregory Lance Sisson.

25       Q.    And how are you employed, sir?

1          A.    With the Montgomery Police Department.

2          Q.    And what do you do for the Montgomery

3     Police Department?

4          A.    Work on third shift patrol.

5          Q.    Officer Sisson, I want to get right to

6     the point and direct your attention back to October

7     30th of 1998.  Did you have an opportunity, at that

8     time, to respond to a call on Empire Terrace?

9          A.    No, sir.  It was Brookview Apartments up

10    on Wetumpka Road.

11         Q.    I'm sorry.  I've got some confusion going

12    on.  Brookview Apartments?

13         A.    Yes, sir.

14         Q.    And is that located here in Montgomery?

15         A.    Yes, it is.

16         Q.    Okay.  Can you please tell the ladies and

17    gentlemen of the jury what occurred when you

18    arrived at that location?

19         A.    That evening, myself and my partner were

20    dispatched to a domestic violence call at Brookview

21    Apartments.  When we arrived, the dispatcher gave

22    us some words to tell us what was going on, that a

23    male subject was chasing his girlfriend --

24                  THE DEFENDANT:  I object.

25                  THE COURT:  Wait just a minute.  You

1    don't need to go into details.  I'm going to let

2    him testify as to the reason, that that was the

3    reason for him going, but you don't need to go into

4    all of those details.

5                MR. BAILEY:  Okay.

6                THE COURT:  Not for the truth of

7    what occurred on that occasion, but for why he went

8    there.

9        Q.    So you have testified that you and your

10   partner were responding to a domestic violence

11   call?

12       A.    Yes.

13       Q.    Placed to the Montgomery Police

14   Department?

15       A.    Yes.

16       Q.    And did you arrive to that scene,

17   Brookview Apartment scene?

18       A.    Yes, we did.

19       Q.    And can you please tell the ladies and

20   gentlemen of the jury what you observed once you

21   arrived at that location?

22       A.    When we pulled into the parking lot of

23   Brookview Apartments, I saw the defendant chasing

24   the victim around the parking lot, yelling,

25   cursing, and making verbal threats at her.

```
1         Q.    Okay.  Do you recall what type of
2    threats?
3         A.    Threats as, "If I get my hands on you,
4    I'm going to hurt you.  Just stop so I can get my
5    hands on you."
6         Q.    And this was going on once you pulled up
7    into the Brookview Apartment area?
8         A.    Yes.
9         Q.    Okay.  And what did you do in response to
10   this?
11        A.    Me and my partner took the subject into
12   custody because he was -- because people were
13   coming out of their apartments to see what was
14   going on.  And we put him into custody, and we were
15   going to take him to jail for disorderly conduct.
16        Q.    Okay.  And did you do that?
17        A.    Yes, we did.
18        Q.    Did you notice anything about his
19   appearance or demeanor?
20        A.    Yes, sir.  He had a strong odor of
21   alcohol beverage on his breath and his person.  He
22   could barely -- he staggered as he was chasing the
23   victim.  And his eyes were bloodshot and his speech
24   was really slurred.  It appeared that he had been
25   drinking a tremendous amount of alcohol that
```

1    evening.

2        Q.    Did -- did you -- you stated that you had

3    charged him with disorderly conduct for that

4    offense.  Did you, at a later time, have to appear

5    in court on that matter?

6        A.    Yes.  We went to municipal court for the

7    City.

8        Q.    Okay.  And was the defendant present at

9    that time?

10       A.    Yes, he was.

11       Q.    And during the course of that proceeding,

12   did you hear the defendant make any statements as

13   far as to what was happening that night or what had

14   gone on that night?

15       A.    He admitted that he had been chasing his

16   wife around the parking lot and he was going to

17   hurt her that night.

18       Q.    He said that?

19       A.    Yes, he did.

20       Q.    Okay.  And what words did he say?

21       A.    In his exact quote was, "I was going to

22   do her ass in."

23       Q.    And that was in front of the Judge?

24       A.    Yes, sir, it was.

25       Q.    The person that you've been talking about

1    about this incident, is that person in the

2    courtroom today?

3        A.    Yes, he is.

4        Q.    Can you please identify him?

5        A.    Yes, sir.    It's the defendant sitting

6    right there.

7            MR. BAILEY:    Let the record reflect

8    that he has identified the defendant.

9        And I believe that's all the questions I have

10    for Officer Sisson at this time.

11                    CROSS-EXAMINATION

12    BY MR. MINNIFIELD:

13        Q.    Officer Sisson, how long have you been

14    knowing Vonciel Minnifield?

15        A.    I don't.    I met her that one night on

16    October the 30th of 1998.

17        Q.    And when you -- you and your partner, you

18    were the first one to arrive on the scene?

19        A.    Yes, sir, we were.

20        Q.    And what did you observe exactly?    What

21    did you observe?    Where was she, I, or the children

22    or whatever?

23        A.    I observed you chasing the victim running

24    through the parking lot of Brookview Apartments.

25        Q.    And that's all?    You seen just me chasing

1    her?

2         A.    Yes, sir.  And I heard you yelling and

3    cursing at her and making threats to her.

4         Q.    What kind of threats was those?

5         A.    They were threats to her physical

6    well-being.

7         Q.    Sir?

8         A.    They were threats to her physical

9    well-being, you saying that you were going to hurt

10   her if you got your hands on her.  You were telling

11   her to stop so that you could get your hands on

12   her.

13        Q.    You all's two statements are very well

14   conflicting with each other.  You're telling me

15   that you seen me chasing her.  What did I have in

16   my hand, anything, or what, or any type of weapon

17   or just chasing her?

18        A.    You were just chasing her when we saw

19   you.

20        Q.    Okay.  And you said in your statement

21   here that I was strongly smell of alcohol and a

22   couple of you had to hold me up, right?  That's in

23   the statement you have here?

24        A.    No, sir, we didn't say we had to hold you

25   up.  We said we had to give you assistance to stand

145

1     up.

2          Q.    Well, how can a person chase a person and

3     yet still need assistance to stand?

4          A.    Because when we saw you, you were chasing

5     the subject.  And when we put you in handcuffs,

6     your knees were weak, as if you were tired or as

7     the alcohol was starting to affect you at that

8     time.

9          Q.    And how many officers was there?

10         A.    Two -- myself and my partner that I

11    remember.

12         Q.    What is your partner, male or female?

13         A.    He's a male.

14         Q.    A male?

15         A.    Yes.

16         Q.    And you can only remember you and your

17    partner there?

18         A.    Yes, sir.

19         Q.    How long have you been a police officer?

20         A.    Twenty-two months.

21         Q.    Twenty-two months.  So you had just came

22    on when this happened?

23         A.    No, sir.  I had been there about eight

24    months.

25         Q.    A year?

1          A.    Okay.

2          Q.    Is your partner here to testify?

3          A.    No, he is not.

4          Q.    We're going to need his testimony too

5     because this is conflicting.

6                THE COURT:    Well, go ahead and ask

7     the question.

8          Q.    With the testimony, you're saying you

9     seen me chasing her.    Yet and still, how can I be

10    chasing her, understand, and then one testimony

11    saying you out of sight?

12               THE COURT:    Can you answer that?    Do

13    you understand the question?

14                    THE WITNESS:    No, ma'am.

15               THE COURT:    Rephrase it.

16         Q.    It's conflicting one testimony saying you

17    said --

18               THE COURT:    No.    Just ask him the

19    question.

20         Q.    Are you saying, understand, that you seen

21    me chasing her, and then you had to come up there,

22    you and your partner, and assist me standing up and

23    then put me in custody because alcohol --

24               THE COURT:    What is your question?

25         Q.    That's what I'm asking him.    Is this what

1    he said?

2        A.    I'm still --

3        Q.    Are you saying when you came up on the

4    scene --

5                THE COURT:    Well, now, he's already

6    testified that he -- what he observed when he got

7    there and what he did in regard to your arrest, so

8    the jury has heard that evidence and you can argue

9    it --

10        Q.    And where were you and what --

11                THE COURT:    -- at the end of the

12    case.    What's your question?

13        Q.    Did you put me under arrest or what or

14    put me in a car or whatever?

15        A.    Yes, sir.    We put you under arrest and

16    put you in the back of our patrol car.

17                THE DEFENDANT:    That's all.

18                THE COURT:    Anything else from him?

19                MR. BAILEY:    That's all I have of

20    him.    Can he be excused, Your Honor?

