COURT OF CRIMINAL APPEALS NO. _____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___MONTGOMERY___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC 99-327__

CIRCUIT JUDGE ___SALLY GREENHAW___

Type of Conviction / Order Appealed From: ___STALKING___

Sentence Imposed: _20 years_

Defendant Indigent: [X] YES [ ] NO

John Willie Minnifield

NAME OF APPELLANT

__JOSEPH BURKHART__          262-4800
(Appellant's Attorney)
472 S. Lawrence Street    Suite 206    (Telephone No.)
(Address)
Montgomery, AL   36104
(City)              (State)              (Zip Code)

V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

NAME OF APPELLEE

_____

_____

_____

(For Court of Criminal Appeals Use Only)

1    A. He came towards my mom, and he put his

2 hand around her neck and put her against the wall.

3 And I jumped in between them two.

4    Q. Okay.  Did anything happen to you during

5 this?

6    A. No, sir.

7    Q. Okay.  Did he have anything with him?

8    A. Yes, sir.

9    Q. What?

10    A. Kind of looked like a hatchet and a

11 hammer.

12    Q. And was he doing anything with that

13 object?

14    A. He raised it at us like he was going to

15 hit us.

16    Q. What happened from that point?

17    A. Somehow we got separated.  My sister, she

18 went in the kitchen to get a hammer.  And he seen

19 her with the hammer, so he slapped her, and she

20 fell against the wall.

21    Q. Did you see him do that?

22    A. Yes, sir.

23    Q. And then what happened?

24    A. I went into the bathroom, and I closed

25 the door.  And I heard some glass break, and then

```
 1    somebody knocked on the door.  I opened the door,
 2    and it was him.  He raised the hatchet at me, and I
 3    told him not to hit me.  And he just looked at me
 4    for a second, and he said, I love you.  I'm not
 5    going to hit you.  I'm going to let you go.
 6         Q.   That's what he told you?
 7         A.   (Witness nods.)
 8         Q.   And did he let you go?
 9         A.   Yes, sir.
10         Q.   And this occurred at your residence,
11    correct, you and your mother's residence?
12         A.   Yes, sir.
13         Q.   Who all was living there at the time?
14         A.   Just me, my mom, and my sister.
15         Q.   Do you recall when you and your mom and
16    your sister moved out of the home in which you
17    lived with John -- you used to live with John and
18    your mother in the same house, correct?
19         A.   Yes, sir.
20         Q.   Okay.  Do you recall when y'all moved out
21    of that house?
22         A.   No, sir.
23         Q.   I'm sorry?
24         A.   Could you ask me that again?
25         Q.   Do you remember when y'all moved out of
```

1    the house that you were living in with John?

2         A.   It was in October.

3         Q.   That's okay.  I don't think I have any

4    further questions.

5                      CROSS-EXAMINATION

6    BY MR. MINNIFIELD:

7         Q.   Hello, Ashley.  I just want to ask you a

8    few questions.  Okay?

9         A.   Okay.

10        Q.   I want you to tell the truth.  Have I

11   ever -- have you ever seen me hit your mother?

12        A.   No.

13        Q.   Have I ever hit you?

14        A.   No.

15        Q.   Do I threaten you all?

16        A.   Yes.

17        Q.   In what way do I threaten you?  When you

18   all stayed with me, what way did I threaten you?

19        A.   You threaten my mama and told her you

20   were going to kill her.

21        Q.   That's when you all were staying with me?

22        A.   When we were getting ready to leave.

23        Q.   When you were getting ready to leave.

24   Did I tell her to leave or did I tell her I was

25   putting her out, to get out of my life or something

1  like that, or did I -- did I ask her, you know, not

2  to leave?

3      A.  You told us that we had to get out.  And

4  you told us we can't use the car.  We had to walk.

5      Q.  Yes.  I remember that.  Because the car

6  was tore up.

7          MR. BAILEY:  Your Honor, I'm going

8  to object.

9          THE COURT:  Just ask the questions.

10      Q.  Ashley, since y'all have been staying

11  over there -- or staying at Brookview at the

12  time -- as a matter of fact, in October, that's

13  when they had kids for cop day, right?  Do you

14  remember that?

15      A.  Yes, sir.

16      Q.  Do you remember that I came over?

17      A.  Yes, sir.

18      Q.  Did I get permission from your mom to

19  carry all you all to kids for cop day?

20      A.  Yes.

21      Q.  And did your mom go?

22      A.  I don't remember.

23      Q.  Okay.  Now, on the -- you said on the day

24  I kicked the door in -- the night rather -- I want

25  to ask you this here.  Your mom was -- was she

1    frightened or something because you all didn't have

2    a telephone?

3        A.    Yes.

4        Q.    And what was the occasion that you all

5    got the telephone?

6        A.    When you bought it.

7        Q.    I beg your pardon?

8        A.    When you bought the phone.

9        Q.    Yes.  Can you tell how long before this

10   incident happened when I bought the phone?

11       A.    No.

12       Q.    Like a week or two weeks or whatever?  I

13   know different little things, you don't think back

14   that far.  And that phone was for what?  Can you

15   remember that?  By me purchasing the phone, what

16   was it for?

17       A.    No.

18       Q.    Okay.  Would it be for to protect you all

19   down there so you could call the police if someone

20   came there?  Do you remember that?

21       A.    No.

22       Q.    Okay.  But at no point, I understand, did

23   I hurt you by hitting you or whatever?

24       A.    (Witness nods.)

25       Q.    Only when you all did something wrong.  I

```
 1     never hit you all, did I?

 2          A.   No, sir.

 3          Q.   I would put you on punishment or would I

 4     not?

 5          A.   Yes, you would.

 6          Q.   And was it extreme punishment?

 7          A.   Huh-uh.

 8          Q.   Okay.  Ashley, then how about your

 9     schooling?  Did I stress to you --

10               MR. BAILEY:  Your Honor, I'm going

11     to object.

12               THE COURT:  I'm going to sustain the

13     objection.  I don't see the relevancy of that.

14     Move on to the issues here.

15          Q.   Okay.  Are you afraid of me, Ashley?

16          A.   I was.  Not anymore.

17          Q.   Beg your pardon?

18          A.   I was.  Not anymore.

19          Q.   Do you believe I would do you any harm?

20          A.   Yes.

21          Q.   Your mother?  Your sister?

22          A.   (Witness nods.)

23          Q.   And what would give you that idea?

24          A.   Because you tried it before.

25          Q.   I tried to hurt you before?
```

1   A. No.

2   Q. Okay.  You've seen me, Ashley.  I was out

3 on bail during July, right?  Didn't you see me on

4 several occasions?

5   A. When?

6   Q. This summer -- this past summer?

7   A. Yes.

8   Q. Did I try to harm you or your mother or

9 your sister?

10   A. It was just me.

11   Q. Beg your pardon?

12   A. When I seen you, it was just me.

13   Q. You wasn't in the car when your mother

14 came over to Park Manner?

15   A. Oh, yes.

16   Q. Beg your pardon?

17   A. I was there then.

18      THE COURT:  What did you say?

19      THE WITNESS:  I said, I was there

20 then.

21   Q. Okay.  And did I attempt to hurt your

22 mama or anything then?

23   A. No.

24   Q. Did I seem like I was angry?

25   A. No.

1                    THE DEFENDANT:  Thank you, Ashley.

2                    MR. BAILEY:  That's all.

3                    THE COURT:  Okay.  You can step

4      down.

5                        (Witness excused.)

6                    THE COURT:  Your next witness?

7          And raise your right hand?

8                        DANA COOK

9          The witness, having first been duly sworn or

10     affirmed to speak the truth, the whole truth, and

11     nothing but the truth, testified as follows:

12                    DIRECT EXAMINATION

13     BY MR. BAILEY:

14         Q.    Would you please tell the ladies and

15     gentlemen of the jury your name?

16         A.    Dana Cook.

17         Q.    Dana, do you know Vonciel Minnifield?

18         A. -  Yes, sir.

19         Q.    And how do you know her?

20         A.    My mother.

21         Q.    And you're aware that your mother has

22     reported to the police department and to the

23     district attorney's office stalking charges against

24     John Minnifield, correct?

25         A.    Yes, sir.

1    Q.    I want to direct your attention, Dana,

2    back to October of 1998.  Did you, during that

3    month, witness an incident involving your mother

4    and John Minnifield?

5    A.    Yes, sir.

6    Q.    Can you tell the ladies and gentlemen of

7    the jury what you remember?

8    A.    At first it was like nine o'clock that

9    night.  My mom was in the kitchen cooking, and he

10    came and knocked on the door asking about a vacuum

11    cleaner.  And she told him she wasn't going to open

12    the door.  She was going to drop it off by his job

13    tomorrow because she wasn't going to open her door.

14    And so he left.  And then he sent a girl around to

15    the house, and my mom didn't answer the door while

16    she was knocking on it.

17    Then he came back later on that night while we

18    were asleep around about, I'd say, about twelve.

19    And he was knocking on the door real hard or

20    whatever.  And then he said he was going to come

21    through the window, but he hit the window real

22    hard.  And then my little sister, she came in

23    there -- in the living room because we were in the

24    living room.  But instead of him -- like, after he

25    hit the window, he came to the front door and

1       kicked the front door in.

2              Q.    Okay.  And when he kicked the front door

3       in, did he come into the residence?

4              A.    Yes, sir.

5              Q.    Did he have anything with him?

6              A.    Yes, sir.

7              Q.    What did he have?

8              A.    I think it was, like, an ax or hatchet.

9              Q.    Okay.  Did you see that?

10             A.    Yes, sir.

11             Q.    Did -- what did he do next?

12             A.    At first it was, like, he went towards my

13      mom.  And my little sister, she jumped between them

14      so he wouldn't do nothing to my mom.  And I jumped

15      between him and my sister so he wouldn't do nothing

16      to my mom and my sister.  And somehow we got a

17      loose, and then he had slapped me.  And then, like,

18      my mom --

19             Q.    How -- I'm sorry to stop you.  But how

20      did he slap you?

21             A.    He just raised his hand and just slapped

22      me real hard.

23             Q.    Where?

24             A.    In my face -- on the right side of my

25      face.  And then, like, my mom told me and my sister

1    to move -- get out of the house or whatever.  And

2    my sister ran in the room and went in the bathroom,

3    and him and my mom were in the room tussling.  And

4    I was going in the room.  As I went in the room, I

5    seen my mom go out the window.  And I tried to go

6    get my sister out of the bathroom, then -- but I

7    seen him going towards me, so I ran and jumped out

8    the window.  And when I looked up, he was going by

9    the bathroom door, and my little sister was in the

10   bathroom.  And he knocked on the door, and my

11   sister thought it was me or my mom, so she opened

12   the door.  And he answered --

13                THE COURT:  Wait just a minute.  We

14   need more question and answer.

15        Q.   You say he opened the door to the

16   bathroom?

17        A.   My sister opened the door because he

18   knocked on it, and my sister thought it was me or

19   my mom.

20                THE COURT:  Well, you can't say what

21   your sister thought, but she opened the door.  Go

22   ahead.

23        Q.   And he was standing on the outside of the

24   bathroom?

25        A.   Yes, sir.

1      Q.    And what happened at that point?

2      A.    I seen the hatchet in his hand.  And then

3   it was, like, he raised it up, and then he put it

4   down, and he told my sister that he wasn't going to

5   hurt her.  So me and my mom had called her on out

6   the house, and she came through the window.  And

7   then he went back through the living room, like, by

8   the dining area and came through the living room

9   out the front door.  And my mom's neighbor called

10  us, me and my sister, to her apartment.  And he

11  chased my mom around the complex while my mom --

12  neighbor was out there on the cell phone calling

13  the police.

14     Q.    And you saw all of this happen?

15     A.    Yes, sir.

16     Q.    Okay.  And where -- this was at your

17  apartment over in Brookview?

18     A.    Yes, sir.

19     Q.    Okay.  Have -- Dana, have you ever had

20  to -- have you ever witnessed any other incidents

21  between Mr. Minnifield and your mother -- and I'm

22  talking about physical incidents -- where they got

23  into any type of fight?

24     A.    Like any time before that?

25     Q.    Right.  Before this incident.

1    A.    No, not like that.  But I remember a long

2  time ago, they had, like, a little misunderstanding

3  or whatever, and I remember he pushed her.

4    Q.    Did you see that happen?

5    A.    I was standing in the living room door

6  when he did it, me and my brother was.