21                THE COURT:    You're excused.

22                (Witness excused.)

23                THE COURT:    Your next witness?    If

24    you would raise your right hand?

25                        ROSEBUD BROWN

1          The witness, having first been duly sworn or

2     affirmed to speak the truth, the whole truth, and

3     nothing but the truth, testified as follows:

4                      DIRECT EXAMINATION

5     BY MR. BAILEY:

6          Q.    Good afternoon, ma'am.

7          A.    Good evening.  How are you?

8          Q.    Fine.  Could you please state your name?

9          A.    My name is Rosebud Brown.

10         Q.    Ms. Brown, I want to get right to the

11    point at hand and ask you if you know the parties

12    in this case, Mr. John Minnifield and Vonciel

13    Minnifield?

14         A.    Yes, I do.

15         Q.    How do you know them, please, ma'am?

16         A.    I know her -- she moved over to where I

17    was living, Brookview Apartments, and her two

18    daughters.  She had been over there approximately

19    two weeks when I encountered him.

20         Q.    Okay.  And I want to talk about that.  Do

21    you -- let me ask you this:  Do you know

22    approximately a time frame when this was?

23         A.    You're talking about the month of the

24    time?

25         Q.    Yeah.  Approximately the time frame?

1        A.    It was before Christmas, leading around
2    the holidays.
3        Q.    What year are we talking about?
4        A.    Last year.
5        Q.    Are you referring to '99 or '98?  You
6    know, we just had a change of year.
7        A.    '98, I think.
8        Q.    '98?
9        A.    I'm not for sure.
10        Q.    Are you talking about this last
11    Christmas?
12        A.    The Christmas before, yes.
13        Q.    So that would have been '98?
14        A.    Yes.
15        Q.    You said at that approximate time frame,
16    sometime before Christmas in '98, that you
17    encountered the defendant?
18        A.    Yes.
19        Q.    Can you tell us about that encounter,
20    what happened?
21        A.    It was on a Friday, and it was
22    approximately around about ten o'clock at night.
23    And where my apartment complex was long, there was
24    a bench sitting there, and we all heard a lot of
25    cussing and SOB'g and this type thing.  I'm going

1    to kill so and so and so. And so I looked out my

2    bedroom window because the bench is right by my

3    bedroom window. And then I called my next-door

4    neighbor, and I asked her did she know who it was

5    out there, because I thought maybe somebody -- she

6    has a cousin who he be doing the same thing, and

7    she said no. So I called 911. And when the police

8    came, he had left. As soon as he left, he came

9    back. Not seeing his face at all, he went back

10   until about six o'clock in the morning, and that's

11   when I got my first look at him.

12        Q.   Okay. And did you observe him doing

13   anything?

14        A.   He was cussing and talking about her and

15   her kids. And he was drinking. He had a bottle of

16   liquor sitting the bench. And there was another

17   gentleman with him real stout, but he left him

18   because he was trying to get him to leave, and he

19   wouldn't. And he kept saying, I'm going to kill

20   that SOB.

21        Q.   Have you ever -- since that time -- well,

22   let me ask this. Is there any other time that you

23   encountered this defendant?

24        A.   Yes.

25        Q.   Okay. Can you tell us about that?

1        A.    The night that he came to Vonciel's door

2    with the hatchet, and he was --

3        Q.    Do you know -- and I'm sorry to interrupt

4    you.  Can you give us a time frame on when this

5    might have been -- are we still talking about '98?

6        A.    At night.

7        Q.    No.  I mean, 1998 year?  Is that when

8    we're talking?

9        A.    Yes.

10        Q.    Okay.

11        A.    Approximately about -- between ten and

12    eleven o'clock, we heard, like, click on the door,

13    like somebody was trying to knock down a door.  And

14    so the young lady that lived upstairs over me, she

15    called me and asked me was everything all right

16    downstairs.  And I told her it wasn't coming from

17    my house.  So at that time, we came to the door,

18    approximately, at the same time, he, in essence,

19    was kicking the door and hitting it with the

20    hammer.

21        Q.    When you say "he," who are you referring

22    to?

23        A.    Mr. Minnifield.

24        Q.    Okay.

25        A.    He was hitting it with the hammer and

1    cussing saying that if she didn't open the blank

2    blank door, he was going to kick it in, and he did.

3         Q.    Did you see him do that?

4         A.    Yes, I did.   He was standing right out

5    there.   And I had the phone in my hand because I

6    had dialed 911, because I knew of the incident,

7    what was going on, and I would watch her door.   And

8    her kids would come over to my house while she be

9    gone -- stay over at my house.   So when he went

10   entered it, he went in and her oldest daughter, he

11   hit her.

12        Q.    Did you see that?

13        A.    Yes, I did.

14        Q.    And from there, the only thing we could

15   see from the outer side, we just heard the

16   screaming and the tussling on the inside, and

17   everybody tried to call 911.   And I kept hearing

18   her cussing so forth.   So around about fifteen

19   minutes into this, I saw her come out the window.

20   He pushed her out the window.   The next thing

21   was --

22              THE COURT:   We need more question

23   and answer than just narrative.

24              MR. BAILEY:   Okay.

25        Q.    You saw her come out the window?

1          A.    Yes.

2          Q.    Okay.   What happened at that time?

3          A.    And then she was begging for her baby

4    daughter to come out the window.  And probably

5    about in five minutes, she finally got her to come

6    through the window and her daughter jumped out the

7    window.  Her oldest daughter, in essence, had

8    turned around to went back into the house to look

9    for them, but they had -- he had pushed her,

10   Vonciel, out the window first.

11         Q.    The apartment complex that you were

12   living at at that time and you said the victim was

13   living at at that time, Brookview Apartments?

14         A.    Yes, sir.

15         Q.    Okay.   Is that located here in Montgomery

16   County?

17         A.    On the Upper Wetumpka Road.

18         Q.    Is that in Montgomery County?

19         A.    Yes, it is.

20         Q.    And the person that you're referring to

21   as John Minnifield, is that person in the courtroom

22   today?

23         A.    Yes.

24         Q.    And can you please point him out to the

25   ladies and gentlemen of the jury?

1      A.    (Witness points.)  He's sitting right

2   there.

3                    MR. BAILEY:  Let the record reflect

4   that she has identified the witness, John

5   Minnifield.

6        And, Your Honor, at this time, this is all the

7   questions I have of Ms. Brown.

8                    CROSS-EXAMINATION

9   BY MR. MINNIFIELD:

10      Q.    Ms. Brown, how are you doing?

11      A.    I'm fine.

12      Q.    I think this is about the third time you

13   and I met.  I want to ask you a few questions.

14      A.    Excuse me, what did you say?

15      Q.    I think this is --

16                    THE COURT:  Just ask her the

17   question.  Go ahead.

18      Q.    I want to ask you a few questions.

19      A.    Sure.

20      Q.    You and Vonciel are -- you all are real

21   good friends, right?

22      A.    Yes, I consider her as being a friend of

23   mine.

24      Q.    A friend of mine.  Okay.

25      A.    More like a daughter, sir.

1      Q.    Okay.  Have you ever had a conversation

2    with John Minnifield?

3      A.    Yes.  You?  Yes.

4      Q.    And what was that conversation?

5      A.    You want the first or the last

6    conversation?

7                THE COURT:  Could you put it in a

8    time frame?

9      Q.    October of '98, anytime in October of

10   '98?

11     A.    I don't recall the month, sir, but you

12   had two encounters with me.  One -- both was at my

13   door.  You came to my house.

14     Q.    Right.

15     A.    And you -- in essence, she was there, and

16   you said you want to see her.  And I said, Get off

17   my porch.  You're trespassing.  You went like this.

18   And I had my son's shotgun in my hand, and I said,

19   Get off my porch and don't come back.  You're

20   trespassing.

21        The second time that I saw you, you came and

22   pretended like you had a piece of paper to give

23   her.  And I told you that they had a warrant

24   against you.  If they caught you on the property,

25   they would trespass you.  And I was living in

1    Apartment 11 at the time.

2         Q.    Ms. Brown, some kind of way you moved

3    from Brookview Apartment.  Have you moved from

4    Brookview Apartment now?

5         A.    Yes.

6         Q.    And were your son, Tim, staying there

7    with you at the time?

8         A.    Staying where?

9         Q.    In Brookview Apartment with you at the

10   time this incident was happening?