7    Q.    Did you see him do that?

8    A.    Yes, sir.

9    Q.    Okay.  And how did he do that?

10    A.    It was like -- like, he pushed her, like

11  a shove or whatever because they was arguing.  And

12  then me and my brother ran in our room, and we told

13  him not to touch our mother no more.

14    Q.    Did anyone call the police on that

15  particular time?

16    A.    I can't remember if we did or not.

17    Q.    Okay.  Has there ever been any other

18  time, Dana, that you had to call the police when

19  you witnessed an incident between you mother and

20  Mr. Minnifield?

21    A.    Yes.  There was -- in the kitchen they

22  was arguing about something.  I forgot.  And my

23  mom's co-worker was over that night and his son and

24  his son's wife and kids was down.  And my aunt was

25  in there doing his grandchild's hair.  And I

1    remember them fussing about something, and I looked

2    up from the kitchen table.  They was running

3    towards each other, so I went and called the police

4    because I didn't know if they were going to fight

5    or what.

6         Q.   Did anything happen?

7         A.   No, sir.

8         Q.   Did he say anything to you on that day?

9         A.   He told me that I would be punished for

10   calling the police.

11        Q.   Do you remember his exact words?

12        A.   I can't remember.

13        Q.   Okay.  That's fine.

14              MR. BAILEY:  That's all the

15   questions I have for you at this time.

16                   CROSS-EXAMINATION

17   BY MR. MINNIFIELD:

18        Q.   Hello, Dana.

19        A.   Hey.

20        Q.   Let me ask you a few questions.  Always

21   stressed to you and asked you to tell the truth on

22   everything regardless of who it hurt?

23        A.   Right.

24        Q.   And to stand by your mother?

25        A.   Right.

1     Q.   Even against me?  I want you to think

2   back to October when you all were living in

3   Brookview Apartments.  You said your mom and I was

4   tussling after I came into the house, right?

5     A.   Uh-huh.

6     Q.   And she went through the window -- or how

7   did she go through the window?

8     A.   She went through the window with her back

9   to the window.  That's all I seen.  When I seen her

10  go through the window, she was looking in my face

11  as she was going through the window.

12    Q.   Was the window up or down?

13    A.   The window was down, as I remember.

14    Q.   And where was you standing in reference

15  to that?

16    A.   I was running in the bedroom at the time.

17    Q.   Dana, telling the truth about answer -- I

18  know you can think a lot better than Ashley can

19  because you're older, more mature.  I want you to

20  think back hard, just set a pattern.  I did kick

21  the door in.  I never denied that.

22             THE COURT:  Wait just a minute.  You

23  need to -- I don't know what --

24             THE DEFENDANT:  I'm fixing to ask

25  her this question.

```
 1                    THE COURT:  Well, ask the question.
 2          Q.    But when I came in the house, Dana, who
 3     did I cuss first?  Who did I come up to first, you,
 4     your mama, or Ashley or what?
 5          A.    My mom.
 6          Q.    And what did I do then?
 7          A.    At the time when you went up to her, you
 8     tried to choke her until Ashley got between y'all.
 9          Q.    And what were you doing?
10          A.    I was coming out of the kitchen.  And I
11     ran in there, and I jumped between y'all so you
12     wouldn't do anything to hurt them.
13          Q.    You were in the kitchen when I first came
14     in, right?
15          A.    Not when you first came in.  I was
16     sitting down.  When you kicked the door open, I
17     jumped up and ran in the kitchen.
18          Q.  - Did you not run down to your auntie's
19     house during this confrontation or whatever?
20          A.    I didn't run to my aunt's house.
21          Q.    So you seen everything happen in there,
22     right?
23          A.    Yes, sir.
24          Q.    Well, Dana, how did you get cut?
25          A.    How did I get cut?  Like where, on my
```

1    knees and back?

2         Q.    Yes.

3         A.    Jumping through the window where you -- I

4    got a cut on the left side of my surgery mark and

5    my knees got cut up from landing in the grass, and

6    I got stitches in my hand.

7         Q.    Did -- well, if you jumped through that

8    window, Dana, what happened?  Were the window there

9    or what, the glass there?

10        A.    The window was out, but it still had

11   pieces hanging from it, like, around the sides of

12   it.

13        Q.    And why was all the pieces hanging down?

14        A.    Like, from the wall where the window

15   starts, it was, like, some still --

16        Q.    No.  I'm talking about what reason.

17        A.    What reason?

18        Q.    Wasn't the window already broke?

19        A.    It was already broken through her going

20   through the window first.

21        Q.    And she didn't get cut?

22        A.    I don't remember.

23        Q.    I'm just asking.

24        A.    I don't remember her getting cut.  She

25   probably did, but I don't know if she did.

1    Q.    Have any time have I given you any reason
2    to be afraid of me, Dana?
3        A.    Well, I wouldn't say being afraid of you.
4    It was just that I was afraid of having my mom
5    being hurt.  I mean, it's not that I was afraid of
6    you.  It was just that I was afraid for my mom and
7    my sister.  That was it.
8        Q.    Was I always there with you all and your
9    sister?  Never no harsh punishment, no beating, or
10   nothing like that?
11       A.    I didn't understand the first part of the
12   question.
13       Q.    Is it that there was never no harsh
14   punishment that I would put on y'all or no spanking
15   you or something like that, beating you or using
16   violence towards you all?
17       A.    When you put us on punishment, like, you
18   would fuss at us or whatever or you would say that
19   you were going to, you know, whoop us or hit us or
20   whatever, but you never did.  You just put us on
21   punishment.
22       Q.    And would that punishment last the entire
23   time that I tell you it would?
24       A.    No, it did not.
25       Q.    Okay.  Now, you supposedly called the

1    police once, right, where your mom was supposed to

2    be whooping me?  Do you remember that?

3        A.   I don't remember what went on because --

4    whatever was, like, going on between y'all, it was,

5    like, what basically happened, I was out at the

6    neighbor's car calling the police, so I couldn't

7    really tell you what went on.

8        Q.   Have you ever seen me hit your mother?

9        A.   You didn't hit her.  I seen you shove her

10    when me and Jason was standing in the door of the

11    living room.

12        Q.   That was way back, right?

13        A.   That was way back, right.

14        Q.   And you never seen any other

15    confrontation between your mother and I other than

16    what all families do, argument?

17        A.   That's the only time.

18        Q.  In those argument, did it get real

19    violent, you know, of or -- it don't have to be

20    physical where we're hitting each other or calling

21    each other different names like B and H and W and

22    stuff like that.  Did we do that that you know of?

23        A.   Yeah, I remember a lot of harsh words

24    being said.

25        Q.   And what occasion was that?

1          A.    It was, like, when y'all -- like, argue

2     over some things.

3          Q.    For instance?

4          A.    Like, say like, when y'all used to argue

5     about chicks -- fuss about chicks and stuff.

6          Q.    Thank you, Dana.

7                    THE COURT:  Anything else for her?

8                    MR. BAILEY:  Just one question, Your

9     Honor.

10                  REDIRECT EXAMINATION

11    BY MR. BAILEY:

12         Q.    In response to what Mr. Minnifield had

13    asked you, you said that you had never witnessed

14    him hit your mother?

15         A.    Uh-huh.

16         Q.    But you have testified that you have seen

17    him push your mother and also choke your mother

18    back in October, correct?

19         A.    Yes, sir.

20         Q.    Okay.

21                    MR. BAILEY:  That's all the

22    questions I have.

23                    THE COURT:  You can step down, and

24    you're excused.

25                    (Witness excused.)

1          THE COURT:  We're going to break for

2     the day.  We should finish up the evidentiary

3     portion in the morning, and then, hopefully, it

4     will go to the jury by late afternoon -- I mean, by

5     early afternoon.  I'm going to caution you not to

6     discuss the case with anyone.  And if you go home

7     and anybody asks about it, just tell them the Judge

8     said I can't talk about it.  I'm going to release

9     you until nine o'clock in the morning because we

10    have some other matters we're going to do.  And if

11    you'll report to the jury assembly room, we'll get

12    you at nine in the morning.  Have a good night.

13              (Out of the presence of the jury.)

14              THE COURT:  Mr. Bailey, now, what

15    about your witness situation?

16              MR. BAILEY:  If I could check on her

17    right now, Your Honor?

18              THE COURT:  Wait just a minute

19    before you do that.

20              MR. BAILEY:  I was just going to ask

21    her if she's talked to her.

22              (Mr. Bailey talks to her.)

23              MR. BAILEY:  I'm afraid she may have

24    been checked into the hospital, but we'll deal with

25    it somehow.

1        THE COURT:  I -- we might just

2   briefly discuss jury charges because all I know to

3   do is go over elements of stalking.  And there are

4   a couple of cases annotated over that, so I don't

5   know of anything else to give in this regard, but

6   certainly we can discuss that in more detail

7   tomorrow.

8       How many witnesses do you expect to call,

9   Mr. Minnifield?

10        THE DEFENDANT:  It's going to be

11   about six, I think, left.

12        THE COURT:  Okay.  Well, you'll need

13   to be over by eight -- well, just bring him at

14   eight with everybody else, and that way we won't

15   have any more problem.

16        MR. HARTLEY:  And, Judge, how many

17   more witnesses does the State expect to call?

18        MR. BAILEY:  We have -- well, we,

19   hopefully, have two.

20        MR. HARTLEY:  Well, if there's only

21   one or two, what's the length of those witnesses?

22   What do we need to anticipate in time?

23        MR. BAILEY:  Well, if Detective

24   Williams is able to be here tomorrow, her testimony

25   is probably going to be about an hour.  If the --

1    the other witness should be about five minutes.

2                    THE COURT:  Why would it take an

3    hour for her?

4                    THE DEFENDANT:  That's the length of

5    his statement.

6                    THE COURT:  Okay.  It's regarding a

7    statement.  I didn't know that's what it was

8    concerning.  Okay.

9                    MR. HARTLEY:  Thank you, Judge.

10                   (Break for the day.)

11                   (In the presence of the jury.)

12                   THE COURT:  You don't have to go to

13   the same seat unless you want to.  Good morning.

14        Before we start, and for the record, Linda

15   Livingston had made known to the Court yesterday

16   that her brother was having surgery this afternoon,

17   and I assured, through the clerk, that she could be

18   excused if we were not through by that time.

19   Apparently, her brother has gotten worse and she

20   needs to go immediately, and I've excused her for

21   the remainder of the trial.  But we still have

22   sufficient numbers to go.  Okay.  Your next

23   witness?

24                   MR. BAILEY:  Your Honor, at this

25   time, State would call Nicholas Washington.

```
 1              THE COURT:  And raise your right
 2    hand.
 3                  NICHOLAS WASHINGTON
 4        The witness, having first been duly sworn or
 5    affirmed to speak the truth, the whole truth, and
 6    nothing but the truth, testified as follows:
 7                  DIRECT EXAMINATION
 8    BY MR. BAILEY:
 9        Q.   Nicholas, I'm going to ask you if you
10    might could scoot up and speak into the microphone
11    so everyone can hear you.
12        A.   (Witness complies.)
13        Q.   Will you please tell the ladies and
14    gentlemen of the jury your name?
15        A.   Nicholas Washington.
16        Q.   And, Mr. Washington, how old are you?
17        A.   20.
18        Q.   And do you live here in Montgomery?
19        A.   Yes, I do.
20        Q.   Okay.  Do you work here in Montgomery?
21        A.   Yes.
22        Q.   And where are you employed, sir?
23        A.   Montgomery Catering.
24        Q.   Okay.  And I'm going to get to the point
25    of this case and ask you if you know a person by
```

```
 1       the name of Vonciel Minnifield?

 2              A.    Yes, I do.

 3              Q.    And how do you know her, sir?

 4              A.    I work with her.

 5              Q.    Okay.  How long have you worked with

 6       Mrs. Minnifield?

 7              A.    Say, close to two years.

 8              Q.    And how long have you been employed at

 9       the RSA Plaza?

10              A.    Two years.

11              Q.    About two years.  I want to direct your

12       attention back to around November the 23rd of 1998.

13       Did you have an opportunity on that day to come

14       into contact with a person by the name of

15       John Minnifield?

16              A.    Yes.

17              Q.    Okay.  Can you tell the ladies and

18       gentlemen of the jury about that occasion?

19              A.    Okay.  This morning, I was taking out the

20       trash.  And by the time I was opening up the door

21       to start putting the trash in, Mr. Minnifield

22       pulled up.  And he asked me had I seen Von this

23       morning or recently, and I told him no.  And so --

24       then he went on about -- well, he told me to tell

25       her that for her to watch her back, that the next
```

1     time he would see her, that she might not live to

2     see Thanksgiving or whatever, and that he was going

3     out of town or something and that she don't know

4     when he might return or she don't know where he's

5     going to be at any time. Just for her to watch her

6     back because he was going to kill her.