11        A.    Most certainly.

12        Q.    Sure was.  Okay.  Ms. Brown, is it true

13   that Vonciel lost her apartment and was living with

14   you and Tim by she was dating your son?

15        A.    Say again.

16        Q.    And you put them out?

17        A.    Mr. Minnifield, first of all, I'm raising

18   three grandbabies.  Vonciel --

19        Q.    Sure.

20        A.    You asked me a question.  Let me answer

21   it.

22        Q.    Sure.

23        A.    First of all, Vonciel wouldn't be

24   sleeping in my house with my son.  My son is 31

25   years old.

1          Q.    Sure.

2          A.    My son and Vonciel has never had an

3    intimate relationship before.  And Vonciel, when

4    you tried to run them off the road in Millbrook,

5    she was taking him to go get the little boy that's

6    outside the courtroom now.  I don't run a --

7          Q.    I object.

8          A.    Excuse me --

9                THE COURT:  Wait just a moment.

10   Wait just a moment.  Listen to his question, and I

11   think you've answered it.  Go on to your next

12   question.

13               THE DEFENDANT:  I have no further

14   questions for that witness there.

15               THE WITNESS:  Thank you.

16               THE COURT:  Anything else for her?

17               MR. BAILEY:  Your Honor, I don't

18   believe I do.  I think that's all the questions I

19   have.  May she be excused?

20               THE COURT:  You're excused.

21               (Witness excused.)

22               THE COURT:  Your next witness?

23               MR. BAILEY:  If you would raise your

24   right hand, so the Judge could swear you in?

25               THE COURT:  If you would raise your

1    right hand?

2                    LAWANDA BENSON

3         The witness, having first been duly sworn or

4    affirmed to speak the truth, the whole truth, and

5    nothing but the truth, testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. BAILEY:

8         Q.    Good afternoon, ma'am.

9         A.    Hey.

10        Q.    Can you please tell the ladies and

11   gentlemen of the jury your name?

12        A.    Lawanda Benson.

13        Q.    And, Ms. Benson, do you live here in

14   Montgomery?

15        A.    Yes, sir.

16        Q.    Okay.  I want to get right to the point

17   and ask you if you deal with a person by the name

18   of Vonciel Minnifield?

19        A.    Yes, I do.

20        Q.    How do you know her?

21        A.    I used to babysit her kids.

22        Q.    Okay.  How long did you do that?

23        A.    I say about a year or so or more.

24                    THE COURT:  Can all of you hear her?

25                    (Jurors nod.)

1       Q.   Can you give us kind of a time frame of

2  when you were doing this?

3       A.   Well, I met Vonciel when we used to live

4  on the other side of town on the west side over

5  there by Carver. That's where I met her and John

6  Minnifield. We used to live across the street from

7  her. Both of them used to work, and she trusted me

8  to keep her kids. And I used to keep her kids that

9  way. It has been, like, a year or more that I kept

10  her kids. She moved. We moved. We still kept in

11  contact with each other. And they moved in the

12  apartment, Brookview. That's closer. I still kept

13  her children while she was still at work.

14       Q.   Okay. And what -- when was the latest

15  time that you had kept her children? I'm

16  talking -- I'm not asking you to give me an exact

17  date, but if you can give me a time frame.

18       A.   Last time I kept her children was

19  September or October. She was at work, and I was

20  at her house in Brookview Apartments and I kept her

21  kids.

22       Q.   And this is what year?

23       A.   Last year, '99.

24       Q.   This was last year, this past September?

25       A.   Right.

1    Q.    Okay.    Now, I want to direct your

2    attention back to -- back to November of 1998.

3    During that time frame, did you have an opportunity

4    to have an encounter with the defendant in this

5    case, Mr. John Minnifield?

6        A.    Yes, I did.    He came to my house when I

7    was living in Riverside.

8        Q.    Okay.    You were living in Riverside, and

9    you say Mr. Minnifield came to your house?

10       A.    Yes.

11       Q.    Can you tell us what happened?

12       A.    Well, he didn't know for sure that's

13   where I live.    He seen my car.    I guess he figured

14   that nobody else in Riverside had a car like I had.

15   And he knocked on the door -- well, he blowed the

16   horn, and we didn't come to the door.    Then he

17   knocked on the door.    My boyfriend at the time came

18   to the door, and he said, oh, do Lawanda -- oh, hey

19   Demetrius, how are you doing?    And he was, like, my

20   boyfriend, Lawanda, John, wants you.

21                THE COURT:    Wait just a minute.    She

22   needs to slow down.    And I think you need more

23   question and answer.

24                MR. BAILEY:    And, Your Honor, I

25   believe she's testifying as to what Mr. Minnifield

1    said.

2

3         Q.    But if you will slow down so Judge can

4    understand you and the jury can understand you.

5         You said Mr. Minnifield was outside blowing

6    the horn?

7         A.    Yes.

8         Q.    Pick up from there and tell us slowly

9    what happened.

10        A.    He blowed the horn.  So we didn't get up.

11   We didn't get up to go to the door.  He got out of

12   the car, and he knocked on the door.  He wasn't for

13   sure that I lived there.  So he was, like, do

14   Lawanda -- oh, hey, Demetrius -- that's my

15   boyfriend's name at that time -- how are you doing?

16   Is Lawanda here?  So my boyfriend said, Yeah.  So

17   he hollered out in the house, Lawanda, John wants

18   you.  I was, like, John -- I didn't know it was

19   John Minnifield.  So I walked to the door, and I

20   said, John, don't come to my house with this mess.

21   Why don't you leave the lady alone?  After that I

22   told -- because I was afraid of him too.  So I

23   said, You stand over here and I'll stand right

24   here.  He was, like, Lawanda, you're about the only

25   one I can talk to for me not to hurt Vonciel and

```
 1      her kids.  I have talked to John.  John, leave the

 2      lady alone.

 3                  THE COURT:  Wait.  Again, we need

 4      more question and answer.  Don't go any further

 5      than necessary to answer the questions.

 6                  THE WITNESS:  Okay.

 7          Q.   Okay.  Lawanda, you said that

 8      Mr. Minnifield had made the comment to you that you

 9      were about the only one he could talk to to keep

10      him from hurting Vonciel and the kids; is that

11      correct?

12          A.   That's correct.

13          Q.   Now, what else did he say to you, if

14      anything?

15          A.   But that certain day --

16          Q.   That day, correct.

17          A.   Him -- well, there had been certain

18      occasions that he came over to my house.  But that

19      day, he was by himself.  So another following day,

20      he came over there with another man.  I don't know

21      the man's name, but he was driving John's car.

22      John was on the passenger side.  John had been

23      drinking because I was smelling on him.  You know,

24      my hand was, like, on the window part.  And I was

25      afraid of him too, but I didn't want him to think I
```

1    was.  And he grabbed my hand, and I slide my hand

2    away from him.  So John, from my arm, I know for a

3    fact that he had a gun --

4         Q.   Now, how --

5              THE COURT:  Now, wait just a moment.

6              THE DEFENDANT:  Object to that.

7              THE COURT:  Don't volunteer that.

8    I'm going to sustain your objection.  Disregard the

9    last answer.  Go ahead.  Ask her a question.

10        Q.   Lawanda, when you say that he grabbed

11   your hand and you pulled back from him, what did he

12   do in reaction to that?

13        A.   You know, he was crying, like, he don't

14   know what to do.  Say he was going to wind up

15   killing him and the kids and then kill himself.

16        Q.   Who was he referring to?

17        A.   Von and her kids.

18        Q.   And can you describe his appearance at

19   that time?

20        A.   What you mean?

21        Q.   Well, what did he look like?

22        A.   He was, like -- like, he haven't been

23   getting no sleep.  Like, he used to keep his hair

24   trimmed down.  He didn't have no haircut, like

25   combed his hair or anything like that.

1    Q.    Did he have anything with him?

2    A.    Sir?

3    Q.    Did he have anything with him?

4    A.    That period of time, I wasn't for sure.

5    It was, like, daybreak, this day -- that day, it

6    was daybreak when he came over there.

7    Q.    Was there another time that you

8    encountered him?

9    A.    Yeah, he had came to my house numerous

10   times.

11   Q.    Okay.  Let's talk about the next time.

12   A.    The next time he still talked about him

13   hurting Vonciel.  He admitted himself that he ran

14   her off the road because she was in the car with

15   another man.