7              Q.    And he told you that?

8              A.    Yes.

9              Q.    And he told you that she might not live

10    to see Thanksgiving?

11             A.    Yes.

12             Q.    Before this occasion on November the

13    23rd, 1998, had you ever come in contact with

14    Mr. Minnifield before?  Had you seen him?

15             A.    Yes.  He used to come up to the job.

16             Q.    So you knew who he was?

17             A.    Sir?

18             Q.    You knew who he was?

19             A.    Yes.

20             Q.    And he knew who you were?

21             A.    Yes.

22             Q.    The -- did he say anything else?

23             A.    As I remember -- I remember him saying --

24    you know, I remember him saying he had a gun, but I

25    never seen it.  But just by what he had already

1    told me about killing her --

2                    THE DEFENDANT:  Object.

3                    THE COURT:  Wait just a moment.  You

4    don't need to speculate.

5                    THE DEFENDANT:  Object.

6                    MR. BAILEY:  Okay.  That's fine.

7                    THE COURT:  Wait a minute.  I'm

8    going to sustain the objection.  You've answered

9    it.  Your next question?

10                    MR. BAILEY:  That's fine.

11         Q.    The -- I believe there has already been

12    testimony to this fact, but the RSA Plaza that

13    you're speaking of, is that located in Montgomery?

14         A.    Yes, it is.

15         Q.    And the person that you have referred to

16    as John Minnifield that told you these things that

17    you have testified about to the jury, is that

18    person in the courtroom today?

19         A.    Yes, he is.

20         Q.    And can you please point him out to the

21    ladies and gentlemen of the jury?

22         A.    (Witness points at him.)

23                    MR. BAILEY:  And let the record

24    reflect that this witness has pointed to the

25    defendant, Mr. John Minnifield.

1         And that's all the questions I have at this

2    time.

3                    CROSS-EXAMINATION

4    BY MR. MINNIFIELD:

5         Q.   Mr. Washington, on that morning that you

6    say I came by up there, could you give us a time

7    frame on that?

8         A.   No, I cannot.

9         Q.   What time do you generally carry out your

10   trash?

11        A.   Maybe before ten o'clock before I sit

12   down to eat.

13        Q.   Before you sit down and eat?

14        A.   Yes, sir.

15        Q.   Is it not true that -- what time does

16   Vonciel generally get to work?

17        A.   Excuse me?

18        Q.   What time does Vonciel generally come to

19   work?

20        A.   She usually comes 8:00 or 8:30.

21        Q.   Could this have been before she came

22   or --

23        A.   Yes.

24        Q.   Before she --

25        A.   Because she had never showed up.

1      Q.    Okay.    Is it not that John Minnifield

2    works at Montgomery Catering also?

3      A.    You -- he -- on and off maybe work

4    parties upstairs, maybe the weeknight parties.

5      Q.    But it's not unusual for me to come by,

6    right?

7      A.    No.

8      Q.    Okay.    Where did you say I was parked at

9    that morning or where did you see me at?

10     A.    On the South Ripley.

11     Q.    Describe to the jury what street or

12    whatever.

13     A.    Okay.    The loading dock of Montgomery

14    Catering is on South Ripley, and the trash can is,

15    like, maybe five or ten feet from the street, so

16    it's a park area where the trucks come in.  So he

17    pulled -- he didn't pull in, but he stopped right

18    along so when he gets ready to drive off, he just

19    keeps straight going so he won't have to turn

20    around or anything.

21     Q.    Okay.    Is it very unusual a person will

22    go around bragging about he has a gun?

23     A.    Yes.

24     Q.    Is that unusual to you?  You also stated

25    I was going out of town, right?

```
1          A.    Yes.

2          Q.    But I was going to kill her before

3    Thanksgiving?

4          A.    Yes.

5          Q.    If I was going out of town, how would I

6    be able to be in town?

7          A.    I can't answer that.

8                    THE COURT:  Wait just a moment.  You

9    can't ask him about your conduct.

10                   THE DEFENDANT:  I'm sorry about

11   that.

12         Q.    Okay.  In your earlier statement, did you

13   not tell the detective that I was parked on

14   Washington Street?

15         A.    No.

16         Q.    You didn't tell her that?

17         A.    No.

18                   THE DEFENDANT:  Your Honor, on Page

19   7, I would like to --

20                   THE COURT:  Wait just a moment.

21   That's not the proper way to do it.  If you want to

22   get Mr. Hartley to go up and show him or direct him

23   to that?

24                   MR. BAILEY:  Mr. Hartley, if this

25   would help, you could have his statement.  It's
```

1    three pages.

2         Q.    Excuse me just a minute.  Back that

3    statement up.  That was in the police report.

4    Okay.  You said that I was going -- I said I was

5    going out of town and I resurfaced.  That's what

6    you said?

7         A.    Yes.

8         Q.    And when I resurfaced, I was going to do

9    what to her?

10        A.    You didn't say.  You just -- when you

11   resurfaced, she don't know where you might be or

12   when the next time you might run into her.

13        Q.    Is that it?

14        A.    Yes.

15        Q.    Okay.  Where did you -- where did it come

16   from that I was going to kill her?

17        A.    (Witness nods.)

18        Q.    How did that came about?

19        A.    What do you mean?  I don't understand the

20   question.

21        Q.    You said in the statement that I said I

22   was going to kill her --

23        A.    Right.

24        Q.    -- the next time I see her?

25        A.    Right.  So you're asking me, how did that

1    come about?

2        Q.    Yeah.  How did that come about?

3        A.    I don't -- I guess problems -- personal

4    problems you all having.  I don't know.  From -- I

5    don't know for what certain reason.

6        Q.    I'm talking about me telling you.

7        A.    Right.

8        Q.    Okay.

9        A.    You just told me.  I guess y'all were

10    having -- going through personal problems or

11    whatever.

12                    THE DEFENDANT:  No more questions of

13    that witness.

14                    THE COURT:  Anything else?

15                    MR. BAILEY:  I don't think I have

16    anything else for this witness, Your Honor.  Can he

17    be excused?

18                    THE COURT:  You may be excused.

19                    (Witness excused.)

20                    THE COURT:  And where are you with

21    your witnesses?

22                    MR. BAILEY:  If I could just check,

23    Your Honor, just one second.

24                    (Mr. Bailey steps out.)

25                    MR. BAILEY:  Your Honor, at this

1    time, the State would rest its case in chief

2    possibly subject to a rebuttal witness.

3                    THE COURT:  Okay.  I know you just

4    came in, but we're going to have to take up a few

5    motions outside the presence of the jury.  I'm

6    going to give you about a ten-minute recess, and

7    then we'll get started back with the case.

8                    (Out of the presence of the jury.)

9                    THE COURT:  At this time, the State

10   has rested.  Do you have any motions,

11   Mr. Minnifield?

12                   MR. HARTLEY:  Your Honor, may I make

13   a motion on his behalf?  This is an area --

14                   THE COURT:  Well, you know,

15   Mr. Hartley, he's indicated he wants to represent

16   himself.  Now, he either needs to, at this point --

17   he has, at any time, the right to assert his right

18   to an attorney, and if he's doing that, then I will

19   let you proceed.  But he has said he wants to

20   represent himself, and I'm not going to let it go

21   back and forth every few minutes.

22                   MR. HARTLEY:  Yes, Your Honor.

23   Could we have just about five minutes --

24                   THE COURT:  Yes.  And you might can

25   suggest something to him.

1           MR. HARTLEY:  I believe I can.

2           THE COURT:  And if he does want you

3   to represent him throughout the remainder of the

4   trial, he has the right to have you do so.

5           MR. HARTLEY:  If we could just have

6   about five minutes?

7           THE COURT:  Okay.

8           (Brief recess taken.)

9           THE COURT:  At this time,

10  Mr. Minnifield, do you wish to continue

11  representing yourself, or do you want Mr. Hartley

12  to do so?

13          THE DEFENDANT:  I will continue.

14          THE COURT:  Okay.  Do you have any

15  motions?

16          THE DEFENDANT:  Yes, I have a

17  motion.

18          THE COURT:  Okay.  I'm ready to hear

19  them.

20          THE DEFENDANT:  I have a motion to

21  dismiss due to failures of the State to make prima

22  fascie case of stalking.  Why?  Number one, no

23  showing of enough acts, a-c-t-s, that would be

24  stalking.  Many of the events that the State

25  brought up had no threat of harassment.

1   Constitution of conduct is not prohibited, 13A-692,

2   the Code of Alabama.  All of the events took place

3   in the course of a separation, and the filing of a

4   divorce is in progress.  That's my motion.

5              THE COURT:  Well, Mr. Minnifield,

6   I've heard the evidence, and I think the State has

7   put on evidence that would present a jury question,

8   and I'm going to deny your motion.

9       Who is going to be your first witness?

10             MR. HARTLEY:  Judge, if I could,

11  I've been trying to help Mr. Minnifield in this

12  regard.  We were anticipating the State to carry

13  until about ten o'clock this morning.  We have some

14  witnesses who are supposed to be here and some more

15  coming at ten.  We can start with --

16             THE COURT:  I'm going to let you go

17  get the witnesses, but that would be all you could

18  do.

19             MR. HARTLEY:  Right, Judge.  And

20  I've got to make another phone call.  But we expect

21  the arrival of Mr. Ronnie Waters and Gloria Perdo

22  at or about ten o'clock.  We believe Mr. Xides is

23  at the doctor's office, Judge, and cannot be

24  reached by telephone under any circumstances.

25       And -- who else can you think of?

1           THE DEFENDANT:  Johnnie Sullivan.

2           MR. HARTLEY:  Johnnie Sullivan.  I

3   just advised his office about fifteen minutes ago

4   for him to come on down.  So we apologize, Judge,

5   but we're doing the best we can to anticipate when

6   the State was going to finish its case.

7               (In the presence of the jury.)

8           THE COURT:  If you'll come up here

9   and have a seat right over there.  Raise your right

10  hand.

11                  SHERRY MELTON

12      The witness, having first been duly sworn or

13  affirmed to speak the truth, the whole truth, and

14  nothing but the truth, testified as follows:

15          THE COURT:  And would you state your

16  name for the record?

17          THE WITNESS:  My name is Sherry

18  Melton.

19          THE COURT:  And, Mr. Minnifield, did

20  you have some questions?

21          THE DEFENDANT:  Yes.

22              DIRECT EXAMINATION

23  BY MR. MINNIFIELD:

24      Q.  Ms. Melton, how long have you been

25  knowing Vonciel Minnifield?

1          A.   I guess a little over five years.

2          Q.   And John Minnifield?

3          A.   A little over five years.

4          Q.   Okay.  Could you tell the jury where did

5    you live?

6          A.   I lived next door to John and Von at 469

7    Empire Terrace.

8          Q.   Okay.  Have you ever, at any time, seen

9    Vonciel and I fighting or hell-raisers?

10         A.   No, sir.  I don't know -- you know, I

11   mean, I might hear something like that, but I don't

12   go and look.

13         Q.   Okay.  Did you hear it coming from our

14   place?

15         A.   Not really.  I mean, just occasionally.

16   You know, it sounds like some kids playing and all

17   that.  And I -- you know, I never really paid any

18   attention to it.

19         Q.   Okay.  Could you tell the jury what kind

20   of work you do?

21         A.   I do security work.  I own Central

22   Alabama Security.

23         Q.   And, therefore, you be coming in and

24   going all time of night, right?

25         A.   That's right.

1      Q.   Have you seen Vonciel or John Minnifield

2   out late at night, either one of us or --

3      A.   You mean --

4      Q.   Coming in or going out late at night.

5      A.   No, because I'm usually either at work or

6   in the bed.

7      Q.   Okay.  So it's nothing you could say

8   negative towards John Minnifield?

9      A.   No.

10      Q.   Or Vonciel Minnifield?

11      A.   No.

12      Q.   You have -- have you ever observed me

13   following Vonciel?

14      A.   No.

15      Q.   Thank you.

16              THE COURT:  Do you have any

17   questions?

18              MR. BAILEY:  I don't believe I have

19   any questions of this witness.

20              THE COURT:  Okay.  You can step

21   down.  You're excused.