16   Q.    Okay.  Slow down because --

17             THE DEFENDANT:  Object to that,

18   Lawanda.

19             THE COURT:  Overruled.

20   Q.    I had a hard time understanding you.  If

21   you'll just slow down.  You tend to talk fast.

22   Tell us about that occasion again.

23   A.    He, himself, told me the second --

24   another occasion that he came over there, that --

25   well, I haven't been talking to her in a good

1    little while because I've been working and going to

2    school. She been working. And I was afraid of him

3    to where I had to go back to my mom's house. But

4    that day I was fixing to get ready to leave and go

5    to the mall. And I would, like, try to dodge him,

6    like hide my car or something like that. But that

7    certain day, he admitted, himself, that he ran

8    Vonciel Minnifield off the road with another man in

9    the car. I didn't know anything about it.

10        Q.    Did -- what was the reason -- did he give

11    you any reason that he was telling you this? Did

12    he say anything else in connection with this?

13        A.    Only thing I know, John said he gave

14    Vonciel everything and this is how he get paid

15    back. That's the only thing he told me.

16        Q.    Could you tell if he was angry or not?

17        A.    Yeah.

18        Q.    Did he have anything with him on that

19    occasion?

20        A.    No, sir, not that I know of. I wasn't

21    really looking that day.

22        Q.    Okay. Is there any other occasion that

23    you encountered the defendant, Mr. Minnifield?

24        A.    That he had something on him?

25        Q.    Well, no. Is there just any other

1    occasion that you encountered --

2        A.    Well, he used to just come over there and

3    talk about what he was going to do to her, how he

4    was going to do it to her, and when he was going to

5    do it to her.

6        Q.    Okay.  Now, let's talk about this.

7    Exactly what would he say?

8        A.    Okay.  He would say something, like --

9    Vonciel is so afraid of him to where I gave her my

10   car to get around.  He knew that I gave her my car.

11   He was, like, Vonciel got your car today, don't

12   she?  And I look at him, like, no, she don't.  You

13   know, he's was, like, she do because I seen her

14   when she picked up the kids.  I seen her when she

15   went to work, stuff like that.  So I was, like,

16   once again, John, leave the lady alone.  Let her

17   move on.  That was your fault.

18       Q.    And what did he say?

19       A.    So he was, like, Lawanda, you just don't

20   know.  You don't know nothing.  You don't know

21   nothing.  You know, constantly saying stuff.  And

22   he was, like, well -- that day, he was, like,

23   before Thanksgiving she was going to wind up dead.

24       Q.    He told you that?

25       A.    Yeah, he said it himself.  Before

1       Thanksgiving, Vonciel is no longer going to be no

2       Vonciel and her kids.  He said, I don't know you

3       made Vonciel.  I made Vonciel.  And I once again

4       told him, John, don't come to my house with this

5       mess.  I have nothing to do with this.  And so

6       that's what John said out of his mouth.

7           Q.   Did he tell you how she was going to wind

8       up dead?

9           A.   Well, he didn't tell me how she was going

10      to wind up dead, no, he didn't.

11          Q.   Any other occasions that you can recall?

12          A.   Besides other days -- but that certain

13      particular day, him and this other man came over

14      there.  It was one night -- it wasn't, like, late,

15      but it was one night.  But he came over there, him

16      and another guy.  This is, like, my second time

17      seeing him.  But by me knowing his name, I don't

18      know his name.

19          Q.   You're talking about the other guy?

20          A.   Right.

21          Q.   Okay.  What happened on that occasion?

22          A.   How his car was parked, it was parked

23      like this way towards my house.  This is my house.

24      The car was parked this way.  And it was just one

25      way that you can get in Riverside.  And it was,

1    like, one car passed by and reflecting -- the

2    lights reflected inside the car.  I wasn't paying

3    no attention of his waist, but I knew he had

4    something in a white cup he was drinking.  So I

5    said, John what is you drinking?  I said, John,

6    you're talking out of your head.  What is you

7    drinking?  Nothing.  Nothing.  He raised his voice.

8    And the man that was driving was laughing at him.

9    So I told him, What is you laughing at?  You think

10   this is a game?  This is somebody's life you're

11   playing with.  So --

12        Q.    Did Mr. Minnifield say anything else on

13   that occasion regarding Mrs. Minnifield?

14        A.    He told me time was up.  He was tired.

15        Q.    Time was up?

16        A.    Time was up.  He was tired.  That's when

17   I got in contact with Vonciel and told Vonciel,

18   Vonciel, you need to do something about this.  You

19   can't keep running.  And, you know, at that time

20   she was, like, in another place, like one of them

21   safe home places.  I don't know whereabouts.  She

22   didn't tell me.  So that's where we lost our

23   contact at because she was at that safe place.

24        Q.    Okay.  At any time during the course of

25   you seeing Mr. Minnifield, did you ever see him in

1    possession of a weapon?

2         A.    No.   I mean, I never seen him actually

3    pull out one.   You know, he didn't even pull it out

4    that day either.   But --

5              THE COURT:   Well, you've answered

6    it.   You've never seen --

7              THE WITNESS:   Right.   Besides that

8    day he came to the house.

9         Q.   You say besides the day he came to your

10   house --

11        A.   Yeah.

12        Q.   -- did he have one at that time?

13        A.   Yeah.   He didn't actually raise it up.

14   But when the second car passed by, the car -- the

15   light reflected inside the car.   And when he brung

16   the cup back to his mouth, he was bringing it back

17   down, like, sitting it between his legs.   And it

18   was there.   And I said, John, what is that there

19   that you have?   And the man that was driving said

20   something about that's a pistol he's got.   And I

21   was -- once again, told the man, you find this so

22   funny --

23              THE COURT:   Did you see it?

24              THE WITNESS:   Yes, ma'am.   Yes,

25   ma'am.

1    Q.   Okay.  And on that particular occasion
2    that you said that you saw the weapon and he was
3    holding the beer cup, did -- on that occasion, was
4    he also making threats against Mrs. Minnifield?
5    A.   Yeah.  Everything he -- every time he
6    came over there, he was making threats of doing
7    something to her.
8    Q.   I hate to ask you this question because I
9    know these things are hard to estimate, but can you
10   give us maybe a number of times that Mr. Minnifield
11   would come over to your house doing all these
12   things?
13   A.   I say at the maximum, John Minnifield had
14   been over at my house about five to six times.
15   Q.   Okay.  At the maximum?
16   A.   Right.
17   Q.   Were -- just one question, and I'll wrap
18   it up with you, Lawanda.  During the times he came
19   over these five or six times, each time were you
20   keeping her kids or was --
21   A.   Like I said, that's where we lost our
22   contact at.  Like, she was in a safe home.
23   Q.   Okay.  So her kids were not there every
24   time he came?
25   A.   Right.

1    Q.    Okay.

2    A.    Her kids were with her at that time

3    because that's where we lost our contact at because

4    she was, like, in a safe place.

5    Q.    Okay.  And I may have already asked you

6    this, but just of rebundance of caution.  The

7    residence -- and I think you may have talked about

8    two different residences -- your mother's house?

9    A.    Well, at that time he was coming to my

10   house, I was living at Riverside.  And my mom and

11   my dad got some fears of him coming there, you

12   know, she thinking that he would do something to me

13   too, so I moved back to my mom's house.

14   Q.    Did he ever come over to your mom's

15   house?

16   A.    Well, he came over there to talk to my

17   dad, trying to, I guess, brainwash my father.

18   Q.    Okay.  Okay.

19            THE COURT:  Disregard that last

20   comment.

21   Q.    The place that you were living prior to

22   you moving over to your parent's house, was that in

23   Montgomery?

24   A.    Yes, sir.

25            MR. BAILEY:  Okay.  I don't think I

1    have any further questions.

2                    CROSS-EXAMINATION

3    BY MR. MINNIFIELD:

4        Q.    Lawanda, how long have you been knowing

5    the Minnifields?

6        A.    You and your wife?

7        Q.    Sure.

8        A.    I say about -- I can't really give you in

9    years, but it has been a good long time from when

10   we were living on the other side of town.

11       Q.    Who did you know first, her or I?

12       A.    I knew you first.

13       Q.    Okay.  And we've -- have we always

14   treated you fair, the both of us?

15       A.    Yeah.  I mean, yeah.  I had no problems

16   out of you and her.

17       Q.    And when did we start getting you as a

18   babysitter?

19       A.    When she started working at RS -- working

20   at that plaza place downtown.