22      Do you have any other witnesses available?

23              MR. HARTLEY:  Your Honor, I've given

24   your staff the two witnesses who were supposed to

25   have been here at nine o'clock.  Others should

```
 1    start arriving at ten.

 2                    THE COURT:  Let me say this.  We're

 3    having some difficulty in witnesses, and I will say

 4    this.  The State rested maybe earlier than

 5    anticipated.  One of their witnesses had to go to

 6    the doctor yesterday in Birmingham and was not

 7    released and is on her way here now, but the State

 8    has decided to use her as a rebuttal witness.  But

 9    that's put everything off a little bit, and we're

10    going to see that the witnesses that were here

11    yesterday, if we can get them, and they should have

12    some more witnesses arriving shortly.  So I'm going

13    to take a break until ten o'clock, and we'll get

14    you in the jury assembly room.

15         You're excused.  You can go.

16                        (Witness excused.)

17                        (Brief recess taken.)

18                        (Out of the presence of the jury.)

19                    THE COURT:  Mr. Minnifield,

20    hopefully, your witnesses will be here momentarily.

21    But I expect that we may be able to conclude this

22    matter shortly as far as the evidence.  And if so,

23    I would expect you and Mr. Bailey to proceed with

24    your closing arguments.

25         Now, one thing you need to be careful about
```

1    doing in your closing argument is that you cannot

2    testify during that.   You can only comment on the

3    evidence that's been presented in court.

4         Now, if you decide to testify -- and you do

5    have the right to testify, if you want to, but you

6    also have the right to remain silent, and that

7    cannot be considered against you.   If you do

8    testify, the State would certainly have the right

9    to ask you about prior convictions, or you may just

10   want to testify to that.   But I thought I would

11   just mention -- and, of course, you have some

12   familiarity with the criminal court process, in

13   fact, has had a case before me that, as I told you

14   earlier on record, that you were acquitted.   So

15   you're somewhat familiar with the charge given by

16   the Court.

17        But I'm going to cover all the normal things

18   such as burden of proof, presumption of innocence,

19   reasonable doubt, the jury to judge the evidence,

20   the credibility of the witness, and then I'm going

21   to give the elements of stalking.   And I think that

22   really should cover it pretty well.

23             MR. BAILEY:   Judge, I have one

24   requested --

25             THE COURT:   Okay.

1           MR. BAILEY:  -- that's in the

2     annotations that -- let me look and see if I can

3     find it. I should have copied it down.  I

4     apologize.

5           THE COURT:  Now, if you do testify,

6     I will give a charge on that you have the right to

7     do so.  If you do not testify, often attorneys want

8     me to give a charge that you chose not to testify

9     and you have the constitutional right not to take

10    the stand.  If you don't testify, do you want the

11    Court to cover that?

12          THE DEFENDANT:  Sure, because I'm

13    going to ask for a lesser charge.

14          THE COURT:  Okay.  What lesser

15    charge would you be requesting?

16          THE DEFENDANT:  Harassment instead

17    of stalking, because due to the fact, Your Honor,

18    this were a domestic dispute.  The evidence has

19    showed it was not domestic violence.  Never was it

20    in play.  There was no prior harassment, any

21    charges brought against me by Vonciel Minnifield

22    other than on the 23rd.

23          THE COURT:  Mr. Bailey, do you have

24    anything you want to say on the record as far as

25    harassment being a lesser included?

1      MR. BAILEY:  I would say, Your

2   Honor, that the evidence in this case is -- has

3   shown that there is no room for lesser included

4   argument -- or lesser included charge of

5   harassment.  The evidence has been overwhelming

6   that there were many events which have occurred

7   which support the charge, what he's charged with,

8   which is stalking.

9      THE COURT:  Well, on the harasses as

10   included in the definition of stalking, I think

11   under the circumstances here, and I heard the

12   evidence, that it would not be a lesser included,

13   so I'm going to deny your motion in that regard.

14   And that's on the record that you've made that

15   request, and that I've denied it.

16      Now, are any other witnesses here?

17      MR. HARTLEY:  Now we have Ronnie

18   Waters.

19      THE COURT:  Okay.  Then let's get

20   the jury in here and, hopefully, get started.

21      (In the presence of the jury.)

22      THE COURT:  Raise your right hand.

23      JOHNNIE SULLIVAN

24   The witness, having first been duly sworn or

25   affirmed to speak the truth, the whole truth, and

```
 1    nothing but the truth, testified as follows:
 2                    THE COURT:  And would you state your
 3    name for the record?
 4                    THE WITNESS:  I'm Johnnie Sullivan.
 5                    THE COURT:  And where do you work?
 6                    THE WITNESS:  I'm the president of
 7    Montgomery Catering Company.  We do the food
 8    service of the RSA buildings downtown.
 9                    THE COURT:  And, Mr. Minnifield, did
10    you have some questions for him?
11                    THE DEFENDANT:  Sure.
12                    DIRECT EXAMINATION
13    BY MR. MINNIFIELD:
14         Q.    Mr. Sullivan, how long have you been
15    knowing John Minnifield?
16         A.    Probably six or seven years.
17         Q.    Okay.  Have you hired me as -- one of
18    your partners hired me to work up at the RSA?
19         A.    Yeah.  You filled in for us working
20    weekends and whatever.
21         Q.    And just weekends and whatever?
22         A.    Well, you worked for Blankenship, our
23    accountants, so it was kind of a common thing.  And
24    Vonciel worked for us, and you ended up working for
25    us part-time with us, weekends when I saw you.
```

1          Q.    When I worked there, did I do a good job,

2     sloppy job, or what?

3          A.    No, you did a good job.

4          Q.    Okay.   On occasion, do you often screen

5     your people when they come to work for you all?

6          A.    Screen them how?

7          Q.    For health reasons?

8          A.    No, not really.

9          Q.    Because it is that you have a four-star

10    restaurant, right, food business?

11         A.    I don't know that I would call it four

12    star, but we've got several cafeterias downtown and

13    two catering facilities.

14         Q.    And you don't screen them through the

15    health department?

16         A.    No.

17               THE COURT:   He's already answered

18    that.

19         Q.    Okay.   That seems very unusual --

20               THE COURT:   Well, go ahead and ask

21    the question.

22         Q.    Would you lie for one of your employees?

23         A.    Would I lie for one of them?

24         Q.    Yes.

25         A.    I wouldn't lie for anybody.

1      Q.    You wouldn't lie for anybody.    Thank you.

2   Okay.   Mr. Sullivan, have you seen me at any time

3   following Vonciel or threatening her?

4      A.    No.

5      Q.    You never seen me sitting around either

6   the four places you have downtown or where she

7   would frequent work at either one of them or

8   sitting around waiting on her or while we were

9   going through the domestic dispute?

10     A.    The only time I saw either one of you is

11  when you were at the activity center, which, you

12  know, I run.   And I don't ever really work at the

13  plaza, which is really where Vonciel works most of

14  the time.   You know, I only saw the two of you when

15  you were filling in for me part-time, you know,

16  nights and weekends.   I didn't see either one of

17  you day-to-day.   But as far as when I work nights

18  and weekends, no, I never saw you coming around.

19               THE DEFENDANT:   Okay.   Thank you.

20  That's all.

21               THE COURT:   Do you have any

22  questions?

23               MR. BAILEY:   I just have one

24  question.

25                    CROSS-EXAMINATION

BY MR. BAILEY:

    Q.   Sir, are you -- and this may sound like a dumb question -- but in the past year or two years, have you been with Vonciel Minnifield, would you say, a tremendous amount of time?

    A.   You know, I talk to Vonciel all the time because she's head executive assistant at the RSA Plaza. She and I work out the schedules for our crews for the week. So I would say we talk on the phone more than I see her personally. She fills in and works nights with me at the activity center.

    Q.   I guess my question is, and I should have asked it a different way. Are you with her twenty-four hours a day, seven days a week?

    A.   No. I see her very seldom.

    Q.   Do you know what goes on in her personal life?

    A.   I don't have any idea.

          THE COURT: Anything else for this witness? You're excused.

          (Witness excused.)

          THE COURT: Your next witness?

    Mr. Hartley, would you mind getting his next witness?

          THE DEFENDANT: Karen Blanch.

1                **THE COURT:** Raise your right hand.

2                      KAREN BLANCH

3      The witness, having first been duly sworn or

4 affirmed to speak the truth, the whole truth, and

5 nothing but the truth, testified as follows:

6                  DIRECT EXAMINATION

7 BY MR. MINNIFIELD:

8      Q.  Good morning, Karen.

9      A.  Good morning.

10              **THE COURT:** Would you state your

11 name for the record?

12              **THE WITNESS:** My name is Karen

13 Blanch.

14      Q.  Ms. Karen, would you give in reference to

15 where you live, your address?

16      A.  457 Empire Terrace.

17      Q.  And is that anywhere near where Vonciel

18 and I live?

19      A.  Yes, it is.  Next door.

20      Q.  Okay.  Karen, have you ever encountered

21 her and I having domestic problems such as fighting

22 or --

23      A.  No -- I mean, not that I seen myself,

24 just what people say, you know.  I haven't seen

25 any --

1    THE COURT: Okay. You've answered

2    it. You've never observed anything.

3    Q. Just a direct question. Have you ever

4    seen me -- after Vonciel and I separated, have you

5    ever seen me following Vonciel or threatening her?

6    A. No.

7    Q. Have you ever seen Vonciel down in Park

8    Manner?

9    A. Yes.

10    Q. Since we separated?

11    A. Yes, I have.

12    Q. Could you state to the jury about what

13    time frame, night or day or etcetera?

14    A. I'm not sure on the dates, you know,

15    because it's been, like, almost two years ago. But

16    after they separated, she was down several times

17    day and night when he was not at home around in the

18    backside of the house. I don't know what she was

19    doing. And then another time when he got out of

20    jail -- I think it was September or October of last

21    year when he got out -- she came down on our street

22    and stopped in front of our house, and my husband

23    was outside. She talked with him. I went outside.

24    John was also out there, and she also spoke to him.

25    But I went inside. That's all I know about, you

1    know, that situation.

2         Q.    Thank you, Ms. Blanch.  You're very

3    helpful.

4                    THE DEFENDANT:  That's all.

5                    THE COURT:  Do you have any

6    questions for her?

7                    MR. BAILEY:  No questions.

8                    THE COURT:  Okay.  You're excused.

9    You may leave.

10                   (Witness excused.)

11                   THE COURT:  Your next witness?

12                   THE DEFENDANT:  Ronnie Waters,

13   please.

14                   THE COURT:  If you'll have a seat

15   right over there, and raise your right hand.

16                   RONNIE WATERS

17        The witness, having first been duly sworn or

18   affirmed to speak the truth, the whole truth, and

19   nothing but the truth, testified as follows:

20                   DIRECT EXAMINATION

21   BY MR. MINNIFIELD:

22        Q.    Mr. Waters --

23                   THE COURT:  And state your name for

24   the record.

25                   THE WITNESS:  My name is Ronnie

1    Waters.

2                    THE COURT:  And where do you work?

3                    THE WITNESS:  Montgomery Catering.

4        Q.   Mr. Waters, how are you doing?  Could you

5    tell me how long have I been working with you --

6    I've been working with you at Montgomery Catering?

7        A.   John, I don't remember dates well, but I

8    would say five years.

9        Q.   Five years?

10       A.   I would guess that.  Four to five years.

11       Q.   And, Mr. Waters, as of this date -- I

12   know it's been a year or so -- but I have never

13   been fired or replaced from my position at

14   Montgomery Catering by either one of you or your

15   associate?

16       A.   No, huh-uh.

17       Q.   Okay.  The only thing is this domestic

18   thing.  And my wife also work for you?

19       A.   Correct.

20       Q.   Okay.  Did you -- you don't screen your

21   peoples, do you?

22       A.   What do you mean by screen?  I don't run

23   a drug test.  I mean, is that the screening you're

24   talking about?

25       Q.   You do what, sir?

1      A.    I don't run drug tests if that's the

2    screening you're talking about.

3      Q.    Okay.   That's one of them.   Health?

4      A.    No, I don't do any background check as

5    far as their health or drug or, you know, their

6    past.

7      Q.    Okay.   The reason I want to know this is,

8    the health department would close you down if one

9    of your employer was a carrier of a disease, right?

10    They would shut you down or --

11                   THE COURT:   I'm not sure what that

12    has to do with the elements here.

13                   THE DEFENDANT:   It is elements.

14                   MR. BAILEY:   Your Honor, we would

15    object because I don't know where he's going with

16    this, but it certainly doesn't have anything to do

17    with this case.

18                   THE COURT:   I'm going to sustain the

19    objection.   I'm not going to allow you to go into

20    that.  Go ahead with your next question.