21       Q.    And where were we living then?

22       A.    On the other side of town.  And the

23   children used to come over there and spend the

24   night.

25       Q.    The children used to come over where and

1    spend the night?

2         A.    On the other side of town -- west side,

3    on West College Street.

4         Q.    When we had you for a babysitter over

5    there?

6         A.    I used to off and on keep the children

7    whenever they came to spend the night with you and

8    her.

9         Q.    Lawanda?

10        A.    Yes, sir.

11        Q.    Since you've been living in Riverside,

12   you said you seen me with a gun.  Is it not that

13   you got the person turned around?  I'm asking you,

14   haven't you got your time frame and different

15   peoples mix up?

16        A.    No, sir.  That was you, John Minnifield.

17        Q.    Did you tell me -- and I quote what you

18   say -- this other man that was with me, did you

19   tell us or tell me, go on with your life?

20        A.    Yes, I did.  Yes, I did.  Go on with your

21   life.  There wasn't no need in you making her

22   suffer.

23        Q.    Because did you tell me that I love you

24   like a father?  Did you tell me that?

25        A.    Yes, I did.  Honest, I do.  I do love you

1    like a father, but there wasn't no need in you

2    putting her through that.

3        Q.  Did you grab my hand, not me grabbed

4    yours, and put on your belly where you were

5    carrying the baby, right, and said, John, if you

6    mess with that woman -- and I like the both of

7    you -- then I will kill myself and the baby?

8        A.   No.  No, I didn't.  No.  No, sir, I

9    didn't.

10       Q.   Okay.  Well, we'll have a witness to

11   that.

12       A.   Okay.

13       Q.   And, furthermore, did you tell me that

14   Greg bought Vonciel a gun with a permit, and you

15   went back the next day and Vonciel had two guns --

16       A.   I don't remember that either.

17       Q.   -- with the permits?

18       A.   No.

19       Q.   You don't remember telling me, John, I

20   like the both of you.  I don't want to see either

21   one of you hurt?

22       A.   Yeah, you're right.  I did say that.

23       Q.   But Von is going to shoot you?

24       A.   No.  No.  Can I tell them exactly what I

25   said?

```
 1                        THE COURT:  The State can follow up
 2      if he needs to.  Just answer his questions.
 3           A.   Okay.  I did say, I do love both of
 4      y'all.  I treat Von like she's my second mother.
 5           Q.   But we're talking about the weapons now.
 6           A.   No, I don't remember me saying that
 7      Vonciel had possession of any type of gun.  No, I
 8      didn't.
 9           Q.   But you do say I had one?
10           A.   I mean, I have seen it when you was in
11      the car, when you and the man came to the house.
12           Q.   Will you describe the gun to the jury?
13           A.   Well, I can't really say how the gun
14      looked.  But, like I say, the first car passed by.
15      I wasn't paying any attention of his waist part.
16      But when I asked him again, John Minnifield, what
17      was that you drinking -- because he was talking out
18      of his head of what he was going to do to Vonciel.
19      The second car passed by, the car -- the light
20      reflected inside the car.  When he had the cup up
21      to his mouth, he was putting it in between his legs
22      again, and the gun was like resting -- like on
23      John's stomach right here.  I seen a hair part of
24      the gun.  I asked him, John, what was that you had?
25      John was, like, nothing.  Oh, nothing.  Nothing.
```

1    I'm tired of this blank.  I'm tired of this blank.

2    I'm tired of living.  I tired of her treating me

3    the way she is treating me.  I'm tired of her --

4        Q.    Lawanda --

5        A.    Yes, sir?

6                THE COURT:  Wait just a minute.

7    You've asked her.  Let her get through.

8        Q.    You're evading the question.  You've said

9    that one time.

10       A.    Okay.

11               THE COURT:  Do you understand what

12   the question is?

13               THE DEFENDANT:  Yes.

14               THE COURT:  No.  I'm asking her.

15               THE WITNESS:  Ma'am?

16               THE COURT:  Do you understand what

17   the question is?

18               THE WITNESS:  No, not really.  I

19   mean --

20               THE COURT:  Would you repeat your

21   question?

22       Q.    I said, first, I want to know where you

23   see the gun, what type of gun, what part of the

24   weapon did you see?

25       A.    That's what I'm saying.  It was right

1    across your stomach.  You were leaned down like

2    this with the beer between your legs right here.  I

3    said the head part of it.  The long part of it --

4    the long stem part of it.  I asked you, John, what

5    was that you had?  The man that was even driving

6    the car said, That's a pistol.  And that's when you

7    see me back up.  And I said, John -- that's when

8    you seen me start crying, and I said, John, myself,

9    is afraid of you.

10                  THE COURT:  Okay.  Go on to your

11    next question.

12        Q.    Okay.  You said -- you even said it's a

13    one-way down through there, right, where you're

14    saying at?

15        A.    Well, it was this way, and you came up

16    around that way.

17        Q.    Is one car can go through there at a

18    night because it's a narrow strip, right?

19        A.    Narrow, yes, sir.

20        Q.    Okay.  If I'm parked right there, how can

21    that second car, understand, come by and see the

22    lights flash over in there --

23        A.    Okay.

24        Q.    -- and you can see this?

25        A.    Okay.  This is my house.  Your car is

```
 1    this way.  This is your car right here.  Your car
 2    is this way.  Your car is not all the way parked
 3    up.  You see what I'm saying?  It's like, the tail
 4    part of the car is still in the street.  Do you see
 5    what I'm saying?  Once you turn like this, your
 6    light is going to reflect off that wall, and it
 7    reflected in your car.  That's how close the car
 8    came up to you, John, and came on around the curve.
 9    Do you see what I'm saying?
10              THE COURT:  Well, you've answered
11    that.  Go on to your next question.
12         Q.   In discussing this -- when we was
13    talking, did not I ask you to contact Vonciel?  Do
14    you remember me asking you that?
15         A.   Yes, I do.
16         Q.   And you said, Are you going to follow me?
17    Or did you remember me saying that?
18         A.   I mean, yeah --
19         Q.   Am I going to follow --
20         A.   -- certain occasion that I --
21              THE COURT:  Wait just a moment.
22    Don't both talk at the same time.  Let her get
23    through with the answer.
24         A.   There have been certain occasion that I
25    have said, John, you know, don't follow me.  You
```

1    knew already where she was.  But I didn't want

2    Vonciel to think that I was in between of what was

3    going on between you and her.

4                    THE COURT:  Okay.  Go ahead to your

5    next question.

6        Q.   And what reason would I have to follow

7    you if I know where she was at?

8                    THE COURT:  Well, she can't testify

9    to what your reasons are for doing something.

10                   THE DEFENDANT:  Can I say this --

11                   THE COURT:  No, sir.  You can't say

12   anything.  Go on to your next question.

13                   THE DEFENDANT:  That's what I'm

14   saying, my question, Judge.

15                   THE COURT:  Go to your question.

16       Q.   Okay.  Lawanda --

17       A.   Yes, sir.

18       Q.   -- I want you to think hard.  Back in

19   October.  I want you to think hard about the gun,

20   the weapon that disturbs me dearly.  Surely there's

21   something you can tell this court about this weapon

22   if you seen this weapon on me.  Surely there's

23   something you can tell them about --

24                   THE COURT:  Do you have anything

25   else --

1        Q.    -- how it looked?

2                    THE COURT:  -- you want to say other

3    than what you've already said?  She's answered --

4                    THE WITNESS:  That's it.

5                    THE COURT:  She's answered that

6    question.

7                    THE WITNESS:  I just seen the long

8    part of it and --

9                    THE COURT:  Move on to your next

10   question.

11       Q.    And another thing.  Could you tell me

12   what you -- what did you mean when you told me I

13   know where Vonciel at?

14       A.    Okay.  Can you repeat that again?

15       Q.    When you asked me -- well, when I asked

16   you to go call Von or wherefore, that I needed to

17   talk to her and you asked me, you know, where she

18   at?