21      Q.    Okay.   On -- at the Auburn and Alabama

22    game in Auburn, that was October every year, the

23    last game that Auburn played in Auburn, you do a

24    function there?

25      A.    Correct.

1    Q.   Did you see me at that function at any

2    time?

3    A.   I did.

4    Q.   Could you explain to the jury what did

5    you see or what was said?

6    A.   I forget who come told me that you were

7    at the thing that -- at the function or what have

8    you and Vonciel was scared or what have you.  So I

9    saw you across the street.  I called you over and

10   talked to you and told you, John, you don't have

11   any reason to be here.  There's not anything going

12   on.  And you said, You're right.  And you turned

13   around and left, and that was the last I saw you.

14   Q.   Mr. Waters, thank you.  Were there --

15   when someone told you that John Minnifield was out

16   there, did you chase me?

17   A.   No, I didn't chase you.  I said I saw you

18   across the street, and I called you over and told

19   you you didn't need to be there.  And you said,

20   You're right, and turned around and left.

21   Q.   Okay.  Did I explain to you really why I

22   was there?  You might not remember exact words, but

23   did I explain to you why I was there?

24   A.   I don't recall you explaining anything to

25   me.

1    Q.    Did you, by any way, hire a security

2  guard to go with you on this given date?

3    A.    I've been doing a function over there at

4  Auburn for fourteen years.  And four years ago,

5  Auburn University requested us to get security

6  because of something that happened at another

7  function over there the night before one year.

8  After they seen our party the one year, then after

9  that, they've never required us.  But they hired

10 their own security, and I had to pay Auburn

11 University for that security.  So I have not

12 personally hired any security other than the one

13 year that I had to pay Auburn for it.  But after

14 then, they changed their policy for our function.

15    Q.    You did not hire Mr. Glaxton?

16    A.    No.  I've never paid Mr. Glaxton to work

17 an Auburn party.

18    Q.    Thank you.

19              THE DEFENDANT:  That's all.

20              MR. BAILEY:  Just one question.

21                   CROSS-EXAMINATION

22  BY MR. BAILEY:

23    Q.    Were you aware that Mr. Glaxton was there

24  on that day?

25    A.    Oh, yeah.

1    Q.   And were you aware of you requested him

2    to do this?

3    A.   I was told.

4    Q.   Okay.  That's fine.

5              MR. BAILEY:  That's all.

6              THE COURT:  Okay.  You can be

7    excused.

8              (Witness excused.)

9              THE COURT:  Your next witness?  If

10   you'll have a seat right over there and raise your

11   right hand.

12                   GLORIS PERDO

13       The witness, having first been duly sworn or

14   affirmed to speak the truth, the whole truth, and

15   nothing but the truth, testified as follows:

16                 DIRECT EXAMINATION

17   BY MR. MINNIFIELD:

18   Q.   Would you state your name?

19   A.   Gloris Perdo.

20              THE COURT:  Can all of you hear her?

21   Q.   Speak into the microphone so the jury can

22   hear.

23       Ms. Perdo, where do you work?

24   A.   Montgomery Catering.

25   Q.   How long have you worked there?

1      A.    Ten and a half years.

2      Q.    Ten and a half years.  Have you had the

3  opportunity to work with Vonciel?

4      A.    Yes, I have.

5      Q.    John Minnifield?

6      A.    Yes, I have.

7      Q.    About last year -- year before last --

8  we'll put it in 1998.  Did you see, at any time,

9  that John Minnifield stalked, harassed, or

10  threatened Vonciel?

11      A.    Repeat the statement.

12      Q.    Stalked, harassed, or threatened Vonciel?

13      A.    No, I haven't seen it.

14      Q.    Okay.  Have you seen me hanging around

15  after we start having problems with our marriage?

16  Have you seen me hanging around Montgomery Catering

17  at any given time?

18      A.    Could you make that --

19              THE COURT:  Could you give her a

20  time frame?

21      Q.    A time frame of October of 1998.  It

22  would have to be in October.

23      A.    On the streets, but not in the building.

24      Q.    How did you see me on the street?  Would

25  you tell the jury where did you see me at on the

1    street?

2        A.    I was standing on our back loading

3    dock -- and it's facing Ripley Street -- and I see

4    you going up and down.

5        Q.    Right.  Is that frequent like up and down

6    you say is just like every five, ten, or fifteen

7    minutes, or hours, etcetera?

8        A.    Well, occasion, I have seen you twice in

9    fifteen minutes.

10       Q.    Twice in fifteen minutes?

11       A.    Uh-huh.

12       Q.    Do you know where my daily job were in

13   reference to my night job?

14       A.    I guess that's the Eastern Bypass or --

15       Q.    Perry Hill Road?

16       A.    Yeah.

17       Q.    And do you know what my job title was

18   there?

19       A.    I guess the maintenance or delivery or

20   distributor.

21       Q.    Okay.  Currier.  And can you recall that

22   on several occasion, I have to bring payroll?

23       A.    Yes, you bring the payroll in.

24       Q.    Some type of package.  And if Mr. Waters

25   wasn't in, who would get it?  Or Vonciel wouldn't

1    in because she's more the secretary, if she wasn't

2    in, then I would put it in nobody's hand other than

3    who?

4         A.   Ronnie Waters.

5         Q.   Or if he wasn't in?

6         A.   You would take it back.

7         Q.   That's right.  Or Vonciel.  That's where

8    I would have to be --

9              THE COURT:  Wait.  Ask her the

10   question.

11        Q.   Okay.  In this relationship, you've been

12   knowing us.  You've been close to us.  Am I right?

13        A.   Yes.

14        Q.   Okay.  Have you ever known me to threat

15   Vonciel would hurt her?  Just -- not for what

16   you've heard, just you know it yourself?

17        A.   (No response.)

18        Q.   I beg your pardon?

19        A.   I'm trying to see how I should answer

20   that because I heard you say something once.  But

21   you were playing, I guess.  You were playing

22   because all of us were out there.

23        Q.   And could you state that, what was said?

24        A.   My baby won't cheat on me because she

25   know I love her because she know I'll hurt her.

1        Q.  Can you state where that was at when that

2  was said, at your house, on the job?

3        A.  On the porch at my house.

4        Q.  On the porch?

5        A.  Uh-huh.

6        Q.  So we all did frequent visit each other,

7  right?

8        A.  Uh-huh, yes.

9        Q.  And at no time have you seen me stalking

10  Vonciel or threatening her or have you seen me with

11  a weapon?

12        A.  No.

13        Q.  Okay.  Thank you, Ms. Perdo.

14               THE DEFENDANT:  That's all.

15               THE COURT:  Do you have any

16  questions?

17               MR. BAILEY:  Just maybe one or two.

18               CROSS-EXAMINATION

19  BY MR. BAILEY:

20        Q.  Has Mrs. Minnifield ever stayed at your

21  house -- has Mrs. Minnifield ever stayed at your

22  house with her kids?

23        A.  Yeah, she has spent the night.

24        Q.  Okay.  Can you tell me kind of a time

25  frame when she might have done this?

1      A.    During the time that her and

2   Mr. Minnifield was having problems.

3      Q.    Okay.  And during that time that she had

4   been staying at your house, did Mr. Minnifield ever

5   show up?

6      A.    Yes.

7      Q.    Can you tell us about that?

8      A.    He would come and knock on the door, so I

9   just finally give in and open -- unlock the door,

10  but the screen door was hooked.  He said he want to

11  talk to Von.  And I said, Wait to cool off.  You're

12  mad.  And I said, You ought to be glad she's at

13  somebody's house that you know is going to take

14  care of her and the kids.  He said, Well, you're

15  right.  You're right.  And he left.

16     Q.    About what time of day or morning was

17  this?

18     A.    3:00 -- 2:30 or 3:00 in the morning.

19     Q.    2:30 or 3:00 in the morning, you say?

20     A.    Yeah.

21                MR. BAILEY:  No further questions.

22                THE COURT:  Any other questions for

23  her?

24                THE DEFENDANT:  That's fine.

25                THE COURT:  Thank you.  You're

1    excused.

2                    (Witness excused.)

3                    THE DEFENDANT:  Your Honor, I would

4    like to put Vonciel Minnifield back on the stand.

5                    THE COURT:  I'm not going to permit

6    you to do that.  You had the right to cross-examine

7    her when she took the stand, and I'm not going to

8    let you call her back.

9        Do you have any other witnesses -- and that is

10   in the Court's discretion?  Go ahead.  Any other

11   witnesses?

12                    THE DEFENDANT:  There's none here

13   now.  Mr. Xides didn't show up.

14                    THE COURT:  So at this time, do you

15   rest?

16                    THE DEFENDANT:  No.  I want to take

17   the stand.  I want people to know about me, John

18   Minnifield.

19                    THE COURT:  Okay.  Then you'll come

20   up here.

21                    THE DEFENDANT:  Sure.  I have

22   nothing to hide.

23                    MR. BAILEY:  Judge, I just object to

24   his comments that he's making throughout the --

25                    THE COURT:  Again, I will ask the

1    jury to disregard his comments.  You can only

2    consider his testimony under oath that's admitted

3    during the course of the trial.  You can't consider

4    his comments or even his questions when he was

5    acting as an attorney.

6        If you'll raise your right hand.

7                    JOHN MINNIFIELD

8        The witness, having first been duly sworn or

9    affirmed to speak the truth, the whole truth, and

10   nothing but the truth, testified as follows:

11             THE COURT:  And you can put your

12   hand down.

13       Now, I'm going to let you testify somewhat in

14   a narrative, but she has to take things down, so I

15   may interrupt so it would be easier to take it down

16   and for the jury.

17       And would you state your name?

18             THE WITNESS:  My name is John

19   Minnifield.

20             THE COURT:  And, Mr. Minnifield, I

21   think it would be helpful if you would maybe just

22   take one matter at a time.  And where do you want

23   to start?

24             THE DEFENDANT:  I'm going to start

25   with the beginning of this relationship.

1    THE COURT:  Well, we aren't going to

2    go back through the whole relationship.  This isn't

3    a divorce case.  I'm -- you need to start with the

4    matters relevant here.

5    THE WITNESS:  Okay.  The matters

6    relevant here is Vonciel and I, we had a difference

7    towards living together as man and wife.  As you

8    can see, she's a younger lady, and I'm a older man.

9    Vonciel was out on the street.  I took Vonciel in.

10   I tried to make something out of her.  I worked

11   hard.  I tried to get her off drugs.  I went to the

12   welfare, got her children back she had lost and her

13   custody --

14   MR. BAILEY:  Your Honor, I'm going

15   to object.

16   THE COURT:  I'm going to sustain

17   your objection.

18   Again, Mr. Minnifield, you need to address the

19   matters that have been raised in this court

20   proceeding regarding the stalking.

21   Now, what do you have to say in regard maybe

22   to the car incident?  Do you want to say anything

23   in regard to that?

24   THE WITNESS:  That Vonciel has been

25   lying throughout this case.

```
1                      THE COURT:  Mr. Minnifield, if you

2    want to testify, I'm going to let you testify.  I'm

3    not going to let you characterize other witnesses's

4    testimony.  Now, if you want to tell the jury any

5    facts regarding the -- let's just start with the

6    car incident, you can do so.  Is there anything you

7    want to tell them in regard to that?

8                      THE WITNESS:  I want to tell them

9    from the time we broken up, and she left and

10   charged me with the stalking.

11                     THE COURT:  Okay.  When did you

12   break up with regard to the stalking?

13                     THE WITNESS:  We broke up October

14   when Vonciel walked out of my house on October the

15   8th.

16                     THE COURT:  Okay.

17                     THE WITNESS:  1998.

18                     THE COURT:  And what happened after

19   that?

20                     THE WITNESS:  Vonciel just moved out

21   of the house and went to a hotel for a week.  I

22   didn't know where she were until one of the

23   neighbors told me what --

24                     MR. BAILEY:  Your Honor, I'm going

25   to object.
```

1          THE COURT:  You can't go into what

2     the neighbors said.

3          What did you do when you found out where she

4     was?

5          THE WITNESS:  I went to the hotel

6     where she lived, and I asked her what was the

7     problem.  She said she just having some problem and

8     her and the kids needed space.  They just needed

9     space from her and I for her to think.  Vonciel

10     told me, John, it's nothing in my name or nothing

11     with my name on it.

12          THE COURT:  Again, Mr. Minnifield,

13     this is not the divorce proceeding.  So what

14     occurred after that conversation?

15          THE WITNESS:  I asked Vonciel to

16     come back home.  Let's discuss this, work things

17     out.  She said, Okay.  Vonciel packed up her stuff,

18     her and the kids, and they came back home.  We sit

19     down and talk.  We went out to lunch.