19       A.    Yeah, because you was following the lady.

20   That's the reason why I said, John --

21                   THE DEFENDANT:  Object.

22                   THE COURT:  I'm --

23       Q.    Did you see me following her?

24                   THE COURT:  Wait a moment.

25   Mr. Minnifield, when I say something, don't say

1   anything else.  Now, what is your next question for
2   her?
3       Q.   I want to know where -- how did she --
4   did you see me following her?
5       A.   I have seen you one time leaving while
6   she was coming out of the building going to the
7   other building that she work at.  I seen you
8   following her that day because I came to John -- I
9   mean, Von's job.  And Von was very disturbed.  She
10  was scared.  She actually cried at work that day
11  because she knew you were following her.
12                  THE DEFENDANT:  I've got nothing
13  else for her.
14                  THE COURT:  Okay.  Anything else
15  from her?
16                  THE DEFENDANT:  No.
17                  THE COURT:  Okay.  You can step
18  down.  You're excused.
19                  (Witness excused.)
20                  THE COURT:  State's next witness?
21      Raise your right hand.
22                  LESTER GLAXTON
23      The witness, having first been duly sworn or
24  affirmed to speak the truth, the whole truth, and
25  nothing but the truth, testified as follows:

```
 1                    DIRECT EXAMINATION
 2     BY MR. BAILEY:
 3          Q.   Good afternoon, sir.
 4          A.   How are you doing?
 5          Q.   Can you please tell the ladies and
 6     gentlemen of the jury your name?
 7          A.   My name is Lester Glaxton.
 8          Q.   Mr. Glaxton, how are you employed?
 9          A.   I work for Vincent Security Service.
10          Q.   Okay.  And what do you do for Vincent
11     Security Service?
12          A.   I'm a senior field supervisor for them.
13     And we have different contracts, you know,
14     throughout Montgomery and some other states too.
15          Q.   And do you provide security services
16     for --
17          A.   Well, right now we supply it to
18     Montgomery Catering, the RSA Tower -- RSA -- all of
19     RSA's retirement systems of Alabama.
20          Q.   And were you so employed back in 1998?
21          A.   Yes, I was.
22          Q.   Let me ask you if you know a person by
23     the name of Vonciel Minnifield, this lady here?
24          A.   Yes, I do.
25          Q.   And how do you know her, sir?
```

1        A.    She works for the same catering company

2   that we have a contract with.

3        Q.    I want to -- let me ask you if you can

4   direct your attention back to late fall of 1998.

5   Did you have an opportunity to work on a job with

6   Mrs. Minnifield?

7        A.    Yes, we did, in Auburn, Alabama.

8        Q.    Okay.  Can you tell us the details about

9   that?  How did that come about that you worked on

10  that job?

11       A.    Well, Mrs. Minnifield asked me would I go

12  down, but I didn't want to get involved.  So her

13  boss, Mr. Waters, asked me would I go on the trip,

14  and that's how I got involved in it.

15       Q.    Did you agree to do so?

16       A.    Yes, I agreed.

17       Q.    And what were your duties on that

18  particular day?

19       A.    Well, primarily was she had some problems

20  with Mr. Minnifield, and she was afraid that he

21  might show up down there, not knowing that he had

22  done it before, so that's --

23                  THE DEFENDANT:  Object.

24       A.    -- why I went --

25                  THE COURT:  Wait just a moment.  I'm

1    going -- disregard that last portion of his answer.

2    I'm sustaining the objection.  Just what you know,

3    your contact with him.  He's going to be asking you

4    about that.

5        Q.    If you could, just tell me specifically

6    what your duties were for that day.  What were you

7    supposed to be doing that day?

8        A.    Well, my duty was to protect Mrs.

9    Minnifield from any harm -- bodily harm in any way,

10   form, or fashion.

11       Q.    And you had been asked to do that by Mrs.

12   Minnifield and her employer?

13       A.    Yes, that's true.

14       Q.    Okay.  And did you go to Auburn that day?

15       A.    Yes, I did.

16       Q.    Okay.  And can you tell us what, if

17   anything, happened in Auburn that day regarding

18   Mrs. Minnifield and your duties?

19       A.    Yes.  Later in the afternoon, once we had

20   gotten there, Mrs. Minnifield -- we was all -- I

21   just got up in the truck to take something off the

22   truck, and she came across the grounds and said,

23   he's here.  And, you know, John is here.  So that

24   way I came off the truck, and he started walking

25   back towards the street.

1    Q.    When you say "he," who are you referring

2    to?

3        A.    Mr. Minnifield.

4        Q.    Okay.

5        A.    And started walking, so we sort of ran to

6    catch up with him.  I was helping Mr. Waters.  And

7    then we did catch him.  Then we walked to the

8    street from that point.  And Mr. Waters began to

9    talk to him, you know, and asked him why he come

10    without invitation.

11        Q.    Did he respond?

12        A.    Oh, yeah, he said he wanted to talk with

13    Mrs. Minnifield.  And all he wanted to do was just

14    talk to her to get some things straight.  And at

15    that point, he said he was riding with somebody

16    else, and Mr. Waters went back.  I stayed there

17    with him until his ride came to pick him up.  Then

18    he left.

19        Q.    Okay.  The person that you have referred

20    to as Mr. Minnifield, is he in the courtroom today?

21        A.    Yes, he is.

22        Q.    Can you please point him out for the

23    ladies and gentlemen of the jury?

24        A.    (Witness points.)  He's seated at the

25    table there.

1          MR. BAILEY:  Let the record reflect

2    that this witness has identified the defendant,

3    Mr. John Minnifield.

4          And that's all the questions I have for this

5    witness.

                    CROSS-EXAMINATION

6

7    BY MR. MINNIFIELD:

8          Q.    Mr. Glaxton, you was hired by Vonciel

9    Minnifield for what, to protect her from me?

10         A.    Yes, that's true.  It wasn't by Mrs.

11   Minnifield.  It was by Montgomery Catering.

12         Q.    By Montgomery Catering?

13         A.    Yes.

14         Q.    Have you ever seen me lurking around the

15   building where she work at and, you know, you're

16   the officer up there on duty?

17         A.    Yes, sir, Mr. Minnifield, I've seen you

18   several times driving around the building up and

19   down Ripley Street, down Adams Street on a number

20   of occasions.

21         Q.    On a number of occasions?

22         A.    Yes, sir.

23         Q.    Because do you know where my job is, sir?

24         A.    No, I don't know where your job is.

25         Q.    On occasion, right after the Auburn

1    incident, did I not ask you to escort me up to the

2    third floor, the Board of Accountant because my job

3    as a currier and I also work at Montgomery

4    Catering?  Is it not that I asked you due to the

5    problem that Vonciel and I had had, I said, I'm

6    glad to see you here.  Did I not ask you that?

7        A.    That's correct, you did.

8        Q.    And did I ask you to escort me up to the

9    third floor due to the fact I'm only doing my job?

10       A.    Yes, sir.  We discussed the fact that in

11    order to be in the building yourself, you would

12    have to be there by request of your job.

13       Q.    By request of my job.  And is it not if I

14    was going to do her any harm, right, why would I --

15    I want to ask you why would I ask --

16            THE COURT:  Well, you can't ask him

17    why you would do something or not.  Go on to

18    your -- you don't answer that.  Go on to your next

19    question.

20       Q.    Okay.  Did you not escort me up to the

21    fourth floor?

22       A.    As I stated before, yes, I did.

23       Q.    Yes.  And upon completion of the

24    business, then what happened then?  Did I hang the

25    people or etcetera or what?

1     A.    On that day, you exited the building.

2     Q.    I exited the building?

3     A.    On that day, yes.

4     Q.    Okay.  Did I get in my car and drive

5  away?

6     A.    As I said, you exited the building.  That

7  was my only concern.

8     Q.    Okay.  And you said you have seen me up

9  there on several different occasions?

10    A.    That is true.

11    Q.    Do I not -- from the time you know of me,

12  haven't I been working for Montgomery Catering?

13    A.    At this --

14    Q.    That you know of?

15    A.    This is prior to this incident.  Yes, you

16  was.

17    Q.    Prior to that.  And you have no reason to

18  know that I wasn't fired.  I still had my job there

19  at Montgomery Catering and that could be a reason I

20  could be up there?

21    A.    No, sir.  I don't think you had the job

22  at that time.