20          THE COURT:  Mr. Minnifield, I'm not

21     going to let you go into all of those details.

22     Okay.  How long did she stay at the house?

23          THE WITNESS:  She stayed there a

24     week.

25          THE COURT:  And what happened then?

```
1              THE WITNESS:  And Vonciel started

2    running out around at night like she couldn't be

3    still.  She just had to go.  She get off from work.

4    She come home.  She just had to go.

5              THE COURT:  Okay.  Did she and the

6    children move out?

7              THE WITNESS:  Not then.

8              THE COURT:  When did they move out?

9              THE WITNESS:  It was a week or so

10   later that they moved out because I asked her to

11   slow down, to stop running.

12             THE COURT:  Okay.  So they moved out

13   again, and then what happened?

14             THE WITNESS:  They moved out this

15   time, and they went to Brookview Apartment.  She

16   had already rented the apartment.

17             THE COURT:  Well, you've heard the

18   testimony about what she said -- she and others

19   said occurred on that occasion.  Do you have

20   anything you want to say in regard to that?

21             THE WITNESS:  Yes.  Vonciel came

22   back to the house and asked me for certain items --

23   the furniture, clothes, etcetera.  I told her she

24   could get anything she wanted, but only her brother

25   or her uncle could come there and get it and no
```

1    other man could come there and get nothing from me.

2    So she contacted her brother.  We made a time frame

3    that this happened, and he came over and he moved

4    stuff.

5                        THE COURT:  Well, when --

6    Mr. Minnifield, I need you to testify what happened

7    on that occasion that they said you went over there

8    and the incident with the door and going into the

9    apartment.

10                        THE WITNESS:  Okay.  The incident to

11   the door was -- it came -- it lead up to the Friday

12   before this happened.  Vonciel had came to me, and

13   she said, John, said, we're going back together.

14   We just needed space.  But right now I need a

15   telephone.  She said, I need a telephone for me and

16   the kids's safety.  Because I asked Vonciel --

17                        THE COURT:  And did you give her a

18   telephone or get her a telephone?

19                        THE WITNESS:  Yes.  That Friday I

20   went and got Vonciel a telephone at Powertel,

21   nearly two hundred dollars.  But anyway, though --

22                        THE COURT:  And what led up to you

23   being at the apartment that night?

24                        THE WITNESS:  Okay.  This here was

25   some two weeks later.  But I called -- well, I had

1    let her use the vacuum cleaner, and I was putting

2    down some carpet.  And once the carpet got put

3    down, she was coming back.  But what happened, I

4    called Vonciel on the one time on that phone and

5    discovered that the number had been changed.  I

6    bought it on Friday.  She changed the number on

7    Monday.  Everybody had the number but me.  Okay.

8    So that's what caused me to go over to her house.

9    I went over to her house.  Vonciel did not answer.

10    It was about nine o'clock, a decent hour.  Some

11    nights she work ten and eleven o'clock, and I knew

12    she might have not just been there, so I left.  I

13    came back later, due to the fact the guy was going

14    to put down the carpet, and they needed the vacuum

15    cleaner.  I went by a friend of mine's house,

16    Robert.  He's the mechanic, and he told me that --

17              THE COURT:  Now, you can't go into

18    what he told you.  What did you do?  Did he go with

19    you?

20              THE WITNESS:  He went with me to

21    Vonciel's house to get the vacuum cleaner because

22    he needed to try to make him a little bit of money

23    on the side every now and then.  So Vonciel's car

24    wasn't there.  So I goes back and drop him off.

25    And so I go on home.  But I really need this so I

1    could straighten the house up so my family will

2    come back home.  Vonciel had this guy in there.  I

3    seen his car.  I knew he was there.  I kicked the

4    door down and went into the house.  At the time, I

5    lost it.  It was a jealous rage.  Your wife, you're

6    doing everything for her, and now she got a man in

7    the house.  Yes, I kicked the door in.  I went in.

8    The same gentleman that was here yesterday

9    testified, Pete Rose.  He was a frequent visitor of

10   Vonciel on her job.  I have seen this, but she

11   booked parties and etcetera, and she even

12   introduced me to him like he was setting up, like,

13   for a wedding or party.  I went into a rage because

14   I loved my wife.  I love those children.

15         I married my wife there.  She had four

16   children by four different peoples --

17               THE COURT:  Now, wait just a moment,

18   Mr. Minnifield.  You need to -- anything else you

19   want to say about what occurred at that time?

20               THE WITNESS:  Yes, I am.  This is

21   what made me go into a rage.  And any man -- any

22   man prudent or not would love his wife, work hard

23   for his wife, would have felt the same way I did.

24   Some would have went further.

25               THE COURT:  Okay.  Mr. Minnifield, I

1   am going to let you -- remember, you'll get an

2   opportunity to argue this matter.  At this time,

3   you need to just tell the jury the facts.

4        Now, did any -- did you want to say anything

5   else about what occurred on that day?

6                THE WITNESS:  The facts occurred on

7   that occasion.  Yes, I did not put my hand on

8   Vonciel when I went into the house.  I was

9   confronted by Dana, you all met yesterday, the

10  15-year-old daughter.  Dana was the one that

11  confronted me.  Vonciel ran into the closet with

12  Mr. Rose.  Ashley ran into the bathroom.  I heard

13  the door slam, and I know it was a one-room

14  apartment because I visit there frequent.  She get

15  me over for dinner.

16       Okay.  I go in the bathroom.  There Ashley on

17  her knees.  Please, Papa John, don't hurt me.  I

18  said, Baby, I'm not going to hurt you.  And I look

19  around because I hear a scuffling behind me.  And

20  in that corner over there was a closet.  I was

21  intoxicated -- not that much -- but I did see the

22  arm push Vonciel out of the closet.  I recognized

23  the watch.  That's when I came up from right here

24  with the hatchet.  I came out with it.  Vonciel

25  seen it.  Vonciel tried to go back in the closet,

1    but she didn't.  She went through the window --

2    where at the time, I never hit one of those

3    children before.

4         But Dana, when she confronted me, I asked her

5    to move.  She wouldn't move.  Dana was begging me,

6    No, Papa John, no.  I'm trying to push her like

7    this.  And in that process and in the process of me

8    being intoxicated, my hand came up and I slapped

9    her.  It wasn't intentional slap.  She screamed

10   just like this.  Dana is the one turned around,

11   jumped up on the bed, and the window was, like,

12   where those two gentlemen sitting there, and it's a

13   little bit wider than where you're sitting.  Dana

14   just dove through the window.  She's the one that

15   dove through the window.  When Pete Rose pushed her

16   out the closet, then Vonciel know she couldn't get

17   back to the closet.  I said, I'm going to get you.

18   That is the word I said, and if it carry me to

19   prison for the rest of my life or death sentence or

20   what, that is what I told you.

21        You jumped through the window yourself because

22   Dana had tore all of the window out.  You jumped

23   through the window.  You took off running.  I came

24   back through the living room.  And in coming back

25   through the living room, I seen the telephone there

1    on the TV, what another man had bought.  So I

2    grabbed the telephone, and I walked out and sat on

3    the sidewalk, and I bust the hell out of it because

4    I worked and bought the phone, and everybody got

5    the number but me.

6        Then I took out chasing you.  On the first

7    time around the apartment complex, when I came

8    around the window where you came out, Pete Rose

9    tried to come out of that -- he tried to come out

10   that window, but he seen you.  But I was pretty

11   close to you.  He went back in.  I chased you

12   around one more time and at that time, that's when

13   the police man was there.

14       It wasn't like Vonciel said she was at the

15   window.  She was the brave one.  I didn't want my

16   daughters to get hurt.  Vonciel left her baby girl

17   in that house.  Vonciel didn't care nothing about

18   nobody but Vonciel at the time being.

19                   THE COURT:  Mr. Minnifield, go

20   ahead.  You can't say her mental operation, just

21   what occurred.

22       Okay.  So the police came, and then what

23   happened?

24                   THE WITNESS:  When the police came,

25   I was in a rage.  They carried me to jail.  I goes

1    down.  They hold me for four hours due to the smell

2    of alcohol.  I goes back over there -- I get out on

3    bail.  I go back to the apartment to get my

4    vehicle.  I knew Vonciel was in a safe house.  I

5    didn't go searching for her.  The next day, I

6    didn't go searching for her.  I didn't go to work

7    that morning.

8         Don Thomason is one of my bosses.  He kept

9    paging me, so I stopped to call him.  He said, Are

10   you coming in today --

11              MR. BAILEY:  Your Honor, I object.

12              THE COURT:  I'm going to sustain the

13   objection.  With regard, you need to confine it to

14   your contacts or your conduct related to this

15   issue.

16        When was the next time you had any contact, if

17   you did, with your wife?

18              THE WITNESS:  This is pertaining

19   her.  It's --

20              THE COURT:  I'm not going to let you

21   go into what he said or did.  Only what you did.

22              THE WITNESS:  Okay.  This is what

23   happened is he asked me --

24              THE COURT:  You can't go into what

25   he asked you.

```
 1                    THE WITNESS:  It's pertaining to
 2      her.
 3                    THE COURT:  You cannot go into what
 4      he said.  That's not admissible.
 5          What did you do then?
 6                    THE WITNESS:  I gave consent or I
 7      made the statement that she has no reason to fear
 8      me.  I was carried away at the time.  She could go
 9      back to her job.  She can go back to her home, that
10      I was not going to follow her.  If she didn't want
11      to be with me, then I didn't want to be with her.
12                    THE COURT:  Well, did you have any
13      further contact with her over the -- in November?
14                    THE WITNESS:  I had contact with her
15      in November.  I got sick.  And at the time being,
16      Vonciel and her two daughters carried me to the
17      hospital, which I stayed in there for three days,
18      the Montgomery Regional Hospital.  They carried me
19      there, and Vonciel was there every day, every
20      night.  And, you know, I thought we was going back
21      together because I wanted the marriage to work.
22      But it didn't work.
23                    THE COURT:  Okay.  Well, what
24      happened next?
25                    THE WITNESS:  Okay.  What happened
```

1    next is the next incident happened on -- it

2    happened on the day of the Auburn and Georgia

3    football game.  I was going down -- I was getting

4    up on from Lower Wetumpka up on the Northern

5    Bypass.  A little boy named Jody Lewis, which you

6    haven't met, he was in the car with me.  I was

7    going across town, and I did not recognize Vonciel

8    until I got to the traffic light.  I pulled up at

9    the traffic light at James Jackson Federal Road and

10   the Northern Boulevard.  And Jody said something,

11   whatever it was.  We was talking about the football

12   game.  And I looked that way, and there was

13   Vonciel's car right beside mine.  It wasn't her

14   car.  It was somebody else's car, one of the

15   co-workers.  That's what made me not recognize her.

16   And I said, I want to see you.  She had Tim Brown

17   in the car with her.  So he took off when the light

18   changed.  So I took off too.  As I was going to hit

19   65 South, which I did hit 65 South, I didn't go 65

20   North, as she told in her statement.  I went over,

21   and the guy that was going to go to the football

22   game with me because I had two tickets that had

23   been given to me by the company -- and I am a

24   Auburn fan.

25        Well, we went to the game.  And I said,

1    Vonciel is working this game today.  It's over a

2    hundred thousand peoples there, and I said I wanted

3    to talk to her.  So we rode around a few minutes

4    until I spotted the Montgomery Catering truck.  And

5    I went to talk to her, but I stood about as far

6    from here to that door from her.  And the girl that

7    works with her was looking at me, and I did like

8    that.  And Vonciel looked over that way, and she

9    said, No, John.  And she walked down there where

10   Mr. Waters were and the security guard.

11        Like they say, I was standing up there.  When

12   they approached me, I didn't get too closer to her

13   because I didn't want to frighten her.  Mr. Waters

14   and the security guard walked right up to me.  They

15   had probably about twice the distance from that

16   door and table to come up there where I were.  I

17   didn't make no break to walk away.  I didn't make

18   no break to go towards her or put her in fear.

19   Mr. Waters came up, and he said, John, we don't

20   need any kind of confrontation down here.  You

21   heard his statement.  I say, You're right.  There

22   wasn't going to be no confrontation.  I just wanted

23   to talk to her, and I see she don't want to talk.