23    Q.    You don't think?

24    A.    No, sir, I don't think you did.

25    Q.    Okay.  You was hired to protect Mrs.

```
 1    Minnifield?  You weren't hired to call the police,
 2    everybody up there, so they can understand that's
 3    out.
 4                    THE COURT:  What is your question?
 5         Q.    Have you seen me with Mrs. Minnifield,
 6    threatening Mrs. Minnifield in any kind of way?
 7         A.    I have not seen you threaten her, no, I
 8    have not, other than her being in Auburn.  That's
 9    the only time I could say.
10         Q.    And then by being up there in Auburn --
11    and there's a hundred thousands people out there --
12    did you have to chase me down to catch me?
13         A.    Well, we had to run to catch up with you.
14    After you saw us coming, you began to walk away.
15    Mr. Waters and myself had to kind of run to catch
16    up with you.
17         Q.    Okay.  Is it because -- could it have
18    been because Vonciel came down there where you all
19    were, and I seen that she wasn't going to talk, and
20    I turned to walk away?
21                    THE COURT:  He can't --
22         Q.    When you came up --
23                    THE COURT:  Mr. Minnifield, he can't
24    testify to why you did something.
25         Q.    That's what I'm fixing to tell him.  When
```

| | |
|---|---|
| 1 | you came up, did I show any type of threat to |
| 2 | Vonciel that you know of or to the company in |
| 3 | general? Was I drunk? Was I calm, or did I show |
| 4 | where I was angry or what? |
| 5 | A. Well, I don't know which one you want me |
| 6 | to answer first, but -- |
| 7 | Q. Either one. |
| 8 | A. Okay. The one about drinking, you -- it |
| 9 | appeared to me you had been drinking quite a lot. |
| 10 | Secondly, I can't state whether you were going to |
| 11 | do bodily harm or not because you were in the |
| 12 | potential. It's in my behalf you were real angry |
| 13 | because she would not allow you to speak to her. |
| 14 | Q. But I was retreating? |
| 15 | A. You was retreating. After she came to us |
| 16 | to get me and Mr. Waters, then you start retreating |
| 17 | back toward the street. |
| 18 | THE DEFENDANT: No more questions. |
| 19 | THE COURT: Anything else for him? |
| 20 | You can step down. You're excused. |
| 21 | (Witness excused.) |
| 22 | THE COURT: Your next witness? |
| 23 | Raise your right hand. |
| 24 | TIMOTHY BROWN, JR. |
| 25 | The witness, having first been duly sworn or |

```
 1     affirmed to speak the truth, the whole truth, and
 2     nothing but the truth, testified as follows:
 3                    DIRECT EXAMINATION
 4     BY MR. BAILEY:
 5          Q.   Would you please state your name for the
 6     ladies and gentlemen of the jury?
 7          A.   Timothy Brown, Jr.
 8          Q.   Okay.  If you could, speak up just a
 9     little bit so everybody can hear you.
10          A.   Timothy Brown, Jr.
11          Q.   Okay.  Mr. Brown, I want to get right to
12     the point of this case and ask you if know a person
13     by the name of Vonciel Minnifield, this lady here?
14          A.   Yes, I do.
15          Q.   And how do you know her?
16          A.   Well, she moved in the apartment complex
17     where my mother used to stay.
18          Q.   Okay.  And who is your mother?
19          A.   Rosebud Brown.
20          Q.   All right.  And she was in here -- I
21     don't know if you would have known -- had she been
22     in here earlier to testify?
23          A.   Yeah, she came in.
24          Q.   Now, Mr. Brown, I want to direct your
25     attention back to November of 1998, and ask you if
```

1    you recall or if you, at that date, witnessed any

2    type of incident between Mrs. Minnifield and the

3    defendant in this case, John Minnifield?

4        A.    Yes, I do.

5        Q.    Okay.  Can you tell us how all that came

6    about?

7        A.    Well, I think it was on a Saturday or

8    Sunday morning, I asked her to take me -- because

9    my car was broke down -- to take me to get my son

10   from Millbrook.  In the process, we got on the

11   Lower Wetumpka Road, turned, like, coming out by

12   Hardee's, we saw him.  And he didn't see us at the

13   time we turned getting on the northern bypass.  We

14   got down to the red light right at, I think, Court

15   Street, where the UPS building and Winn-Dixie

16   Warehouse.  He pulled up beside us and started

17   pointing his finger and saying all kinds of slang

18   language.

19       Q.    Could you hear, understand what he was

20   saying?

21       A.    Not really because the window was rolled

22   up.  It was kind of cool that day.

23       Q.    Okay.

24       A.    But anyway, when we got on up past the

25   red light, like, going toward the bridge off of --

1    I think that was Sixth Street coming off of Court
2    Street -- I mean, off the northern bypass, he tried
3    to run us off the road.
4         Q.   Okay.  Tell us -- you say he tried to run
5    you off the road.  Tell us exactly -- you know,
6    paint the picture for the ladies and gentlemen of
7    the jury --
8         A.   Well, you got two cars.  We're in one
9    lane and he in the other.  She speeded up.  She
10   said, Tim.  She said, Tim, that's my ex-husband.
11   And I looked over.  I never seen him, so I didn't
12   know what was going on.  We're in the lane.  He
13   speeded up and pulled over in front of us.  She
14   stopped.  He pulled out, so we slowed up.  She ran
15   past him again.  So we turned going off toward the
16   Millbrook.  I think about the second bridge, he
17   tried it again.  So he pulled up in front of us
18   this time, so she hit brakes and turned, and we
19   went off the median.  We turned back around and
20   went back down 65 going back toward Montgomery.
21        Q.   Okay.  And were you able to see the
22   person that had done this?
23        A.   Yes, I did.
24        Q.   Okay.  Get a good look at him?
25        A.   Yes, because he had a little boy in the

1   car with him at the time.

2       Q.   Had someone else --

3       A.   Yes, a little boy.  We -- well, I thought

4   it was a lady -- a bald-headed lady, so -- he had

5   an earring in his ear and he was squashed down in

6   the seat.  And as they tried to run us over, I saw

7   the little boy in the car with him.

8       Q.   Okay.  And you've named some streets that

9   some of these events happened on, but I'm going to

10   ask you anyway.  The events that you talked about,

11   did those happen in Montgomery County?

12       A.   Yes.

13       Q.   And the person that you saw do these

14   things that you said, tried to run you and Mrs.

15   Minnifield off the road, is that person in the

16   courtroom today?

17       A.   Yes.

18       Q.  And can you please point him out?

19       A.   (Witness points.)  He's sitting right

20   there.

21              MR. BAILEY:  And let the record

22   reflect that the witness has identified the

23   defendant, John Minnifield.

24       And I think that's all the questions I have.

25                 CROSS-EXAMINATION

BY MR. MINNIFIELD:

    Q.   Mr. Brown, you said we was -- you all was coming down Lower Wetumpka?

    A.   That's right.

    Q.   And you got on the northern bypass?

    A.   That's right.

    Q.   You also said in your statement, say I didn't see you?

    A.   Well, if you did, I didn't know you seen us.  I mean --

    Q.   Okay.

    A.   If you did, that was you.  But I'm saying to my point of view, I didn't know you seen us until you got to the light.  That's when you pulled up beside us.

    Q.   And when I pulled up beside you at the light or whatever, is it a possibility I could not have recognized either one of you because I don't think I had met you before?

    A.   Well, from the statement you made, it looked like you did because you started cursing and pointing your finger, so evidently you did know her, even though you didn't know me.

    Q.   Oh, I know that is my wife.

    A.   Well, you just said you didn't know --

1          THE COURT:  Wait just a moment.  Go

2    on to your next question.

3          Q.   Okay.  Are you in the military?

4          A.   No, I'm not.

5          Q.   In the National Guard?

6          A.   No, I'm not.  I work at S&CP.

7          Q.   Okay.  And is there any other time you

8    encountered me around your place or your mother's

9    place or around her place?

10         A.   Yes.

11         Q.   Could you tell to the jury there what I

12   was doing?

13         A.   You was trailing her on her way to work.

14         Q.   On her way to work?

15         A.   Yes.

16         Q.   And how was I trailing her?

17         A.   In your car.

18         Q.   Describe the car I was trailing her in.

19         A.   It's a black two or four-door Regal --

20   Buick Regal with an antenna on the back -- a CB

21   antenna.

22         Q.   And where was I trailing her at?

23         A.   Off Lower Wetumpka Road coming up to

24   Ripley Street.

25         Q.   Off the Lower Wetumpka Road coming up

1    Ripley Street?

2        A.    Excuse me.   It's the Upper Wetumpka Road

3    coming up by the police station.

4        Q.    Were you in the car?

5        A.    Yes, I was.   But I wasn't in her car.   I

6    was in her sister's car.   We trailed you.

7        Q.    Okay.   And you trailed me to her

8    workplace?