24   And I showed him the tickets.  I said, I don't even

25   want to go to the game.

```
 1          It was no place to park, so my friend was

 2     driving up and down.  You know, I told him, Don't

 3     get too far.  Just circle around so, you know, we

 4     can get in the car and go find a place to park and

 5     go on to the game.

 6          I asked Mr. Waters, I said, Mr. Waters, I

 7     said, You could say a few words for me to my wife.

 8     He said, I'm not going to get off into that.  I

 9     said, Okay.  That's fine.  Time will work itself

10     out.  So I left.  I said, I don't even want to go

11     to the game.  As a matter of fact, I just handed

12     the tickets to a guy, and I left -- me and this guy

13     did, and came back to Montgomery.

14          I didn't come in contact with Vonciel no more.

15     On the 23rd or the 30th -- on the 23rd, that Monday

16     morning -- I know I've carried her to work too many

17     times -- she don't get to work until 8:30 or after.

18     I had went out and gave the keys to David Johnson,

19     a co-worker of mine, because I wasn't going into

20     work that day.  The company had gave me a leave of

21     absence.  Anyway, only come in, you know, if you

22     feel okay.

23          So I gave him the keys to give to my boss

24     because they had to have the alarm and all that

25     turned on, and we had construction workers over
```

1    there.   So I came back and I seen Nick, Nicholas
2    Washington, the first one that testified this
3    morning, emptying the garbage on Ripley Street.   I
4    said, Nicholas, I say, when Von come in, tell her
5    I'm going out of town until after Thanksgiving.   I
6    won't be back 'til after Thanksgiving.   But when I
7    come back, just to give her some time, maybe we can
8    sit down and discuss things and work things out.
9    He said, Okay.   And I said, You have a happy
10   Thanksgiving, and I drove off.
11         I went home because I had been up all that
12   night -- I went home and parked my car in my yard.
13   I went in and went to bed because I had a white guy
14   that he couldn't get in the Salvation Army and it
15   was cold that night before, and I let him stay with
16   me because he didn't have anywhere to stay.   I went
17   in there and went to bed.   I stayed in the bed
18   until about 2:30.   I got up, taking me a bath, and
19   went over to a friend's house of mine, David
20   Johnson, the one I left the keys with.
21         He said, Man, the detectives have been on the
22   job all day waiting on you.   I said, Waiting on me
23   for what?   He said, Vonciel has filed a stalking
24   charge on you.   And the detectives said you're
25   going to be up under a hundred-thousand-dollar

1    bail, and they gone -- they got all-point bulletin

2    out for you.  What you going to do?  I said, What

3    you think I'm going to do?  He said, Well, I'll

4    ride with you if you want to go.  He said, You

5    don't need to go to jail.  I said, What you mean,

6    go to jail?  I'm not running because I haven't did

7    anything.

8                    THE COURT:  Mr. Minnifield, you

9    don't need to go into the details of your

10   conversation with someone else, but you can say

11   what you did.  What did you do?

12                   THE WITNESS:  I went to the police

13   headquarters, but I let David and this white guy go

14   so if I got locked up for any reason, that my car

15   wouldn't be sitting on the street and I have to be

16   paying extra towing fee to get it towed or for

17   storage.  So they went down there with me, and I

18   went in and asked for Ms. Cassandra Williams, the

19   detective, and she came over and she put cuffs on

20   me, and she questioned me, etcetera.  And she said,

21   We're charging with you the charge of stalking and

22   your bail is going to be a hundred thousand

23   dollars.  I said, Whatever.  And I went on.  They

24   brought me over to the county jail.

25          I did not make contact.  The only other

1  contact I made with Vonciel were we had an early

2  winter and it was cold a couple nights in a row --

3  awful cold.  We have a dog, which is a Chow, and

4  I'm a constant watch of the news, and I noticed the

5  weather was going to be cold.  The dog was tied in

6  the backyard because nobody can get up to him but

7  me and Vonciel and the son, which was in Texas, and

8  Dana.  I written a letter to Vonciel and asked

9  Vonciel -- because she always bring scraps from up

10 there where she work at -- and I asked her to carry

11 him some food.  And in the process, I put a few

12 words in there about her and I thinking about it,

13 and, you know, let's cut all this kid stuff out.

14 We're married.  We're not shacking.  She took the

15 letter to the district attorney, but she didn't

16 take the letter to them then.  She held that

17 letter --

18          MR. BAILEY:  Your Honor, I'm going

19 to object as to what she did.

20          THE COURT:  I'm going to sustain the

21 objection.  Go ahead, Mr. Minnifield.  Anything --

22 then you were arrested in the matter, and we're

23 here today for the trial --

24          THE WITNESS:  I was arrested --

25          THE COURT:  Mr. Minnifield, I'm

```
 1     going to let the State, if they want to ask you
 2     anything on cross-examination, do so, and then you
 3     may make any further brief response.
 4          Do you have anything you want to ask him?
 5                    MR. BAILEY:  Yes, Your Honor, but
 6     may I approach before I do so?
 7                    THE COURT:  Yes.
 8                    MR. BAILEY:  And, I guess,
 9     Mr. Minnifield needs to --
10                    THE COURT:  Mr. Minnifield, you need
11     to come up here as well.
12                    MR. BAILEY:  Judge, I think I'm
13     going to ask him some very limited questions and
14     move this.  And what I would like to do to speed
15     things up, if I could.  Cassandra Williams is here.
16     I would like to just ask her a few questions and in
17     response stop my questioning and --
18                    THE COURT:  Okay.
19                    THE DEFENDANT:  That's fine.
20                    CROSS-EXAMINATION
21     BY MR. BAILEY:
22        Q.  You say David Johnson is a friend of
23     yours?
24        A.  Yes, I thought he were.
25        Q.  Did -- isn't it true, sir, that you had
```

1    told Mr. Johnson in that conversation that you had

2    talked about just a few minutes ago where you said

3    that you had went and told him that you were fixing

4    to leave town, correct?

5        A.    Yes.

6        Q.    Okay. Isn't it true, also, that in that

7    same conversation that you told him you were going

8    up to the mountains?

9        A.    Yes, I told him I was going up to the

10    mountains.

11        Q.    Isn't it also true that you were going up

12    there to think about how you were going to kill

13    your wife?

14        A.    No, sir.

15        Q.    Didn't tell him that?

16        A.    No, I didn't.

17        Q.    You do admit, sir, going and talking to

18    Nicholas Washington?

19        A.    Yes, I do.

20        Q.    Okay. And you -- did you advise Nicholas

21    Washington that you were fixing to leave town?

22        A.    Yes, I did.

23        Q.    Something that you didn't mention in your

24    testimony, but I'm going to ask you about. Do you

25    recall ever going to Lawanda Benson's house?

1      A.    Yes, I do.

2          Q.    And what happened on that occasion when

3      you went to her house, what time?

4          A.    I went to Lawanda Benson's house -- it

5      was about 9:30 one night, and I said, Wanda, I say,

6      I want you to go and deliver a message to me for

7      Von.  She said, John, say, You know where Von is.

8      She said, Let it go.

9          Q.    How many times did you go to Lawanda

10     Benson's house?

11         A.    I went to her house twice over a course

12     of all October.

13         Q.    And you admit to also going to Auburn,

14     Alabama, correct?

15         A.    Yes.

16         Q.    Now, I want to talk about the October

17     30th incident.  You talked a little bit about that,

18     the incident where you had come over to the

19     Brookview Apartments?

20         A.    Right.

21         Q.    Okay.  What all did you have with you on

22     that day?

23         A.    Huh --

24         Q.    Did you have anything with you, any type

25     of weapons?

1      A.    Sure.    I didn't have nothing with me then

2    when I first came up and knocked on the door.    But

3    I did go back to the car to give her time to set

4    the vacuum cleaner outside the door.

5      Q.    Let me ask you about that since you bring

6    up giving her time.    You said you had went over

7    there originally about nine o'clock in the evening,

8    correct?

9      A.    She wasn't there.

10      Q.    And she wasn't there?

11      A.    Right.

12      Q.    You said that you came back later on that

13    night, correct?

14      A.    Right.

15      Q.    I believe you said you came back with

16    someone else?

17      A.    I came back with someone else, and she

18    still wasn't there.

19      Q.    She still wasn't there.    What time was

20    that?

21      A.    This was about 10:30.

22      Q.    Okay.    Then you go and drop your friend

23    off, correct?

24      A.    Right.

25      Q.    And then you came back to her house; is

284

1    that correct?

2         A.    Right.

3         Q.    What time was that?

4         A.    It was about 11:30.  This was on my way

5    home.  See, I could go home that way.  I don't stay

6    far from Brookview Apartment.

7         Q.    You don't think 11:30 at night is a

8    little late to be going and asking someone for a

9    vacuum cleaner?

10        A.    Well, I had a job I needed did.  She was

11   supposed to have gotten it to me before -- three or

12   four days before then.

13        Q.    Okay.  So how did you wind up getting

14   into the house?

15        A.    I kicked the door down.

16        Q.    Okay.  Now, you've testified about some

17   of the events that occurred after you kicked the

18   door down.

19        A.    Right.

20        Q.    Did you also kick the bathroom door down

21   or knock the bathroom door down?

22        A.    No.

23        Q.    Didn't do that?

24        A.    No.

25        Q.    Did you also chase your wife around the

1    parking lot with that hatchet?

2        A.    Yes.

3        Q.    Okay.  And what would you have done if

4    you had caught her?

5        A.    Well, under the --

6                THE COURT:  I'm going to sustain the

7    objection as to what he would have done.  That's

8    speculative.

9        Q.    What were you trying to do?

10       A.    What were I trying to do?  I was trying

11   to catch her.

12       Q.    If you had caught her, what would you

13   have done?  What was your intentions?

14       A.    I could not really tell you what my

15   intentions were.

16       Q.    Did you not tell the police that you

17   would have killed her if you would have caught her?

18       A.    I told them I don't know what I would

19   have did if I had of caught her.

20       Q.    You didn't tell them that you would have

21   killed her?

22       A.    No.  And I was intoxicated, but I know I

23   had -- didn't say that.

24       Q.    Would you have -- did you tell the police

25   you were going to use that hatchet on her?

1        A.    Not that I can recall.

2        Q.    And I think I may have just asked you

3    this, but did you admit or did you testify that you

4    did chase her around in the parking lot?

5        A.    Sure.

6        Q.    And at the time that you were doing that,

7    you had the hatchet in your hand?

8        A.    Sure.

9        Q.    I want to ask you something else.   Have

10   you ever messed with her car, tampered with her

11   car?

12       A.    Sure.

13       Q.    How many times?

14       A.    Once.

15       Q.    You haven't done it twice?

16       A.    No.

17       Q.    You're sure about that?

18       A.    I'm positive.

19       Q.    Have you ever stayed out -- stayed out in

20   front of her house and sat up on a hill and watched

21   her house?

22       A.    No.

23       Q.    Never done that?

24       A.    Excuse me, let me refrain that.   On the

25   night that I went over to her house, that was on

1    the day, kid for cops day.  I don't remember the

2    exact date.  We had been out all day that day, and

3    I had went with her and help wash.  And then we

4    came back, and Jody and I left.  It was about 11:30

5    or quarter 'til twelve.  And we was going to go to

6    kid for cops the next day.  So -- and I came back

7    over there -- Jody and I came back over there.  And

8    my car quit running, so it had ran hot is what it

9    did.  Because she had the black car at the time,

10   and I had the green one, the one that had a busted

11   hose on it.  And Jody went down there.  We were

12   right there at Brookview Apartment.  He went down

13   there to ask to use the phone to call his parents

14   to tell them he was going to be late.  Vonciel was

15   gone.

16              THE COURT:  Just listen to his

17   question.

18       Q.   Let me ask you another question.  Let me

19   try to make it a specific question.  Did you or did

20   you not tell the police that you sat up on a hill

21   one night watching her house?

22       A.   I told the police that while she was

23   gone -- and behind her house was a drug transaction

24   going on and the two girls was in the house, and I

25   stayed there until the police came.  And they

1    waited until Vonciel came, because I left when they

2    came.

3         Q.    My question is:  Did you not tell them

4    that you stayed up on a hill watching her house all

5    night?

6         A.    No, I didn't tell them all night, no.

7         Q.    Did you also tell the police that you

8    would lie to save your neck?

9         A.    No.

10        Q.    Didn't say that?

11        A.    No.

12             MR. BAILEY:  Your Honor, I think

13   that's all the questions I have at this time.

14             THE COURT:  Do you have anything you

15   want to respond to with regard to the specific

16   questions Mr. Bailey asked you?

17             THE WITNESS:  Okay.  Mr. Bailey,

18   he's going by really what she's saying and that's

19   all he can go by and the police report.  But this

20   marriage, it was long done.  Okay.  That's all I've

21   got to say, and I'm going to step down.