9        A.    Yes, I did.

10       Q.    And then what did I do?

11       A.    You kept going.   I guess you made sure

12   she was going to work or whatever, and you kept

13   going.

14       Q.    You assumed that?

15       A.    I saw that.

16       Q.    No problem.

17               THE COURT:   Okay.   Anything --

18               THE DEFENDANT:   I have one more I

19   want to ask him.

20       Q.    Can you give me your age?

21       A.    I'm 31 years old.

22       Q.    Are you dating Vonciel?   Not now --

23       A.    Not never.

24       Q.    -- at the time?

25       A.    No.   I had a girlfriend.   I stay with

```
 1    her.  I've got my own house.
 2           Q.    Okay.   No more questions.
 3                      THE COURT:  Anything else from him?
 4                      MR. BAILEY:   I think that's all.
 5    Can he be excused?
 6                      THE COURT:  You can step down, and
 7    you may be excused.
 8                      (Witness excused.)
 9                      THE COURT:  If you would raise your
10    right hand?
11                    ASHLEY ELIZA COOK
12        The witness, having first been duly sworn or
13    affirmed to speak the truth, the whole truth, and
14    nothing but the truth, testified as follows:
15                    DIRECT EXAMINATION
16    BY MR. BAILEY:
17                      MR. BAILEY:  May I approach, Your
18    Honor, to get her situated?
19        Q.    I'm going to have to ask you to speak up
20    real loud because I know you have a very soft
21    voice.  If you would, scoot your chair up and try
22    to speak right in that microphone.   Okay?
23        Would you tell the ladies and gentlemen of the
24    jury your name?
25        A.    Ashley Eliza Cook.
```

1    Q.    Okay.   Can everybody hear her?

2          (Jurors nod.)

3    Q.    Ashley, do you know Vonciel Minnifield?

4    A.    Yes, sir.

5    Q.    And how do you know her?

6    A.    That's my mama.

7    Q.    That's your mama.   Do you know John

8    Minnifield?

9    A.    Yes, sir.

10   Q.    And how do you know him?

11   A.    It was my stepdaddy.

12   Q.    Okay.   You're aware that your mother has

13   reported to the police department and to the

14   district attorney's office that your stepfather had

15   been stalking her; is that correct?

16   A.    Yes, sir.

17   Q.    I want to ask you, if you would, to tell

18   the ladies and gentlemen of the jury any incidents

19   that you witnessed personally between your

20   stepfather, Mr. Minnifield, and your mother.

21              THE COURT:   Would you direct her to

22   a period of time?   That's rather a broad question.

23              MR. BAILEY:   Sure.

24   Q.    Let's start, for instance, in October of

25   1998.   Okay?  Do you recall any type of incident in

1  that time frame between your stepfather and your

2  mother?

3        A.    Yes, sir.

4        Q.    And can you tell the ladies and gentlemen

5  of the jury what happened or what you saw?

6        A.    I was sleeping and it was about twelve

7  something, and my mom was in the living room.  And

8  I heard a loud banging on the bedroom window, like

9  glass had broken.  I jumped up and went in the

10  living room with my mom, and she told me to be

11  quiet.  It was John at the door trying to get in.

12  So he came back to front door and he starting

13  knocking and cussing saying, Open the door.  He

14  wanted the vacuum cleaner.  So my mom had told me

15  she wasn't going to let him in.  So my mom said she

16  felt like something was about to happen, so she

17  told my sister to go get her pants out of the room.

18  And by the time she was putting them on, he had

19  kicked the door in.

20                THE COURT:  We need more question

21  and answer.

22        Q.    Did you see him come in the door?

23        A.    Yes, sir.

24        Q.    Okay.  And what happened once he got into

25  the residence?

3

TRIAL INDEX


COURT'S OPENING REMARKS  . . . . . . . .  44

OPENING STATEMENTS . . . . . . . . . . .  59


WITNESSES FOR THE STATE:

CLEMMITHA PETACE
      DIRECT EXAMINATION BY MR. BAILEY  .  .  70
      CROSS-EXAMINATION BY MR. MINNIFIELD .  73

PETE ROSE
      DIRECT EXAMINATION BY MR. BAILEY  .  .  75
      CROSS-EXAMINATION BY MR. MINNIFIELD .  81

VONCIEL MINNIFIELD
      DIRECT EXAMINATION BY MR. BAILEY  .  .  87
      CROSS-EXAMINATION BY MR. MINNIFIELD . 120
      REDIRECT EXAMINATION BY MR. BAILEY  . 135

G. L. SISSON
      DIRECT EXAMINATION BY MR. BAILEY  .  . 138
      CROSS-EXAMINATION BY MR. MINNIFIELD . 143

ROSEBUD BROWN
      DIRECT EXAMINATION BY MR. BAILEY  .  . 147
      CROSS-EXAMINATION BY MR. MINNIFIELD . 153

LAWANDA BENSON
      DIRECT EXAMINATION BY MR. BAILEY  .  . 157
      CROSS-EXAMINATION BY MR. MINNIFIELD . 171

LESTER GLAXTON
      DIRECT EXAMINATION BY MR. BAILEY  .  . 181
      CROSS-EXAMINATION BY MR. MINNIFIELD . 185

TIMOTHY BROWN, JR.
      DIRECT EXAMINATION BY MR. BAILEY  .  . 190
      CROSS-EXAMINATION BY MR. MINNIFIELD . 194

ASHLEY ELIZA COOK
      DIRECT EXAMINATION BY MR. BAILEY  .  . 198
      CROSS-EXAMINATION BY MR. MINNIFIELD . 202

4

1    DANA COOK
           DIRECT EXAMINATION BY MR. BAILEY  . . 208
2          CROSS-EXAMINATION BY MR. MINNIFIELD . 214
           REDIRECT EXAMINATION BY MR. BAILEY  . 220
3
     NICHOLAS WASHINGTON
4          DIRECT EXAMINATION BY MR. BAILEY  . . 223
           CROSS-EXAMINATION BY MR. MINNIFIELD . 227
5
                 WITNESSES FOR THE DEFENDANT:
6
     SHERRY MELTON
7          DIRECT EXAMINATION BY MR. MINNIFIELD  236
8    JOHNNIE SULLIVAN
           DIRECT EXAMINATION BY MR. MINNIFIELD 243
9          CROSS-EXAMINATION BY MR. BAILEY  . . 245
10   KAREN BLANCH
           DIRECT EXAMINATION BY MR. MINNIFIELD 246
11
     RONNIE WATERS
12         DIRECT EXAMINATION BY MR. MINNIFIELD 249
           CROSS-EXAMINATION BY MR. BAILEY  . . 253
13
     GLORIS PERDO
14         DIRECT EXAMINATION BY MR. MINNIFIELD 254
           CROSS-EXAMINATION BY MR. BAILEY  . . 258
15
     JOHN MINNIFIELD
16         EXAMINATION OF HIMSELF . . . . . . . 261
           CROSS-EXAMINATION BY MR. BAILEY  . . 280
17         EXAMINATION OF HIMSELF . . . . . . . 288

18                 REBUTTAL FOR THE STATE

19   CASSANDRA WILLIAMS
           DIRECT EXAMINATION BY MR. BAILEY . . 296
20

21   CLOSING ARGUMENTS . . . . . . . . . . . 311

22   JURY CHARGE . . . . . . . . . . . . . . 335

23   VERDICT   . . . . . . . . . . . . . . . 354

24   SENTENCING  . . . . . . . . . . . . . . 357

25

5

STATE'S EXHIBITS:

EXHIBIT NO. 1-AFFIDAVIT/COMPLAINT . . . . . . 95

EXHIBIT NO. 2-AFFIDAVIT/COMPLAINT . . . . . . 103

EXHIBIT NO. 3-AFFIDAVIT/COMPLAINT . . . . . . 104

EXHIBIT NO. 4-TWO AUDIOCASSETTE TAPES . . . . 304

EXHIBIT NO. 5-HANDWRITTEN LETTER . . . . . . . 114

EXHIBIT NO. 6-HANDWRITTEN NOTE ON SCRATCH PAPER 116

EXHIBIT NO. 7-HANDWRITTEN NOTE ON SCRATCH PAPER 117

EXHIBIT NO. 8-HANDWRITTEN NOTE ON PAPER . . . 118

EXHIBIT NO. 9-MIRANDA RIGHTS FORM . . . . . . 299