22             THE COURT:  Okay.  You can step

23   down.

24             (Witness excused.)

25             THE COURT:  Do you have any other

1    witnesses?

2                    THE DEFENDANT:  Has any more came

3    in?

4                    MR. HARTLEY:  I believe one witness

5    is at the hospital, Judge, or doctor's office.

6                    THE COURT:  Do at this time, you

7    rest?

8                    THE DEFENDANT:  What about Don

9    Thomason?

10                   MR. HARTLEY:  He hasn't appeared.

11                   THE DEFENDANT:  Okay.  I have some

12   witness that is crucial to this case, and I was

13   under the impression that they would be here --

14   they knew to be here.  And all witnesses that I

15   asked to be here --

16                   THE COURT:  Did you subpoena the

17   witness?

18                   THE DEFENDANT:  I had him to.

19                   THE COURT:  Was a subpoena served on

20   the witness?

21                   MR. BAILEY:  Judge, I might could

22   help out a little bit.  The witness he's talking

23   about is Mr. Thomason.  And Mr. Thomason was here

24   yesterday.  And I believe Mr. Hartley and I both

25   talked to him and told him we would call him if we

1    needed him.  He's on call.  I don't think he's been

2    called today.

3                    THE COURT:  I'll take this up.

4         We're going to take a short break, and I'll

5    let you know where we are.  Let's take a

6    fifteen-minute break, and I might just have an

7    offer put on the --

8                    (Out of the presence of the jury.)

9                    THE COURT:  Mr. Minnifield, at this

10   time, I'm going to ask you to make an offer of

11   proof as to what his testimony would be.

12                   THE DEFENDANT:  Mr. Xides'?

13                   THE COURT:  No.  He's at the

14   doctors.  Mr. Thomason, is that the name?

15                   THE DEFENDANT:  Right.  Don

16   Thomason.  He would give testimony to -- he had --

17   the police had came out and picked me up on the

18   job.  That was on the 23rd of October.  They had

19   picked me up on the job because she had filed a

20   charge of harassment -- no -- wreckless

21   endangerment.  They carried me down to police

22   headquarters --

23                   THE COURT:  What would

24   Mr. Thomason's testimony be?

25                   THE DEFENDANT:  He came and got me.

1    Vonciel wanted me to sign divorce papers.  I told

2    him I wasn't going to make any contact with

3    Vonciel, but if she will just leave me alone, stay

4    out of my life, she can talk -- contact

5    Mr. Thomason.  She get the paper drawed up.  I'm

6    not going to pay for anything.  And that he's a

7    notary, and the lawyers can get it to him, and I

8    would -- I would be gladly to sign the paper.

9                    THE COURT:  Who is Mr. Thomason?

10   Where does he work?

11                   THE DEFENDANT:  He work for Wilson

12   and Price.  He was my boss out there.  He's my boss

13   out at Wilson and Price.  He's one of them.

14   There's seventeen in all.

15                   THE COURT:  Well, I'm not sure what

16   that has to do with the situation here.

17                   THE DEFENDANT:  And he's been very

18   familiar with Vonciel, more like friends to the

19   both of us.  He knew about the ongoing, you know,

20   situation.

21                   THE COURT:  Well, I think that the

22   jury has had sufficient evidence to know there's

23   been ongoing problems.  Is there any way you could

24   make any stipulation as to what his testimony would

25   be?

1          MR. BAILEY:   I would be happy to

2    stipulate Mr. Thomason, because I've talked with

3    Mr. Thomason.   Mr. Thomason would basically come in

4    and say that he doesn't know anything about this

5    stalking incident specific.   I mean, he knows about

6    the stalking case obviously, but he doesn't know

7    anything about the incidents that have occurred.

8    If there's something specific that they would want

9    me to stipulate to.   I would have to hear it,

10   but --

11         THE COURT:   Again, I don't know what

12   the purpose of the divorce papers -- would you be

13   willing or could you stipulate that Mr. Minnifield

14   discussed with him having signed -- him signing

15   divorce papers?

16         MR. BAILEY:   I don't have a problem

17   with that.

18         THE COURT:   I'm going to see if

19   y'all could stipulate.   I don't think --

20         MR. HARTLEY:   In other words, that

21   would be told -- may I help him, Judge?

22         THE COURT:   Yes.

23         MR. HARTLEY:   In other words, that

24   would be told to the jury that you're supposed to

25   accept this just like Mr. Thomason was here and

1    gave it as testimony, and it's undisputed and it's

2    a fact in this case.

3

4                    THE DEFENDANT:  Yeah, it is a fact

5    in this case.

6                    MR. HARTLEY:  Right.  But the Judge

7    will represent it to the Court that both sides --

8                    THE COURT:  If not, we need to get

9    him here.  And, again, I don't know what benefit

10   his testimony is going to be, to tell the truth.

11   I'm going to take a short break and see if y'all

12   can make a stipulation.

13                    MR. HARTLEY:  Thank you, Judge.

14                    (Brief recess taken.)

15                    THE COURT:  Okay.  Mr. Minnifield,

16   when the jury comes back, I'm going to tell them

17   what -- the State has stipulated that if you call

18   Mr. Thomason, this would be his testimony and they

19   are to consider it as testimony.

20        At this time, I'm going to let you go ahead

21   and make any motions, renew your motions regarding

22   the case because you'll be resting at the end of

23   this.  And at this time, do you renew your motions

24   that you had previously made?

25                    THE DEFENDANT:  Yes, I do.

1          MR. HARTLEY:  Renew the motions --

2          THE DEFENDANT:  I would renew that

3    motion to dismiss.

4          MR. HARTLEY:  On the same grounds.

5          THE DEFENDANT:  Yes, on the same --

6          THE COURT:  And I'm going to deny

7    your motion.  I think a jury question is made.

8        Mr. Hartley, I understand the State is going

9    to call a police officer who had the tape.  And I

10   don't know whether they're going to play it for the

11   jury, but if they -- they may be willing not to

12   play it to the jury if y'all would stipulate that

13   it is in evidence and can be taken with the jury as

14   an exhibit.  Otherwise, he's going to want to play

15   the whole tape.

16         MR. HARTLEY:  This is a very long

17   statement.  They have it on tape.  The jury can

18   take it back there and play it if they want to.  If

19   they don't play it, then that's their call.  Is

20   that okay with you?

21         THE DEFENDANT:  Yes, that's fine.  I

22   have no problem with that.  I have no problem with

23   that.

24         THE COURT:  Well, let me see what

25   they want to do.

```
1              Are you going to -- I don't know how you want

2       to do the tape.

3                   MR. BAILEY:   I would just -- or I

4       guess you can just state that we have stipulated

5       that the tape will go in.  And I will just ask

6       Cassandra a few preliminary things about the tape

7       and maybe a couple things --

8                   THE COURT:   And you had stepped out,

9       but I went ahead and let Mr. Minnifield renew his

10      motions.  And what I'll do is when we get through

11      with this, we'll take a break, and then y'all will

12      argue after lunch, and I will charge the jury.

13                  MR. BAILEY:   Okay.  Do you want me

14      to go ahead and have Detective Williams?

15                  (In the presence of the jury.)

16                  THE COURT:   Mr. Minnifield had

17      another witness that he wanted to call, Don

18      Thomason, who is Mr. Minnifield's employer.  The

19      State has stipulated that if Mr. Thomason was

20      called as a witness, that his testimony would be

21      that in mid October after Mr. Minnifield was

22      arrested on a reckless endangerment charge that

23      Mr. Minnifield told Mr. Thomason that if Vonciel

24      would have the divorce papers drawn up, that

25      Mr. Minnifield would sign it and Mr. Thomason could
```

1    notarize it.  And the parties have stipulated that

2    that would be Mr. Thomason's testimony, and I'm not

3    going to require him to be here.  But you're to

4    consider that just as if Mr. Thomason had been here

5    in person.

6          And at this time, then, Mr. Minnifield, do you

7    rest?

8                    THE DEFENDANT:  Yes, I rest.

9                    THE COURT:  Would you raise your

10   right hand?  The State has some brief rebuttal.

11                    CASSANDRA WILLIAMS

12         The witness, having first been duly sworn or

13   affirmed to speak the truth, the whole truth, and

14   nothing but the truth, testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. BAILEY:

17         Q.   Can you please tell the ladies and

18   gentlemen of the jury your name?

19         A.   Cassandra Williams.

20         Q.   And how are you employed, ma'am?

21         A.   I'm a PCO with the State of Alabama,

22   Department of Public Safety.

23         Q.   And prior to doing that, how were you

24   employed?

25         A.   I was a detective with Montgomery Police

1    Department.

2         Q.    And I want to get right to the case at

3    hand.  Did you have any duties assigned in the case

4    of John Willie Minnifield?

5         A.    Yes, sir.  I was the case agent in that

6    particular case.

7         Q.    And, if you could, please explain briefly

8    to the jury what a case agent is.

9         A.    The case agent is assigned a case to

10   investigate by a supervisor.  And as the case

11   agent, I will file a police report and speak with

12   the victim in the case and any witnesses and also

13   with the defendant.  I take statements and compile

14   a case file to be presented to Court.

15        Q.    And did you do that in this case?

16        A.    Yes, sir.

17        Q.    Okay.  Did you have an opportunity,

18   during the course of your investigation, to talk

19   with the defendant in this case, Mr. Minnifield?

20        A.    Yes, sir, I did.

21        Q.    And at the time -- before you had a

22   conversation -- or before you talked with him, did

23   you have an opportunity to read Mr. Minnifield his

24   rights?

25        A.    Yes, sir.

1      Q.    I want to show you, at this time, what

2    has been marked as State's Exhibit No. 9.  And I'm

3    going to ask you if you can identify this

4    particular form -- this is the rights form?

5      A.    Yes, sir, this is the standard or a copy

6    of the standard Montgomery Police Department's

7    rights form that was read to Mr. Minnifield.

8      Q.    Okay.  And is that what is commonly

9    called his miranda rights?

10     A.    Yes, sir.

11     Q.    And did you read those rights to

12   Mr. Minnifield?

13     A.    Yes, sir, I did.

14     Q.    And there is another -- I believe another

15   second paragraph on that form.  What is that?

16     A.    The second paragraph -- it's a paragraph

17   that we ask the defendant to read.  And it more or

18   less states that he was not coerced or promised

19   anything or threatened in any manner to acknowledge

20   being -- acknowledge understanding his rights or to

21   answer questions or to give a statement.

22     Q.    Okay.  And was that read to

23   Mr. Minnifield or did Mr. Minnifield read that to

24   you?

25     A.    He read it.

1    Q.    And I believe all that you have

2    discussed, as far as the rights form that you said

3    you read to him, and his reading back of the waiver

4    there, is that contained on an audiocassette tape?

5    A.    Yes, sir, it is.

6    Q.    Okay.  And I understand that there is a

7    signature placed on that form, is there not?

8    A.    Yes, sir.

9    Q.    And it's not signed?

10    A.    Right.  It's not signed.

11    Q.    And do you know why?

12    A.    Mr. Minnifield, no doubt, was asked to

13    sign it and along with his witness locator, which I

14    noticed was signed.  And evidently, he, I would

15    imagine, forgot to sign.  It was an oversight on my

16    part.

17    Q.    But everything on that form was read to

18    Mr. Minnifield and he had an opportunity to observe

19    that form, correct?

20    A.    Oh, yes, sir.

21    MR. BAILEY:  Your Honor, at this

22    time, we would move to admit State's Exhibit No. 9.

23    THE COURT:  Admitted.

24    (State's Exhibit No. 9 was admitted

25    into evidence.)

1       Q.   Now, Detective Williams, I want to

2   briefly talk about the conversation you had with

3   Mr. Minnifield. Was that conversation recorded?

4       A.   Yes, sir, it was.

5       Q.   And how was it recorded?

6       A.   I used a cassette tape to tape-record the

7   statement.

8       Q.   I want to ask you real quick about some

9   of the things that were contained in the statement

10   that Mr. Minnifield gave you. Do you recall asking

11   Mr. Minnifield what he had with him on an incident

12   which allegedly occurred back on October the 30th

13   involving his wife?

14       A.   Yes, sir.

15       Q.   Okay. And do you remember what his

16   response was?

17       A.   He informed me that he had a hatchet and

18   a knife.

19       Q.   Okay. Did he describe what type of

20   knife?

21       A.   He may have. I can't recall without

22   referring to the statement.

23       Q.   That's fine. But he did tell you that he

24   had a hatchet and a knife?

25       A.   Yes, sir.