1      Q.    Okay.   Do you recall asking

2   Mr. Minnifield, going back to that same incident,

3   about a particular bathroom door inside of the

4   house?

5      A.    Yes, sir.

6      Q.    And did Mr. Minnifield tell you or give

7   you any indication that he had gained access to

8   that bathroom door or the bathroom?

9      A.    Yes, sir.   He told me that he kicked the

10  door in.

11      Q.   Did he tell you how he gained access to

12  the residence?

13      A.    He kicked or knocked that door in as

14  well.

15      Q.    So he told you that he kicked both doors

16  in?

17      A.    Yes.

18      Q.    Did Mr. Minnifield ever give you any

19  indication, referring to the hatchet and the

20  butcher knife that he had with him, what he would

21  have done or what his intentions were with those

22  items -- having those items?

23      A.    Yes, sir.   He said something to the

24  effect, had he caught her, he would have harmed her

25  or done something to her.

1    Q.    Okay.    Did he specifically tell you that

2    he would have used either one of those items on

3    her?

4    A.    Yes, sir.

5    Q.    Did -- during the course of this

6    conversation with Mr. Minnifield, did he also

7    indicate to you whether or not he had ever tampered

8    with Mrs. Minnifield's car?

9    A.    Yes, sir, he did.    As a matter of fact, I

10   questioned him about tampering with her vehicle.

11   On one particular occasion, it was during the

12   night, and he made the comment, something to the

13   effect, not that night.    And I asked him when had

14   he tampered with her vehicle.    And he mentioned he

15   had tampered with her vehicle during the daylight

16   hours on some other occasion.

17   Q.    Okay.    Do you know if they were any --

18   I'll withdraw that question.    Do you remember

19   asking Mr. Minnifield a question about his

20   truthfulness?    And, I guess, specifically, do you

21   remember asking Mr. Minnifield anything about

22   whether or not he would lie?

23   A.    Yes, sir.

24   Q.    And do you remember what his response

25   was?

1      A.    I believe he told me that he would.

2      Q.    If I could --

3      A.    Well, he was depending on what the

4  circumstances were, especially involving this

5  particular case because that's what we were talking

6  about.

7      Q.    So, if I understand you correctly, did

8  you say that he said he would lie depending on the

9  situation that he was in?

10     A.    Yes, sir.  I was asking him questions

11 about witnesses that he stated were lying for

12 Mrs. Minnifield.  And I asked him if his witnesses

13 would lie for him, which he stated that they

14 probably would.  And I asked him if he would lie to

15 save his own neck, and he made some comment about

16 the circumstances involving this case.  And I

17 informed him that he could get prison time for the

18 stalking charge.  And he more or less indicated

19 that he would.

20     Q.    Would lie?

21     A.    Yes, sir.

22            MR. BAILEY:  Your Honor, I think

23 that's -- I believe that's all the questions that I

24 want to ask Detective Williams at this time.  And

25 just for time's sake, I believe, the defense has

1    already stipulated that the defendant's statement

2    would be entered into evidence; is that correct,

3    Mr. Minnifield?

4                    THE DEFENDANT:  Sure.

5                    THE COURT:  Again, the parties, in

6    order to save time this morning, have stipulated

7    that his taped statement will be admitted into

8    evidence, and it's to go back with you to the

9    deliberation room and can be played by you.  And if

10   you need any assistance with the tape, we can help

11   you with it.  But it is evidence in the case, and I

12   am going to admit it.

13                   MR. BAILEY:  So at this time, we

14   would offer -- it's State's Exhibit No. 4, for the

15   record.

16                   THE COURT:  Okay.  And it's

17   admitted.

18                       (State's Exhibit No. 4 was admitted

19                       into evidence.)

20                   MR. BAILEY:  Now, I do need to ask

21   Detective Williams just a couple questions about

22   the tape.

23                   DIRECT EXAMINATION (continued)

24   BY MR. BAILEY:

25        Q.   During the course of taping this

1    statement, you had some problems with the tape?

2         A.    Yes, sir, the first tape.  During

3    questioning, the tape just clicked, turned off for

4    some reason, and I rewinded it and noticed that the

5    voice was distorted on there, so we had to get a

6    second tape.

7         Q.    Okay.  And did you start back over with

8    your questioning on the second tape?

9         A.    Yes, sir, I did.

10        Q.    And are both of those tapes that you've

11   referred to, are both of those contained in what's

12   been labeled as State's Exhibit No. 4?

13        A.    Yes, sir.

14        Q.    Okay.

15             THE COURT:  Is there any way you can

16   distinguish which is the first or second tape?

17             THE WITNESS:  I believe I have the

18   tapes marked.

19             MR. BAILEY:  They're labeled.

20        I believe that's all the questions I have for

21   Detective Williams.

22             THE COURT:  Okay.  Do you have

23   anything for her?

24             THE DEFENDANT:  No.

25             THE COURT:  Okay.  You can step

1    down.

2                    (Witness excused.)

3                    THE COURT:  And at this time, does

4    the State rest?

5                    MR. BAILEY:  State rests.

6                    THE COURT:  Both sides have rested,

7    and we're going to take a break for lunch.  I'm

8    going to let you go to one o'clock.  And if you

9    will report back to the jury assembly room at that

10   time, then there will be closing arguments, and

11   I'll instruct you on the law.  But you're excused

12   until one o'clock.  Will that give everybody enough

13   time?  I think it will.

14                    (Out of the presence of the jury.)

15                    THE COURT:  Mr. Bailey, I'm going to

16   ask if you'll be sure that the court reporter knows

17   how to work the tape, so if they do want to hear

18   it --

19                    MR. BAILEY:  Okay.

20                    THE COURT:  And they may be able to.

21   But if they aren't, we can assist them.

22                    MR. BAILEY:  Okay.

23                    THE COURT:  At this time,

24   Mr. Minnifield, do you, again, renew your motions?

25                    THE DEFENDANT:  Right.

```
 1                         THE COURT:  And I'm going to deny
 2      them.
 3          Again, I'm going to just charge straight out
 4      of the pattern book on stalking.  And I think it
 5      really covers everything.
 6                         MR. BAILEY:  Judge, I have one
 7      requested charge I would like the Court to look at.
 8      I think it's appropriate to give and it comes out
 9      of the annotations of --
10                         THE COURT:  Where are you because
11      I'm looking at it?
12                         MR. BAILEY:  Okay.  I'm at the --
13      Page 227 on the bottom left, the legislative
14      intent.
15                         THE COURT:  Where -- okay.  Right
16      here.  Okay.
17                         MR. BAILEY:  It says, "When the
18      ordinary time permitting or the term repeatedly is
19      applied to the statute, it is evident that the
20      statue --
21                         THE COURT:  That is part -- more
22      than once --
23                         MR. BAILEY:  More than once.
24                         THE COURT:  Which means repeatedly
25      means more than once.  Okay.
```

1          THE DEFENDANT:  Your Honor, I would

2   like for you to reconsider the harassment -- lesser

3   sentence of harassment.

4          THE COURT:  I will take it under

5   advisement in that regard because harasses is a

6   necessary element of this offense and harassment is

7   defined and it is applicable in this case.  But,

8   again, I think that the evidence doesn't warrant

9   it, but I will look at it again.

10      And if you'll have him over here, just even

11   five till, I'll let you know.

12      And, Mr. Bailey, if you have anything, you can

13   maybe present to the Court your position on that.

14   I think it would be -- well, I've said that.

15          MR. BAILEY:  Your Honor, what time

16   did you say to be back?

17          THE COURT:  One o'clock.

18          (Lunch recess.)

19          (Court back in session.)

20          THE COURT:  Okay.  Mr. Minnifield,

21   right at the break, you had asked the Court to

22   reconsider giving a lesser included on harassment.

23   Does the State have any further response?

24          MR. BAILEY:  The State does, Your

25   Honor.  I have had an opportunity to look at the

1    law.   I did some research and came across the -- I

2    would say with all honesty to the Court that I

3    tried to look at just about every stalking case

4    that I could and could not find a situation where

5    there was ever a requested lesser included charge

6    or whether it was ever brought up on appeal.

7         But what I did come across was a case entitled

8    Chambers v. City of Opelika.   It went to the Court

9    of Criminal Appeals.   It's a 1997 case.   It's cited

10   in the Southern Reporter 698 7 2nd 792.   And,

11   basically, the facts of this case are the defendant

12   was charged with a crime of menacing.   And the

13   defendant at the end of the case had requested a

14   charge of harassment.   And at that time, the Court

15   denied his request to give a lesser included charge

16   of harassment.   And in that, the Court said that --

17   and this is talking about the Court of Criminal

18   Appeals.   This Court has used the following litmus

19   test to determine whether a crime was necessarily a

20   lesser included offense of another, and they give

21   this test where all the elements of an offense

22   separate from the offense charged are present in or

23   included among elements of the charged offense,

24   such separate offense is a lesser included offense

25   for which the defendant may be convicted though

1    acquitted of the offense charged.

2        To be necessarily included in the greater

3    offense, the lesser must be such that it is

4    impossible to commit the greater without having

5    committed the lesser. And I think those -- that

6    last sentence, probably the thing that I would ask

7    the Court to zero in on. And I'll just say again,

8    the lesser must be such that it is impossible to

9    commit the greater without having first committed

10    the lesser.

11        And if the Court would look at the elements of

12    stalking, which 13A690 in the Code of Alabama, I

13    think the Court would see that it is possible to be

14    convicted of stalking without having first

15    committed the crime of harassment. Stalking says a

16    person who intentionally, repeatedly follows or

17    harasses another person and who makes a credible

18    threat, either expressed or implied, with the

19    intent to place that person in reasonable fear of

20    death or serious bodily harm.

21        I would also argue in conjunction with that,

22    that harasses as defined in the code and section

23    for stalking is similar but is distinguishable with

24    the harassment that's defined in, I believe, 13A118

25    of the Code of Alabama.

1          THE COURT:  Well, I've looked at

2    that in particular, that portion of it, and it is a

3    different definition.  And I have reconsidered, but

4    I'm not going to give the lesser included of

5    harassment.

6         And your objection is noted for the record,

7    Mr. Minnifield.

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  And I've given that,

10   and, again, I overrule your objection.

11        Do both of you feel like you can make your

12   closing in about fifteen minutes?

13          MR. BAILEY:  I can.

14          THE COURT:  Because I may limit you

15   if I think it's necessary.

16          (Brief recess taken.)

17          (In the presence of the jury.)

18          THE COURT:  Okay.  At this time,

19   we'll be addressing closing arguments.  And is the

20   State --

21          MR. BAILEY:  State is ready, Your

22   Honor.

23          THE COURT:  The State will address

24   you first and then Mr. Minnifield and then the

25   State has the right to have final close.

1              MR. BAILEY:  Ladies and gentlemen, I

2    want to begin by thanking you for your attention

3    during the trial of this matter.  I know it has not

4    been an easy thing for you to do, and I know that

5    none of you have volunteered to be here at the

6    beginning of the week and sit in a trial.  I know

7    that you were directed to by getting a little piece

8    of paper in the mail.  But nevertheless, I

9    appreciate your service.  Your service as jurors is

10   very important to the judicial system.

11        In the United States, we live under a

12   constitution, a constitution which guarantees us

13   certain freedoms and liberties.  But we, also, in

14   the United States, live under a code of laws.  It's

15   a code of laws which prohibits conduct.  In the

16   state of Alabama, these laws are enumerated in what

17   we call the Code of Alabama.  Contained within this

18   code, there are many, many laws, which prohibit

19   many different kinds of conduct.  But more

20   specifically, for the case at hand today, there is

21   a law contained within this code which prohibits

22   the crime of stalking.

23        And that's why we're here today, ladies and

24   gentlemen.  As I said to you in opening statement,

25   we're here today because this man, John Minnifield,

1    could not let this woman go, couldn't take the fact

2    that she wanted to get out from under his control.

3    And that's what the evidence throughout the course

4    of this trial has shown you. And I just want to

5    spend just a minute or two telling you, first, what

6    I have to prove to you in this case.

7         As I told you in voir dire and also when I was

8    questioning you when you were being selected for

9    the jury and also in opening statement, my burden

10    of proof throughout the course of this trial was

11    beyond a reasonable doubt. It was not beyond all

12    doubt. As I told you earlier in the trial, you

13    couldn't be convinced beyond all doubt unless you

14    were a witness to the case, and that would

15    therefore disqualify you serving as a juror.

16         What did I have to prove to you? Well, I had

17    to prove to you beyond a reasonable doubt that the

18    defendant committed the crime of stalking. Section

19    13A690 of the Code of Alabama defines stalking as a

20    person who intentionally and repeatedly follows or

21    harasses another person and who makes a credible

22    threat. That threat can be either expressed or

23    implied with the intent to place that person in

24    reasonable fear of death or serious bodily harm. I

25    don't have to intend that the person actually

1       intended to kill someone -- which I think the

2       evidence in this case has shown -- but I do have to

3       prove that he had the intent to place that person

4       in reasonable fear of death or serious bodily harm.

5           So our elements to prove stalking is attempt,

6       credible threat, and act of harassing or following.

7       And the Judge will instruct you on the law at the

8       end of this case. And in that instruction, she

9       will tell you that in order to find the defendant

10      guilty of stalking, all you have to find is that he

11      did these things more than once -- more than one

12      time. And I think the testimony that's been

13      presented in this case is abundantly clear that the

14      defendant did those things and did that on more

15      than one occasion.

16          That was my burden of proof. My burden of

17      proof was to prove to you beyond a reasonable doubt

18      that the defendant, John Minnifield, did these

19      things. I think through the testimony that was

20      presented to you that once you go back and consider

21      the evidence, look at the evidence that has been

22      presented, you'll find the defendant guilty as

23      charged. Thank you.

24                  THE COURT:  Mr. Minnifield?

25                  THE DEFENDANT:  Good afternoon,

1  ladies and gentlemen.  I'm sorry to keep y'all here

2  so long, but sometimes you have to keep a person a

3  little longer to prove a point.  And this point is

4  here.  The State has not proven a point of

5  stalking.  You heard the witnesses.  You see the

6  motions here that you all have seen.  These are not

7  stalking motions.  It's only disorderly conduct,

8  just something that's in domestic violence of any

9  person that come under the laws of domestic violent

10  when two peoples has different opinion about

11  things.

12      Vonciel Minnifield has the right to live and

13  walk on this earth, feel free to go wherever she

14  wants to.  She has the right to marry whomever she

15  want to.  But when Vonciel Minnifield marry a

16  person, it's no reason or no right for her to go

17  out there and cheat on this person and play this

18  man for a fool and think nothing is going to be

19  said or did about it.

20      I will never, never hurt Vonciel Minnifield.

21  She is a lot younger than I am.  Y'all might think

22  I'm obsessed with that, but I'm not.  I didn't have

23  time to be obsessed with it.  I had time to work

24  and take care of her children.  I'm not the father.

25  I didn't claim to be.  I was the stepfather that

1    got those kids from the welfare, bought her a home,

2    married her, and put them in that home.  I worked

3    from four in the morning sometime eleven and twelve

4    o'clock at night, several different jobs, to keep

5    bread on the table, clothes on all of them back.

6         You all heard what the kids said.  I was their

7    stepfather.  I treated them like a child, like they

8    were my own, because I love children.  I love my

9    wife, but I couldn't stand her cheating on me.  And

10   I'm taking care of business at home.  I never

11   cheated on my wife because I was satisfied to have

12   a beautiful young wife.  Today I'm sixty years old.

13   She only thirty-five.  I was a proud man, but now

14   I'm a beaten man.

15        I'm not angry enough to go do anything to this

16   lady.  You've seen the witnesses come up here, and

17   you heard what they said.  A lot of the witness, it

18   has been rehearsed what to say.  You all heard

19   that.

20        You all heard Mr. Ronnie Waters.  He is the

21   owner over the building she work at.  Mr. Johnnie

22   Sullivan is a partner.  He don't be around her that

23   much.  They set up schedules over the phone.

24   Mr. Ronnie Waters sat up there and told you I was

25   an employee there.  I had a right to go there.  My

1    job with Wilson and Price, I was there for eight

2    years when I met her.  I was a currier.  My job

3    carried me all over the state of Alabama.  I made a

4    good decent living.

5        But I was a lonely man until I met Vonciel.

6    From the first day I met Vonciel, the first night,

7    Vonciel moved in with me.  She never, never

8    relinquished that role.  She was there.  She didn't

9    walk out of my house until October the 8th, the

10   house we shared together because she could not stay

11   put.

12       If I didn't trust my wife -- she had a vehicle

13   I bought.  I bought all the vehicles.  She could

14   use any one she wanted.  She had keys to any of

15   them.  If I didn't trust her, then why would I buy

16   her a vehicle?  I paid for all of this so she can

17   go and come, and I don't have to be there.

18       I was the mother and the father.  In the

19   morning time -- they call me the morning mother

20   because I go to my job, check on what I had to do,

21   and I come back home, and I'll wake those childrens

22   up, get them ready for school, the three of them.

23   I cook their breakfast.  She's in there asleep.

24       Now, she said I drank.  Sure, I drank.  When I

25   met her, I was drinking nothing but beer.  As time

1    went on, pressure started getting to me, and I seen

2    that Vonciel was looking over the horizon.  She was

3    looking at something different because she had

4    never had a man to stand there and give her a home

5    and treat her like a lady and set her up on a

6    highest pedestal.

7        I did that, and I didn't do it forcely.  I did

8    it willingly.  I couldn't go along with the drug

9    use.  I couldn't go along with the cheating.  I'm a

10   God fearing person.  But I start drinking more and

11   more because I couldn't see her walking away or

12   being able to come around a corner and she in

13   somebody's arm.  That hurts.  That hurts dearly.

14       When the other girl -- she's not here today --

15   when that girl had to have an operation, she went

16   to Birmingham to the Children's Hospital.

17            MR. BAILEY:  Your Honor, could I

18   object at this time?

19            THE COURT:  I'm going to sustain

20   your objection.

21       Mr. Minnifield, you can only discuss the

22   evidence that's been presented.  You cannot testify

23   at this time.

24       And I would caution the jury, and I'll remind

25   you that the arguments are not evidence and you can

1    only consider the evidence that was presented from

2    the witness stand or as an exhibit.

3         So, Mr. Minnifield, you need to confine it to

4    what the evidence was.

5                   THE DEFENDANT:  Okay.  The evidence

6    will show that these three has been into evidence.

7    You all have looked at them, just a copy of them

8    here.  And either one of them is proof.  This was

9    on 10/30 of '90, 11/14 of '98 -- excuse me -- not

10   '90, but '98.  Two of them was on one day and one

11   was on the other date.  This evidence here was

12   contaminated.  And by this, this evidence being

13   contaminated -- this happened on separate days --

14   but the State wants you to believe that this is a

15   continued pattern, stalking, reckless endangerment,

16   harassment.  There was no continued pattern.

17       Vonciel said she had filed several of these in

18   the past before October the 8th.  Vonciel had

19   never, never filed any charges on me for doing

20   anything to her.  So this throws stalking out

21   because it had to be acts of stalking.  It shows

22   it's got to be a repeatedly act.  Just because one

23   time, does not constitute stalking.  In the Code of

24   Alabama, as he stated right there, it will tell

25   you -- we want to make it as short as possible so

1    we all can go and rest.  But it also tell you the

2    offense of stalking is a continuing act.  It has

3    got to be more than one.  Act is a-c-t.  You put

4    the "S" on it, and then it's more than one.

5         They want you all to believe that when I went

6    to Auburn to talk to my wife that -- I didn't go to

7    threaten my wife.  But you heard the security guard

8    say yesterday he was hired by the company and her

9    to go protect her.  I never showed up there before.

10   I went there with hundred thousand peoples to talk

11   to my wife.  I did not walk up on her to startle

12   her, which I could easily have walked up to her and

13   did something to her if I wanted to.

14        You heard Mr. Waters say it, and he her boss,

15   that he came across the ground when he was told

16   that I was out there.  He came across.  He walked

17   up to John Minnifield.  I didn't try to run or

18   retreat or walk away.  But the State wants you to

19   prove, and Vonciel here is trying to prove, that

20   John Minnifield took off running and they gave foot

21   chase.  Why would Mr. Waters have to lie?  He told

22   you I still worked there at Montgomery Catering as

23   of today.  But for the last year, I can't work no

24   way.

25        The evidence is, I got out of jail on a bail.

1    I went to the even program to see was anything --
2    was I a angry man.  The Court can verify that.  I
3    went there sixteen session.  I lacked one
4    session --
5              THE COURT:  Now, again,
6    Mr. Minnifield, I'm going to caution you to just
7    comment on the evidence that was presented.
8              THE DEFENDANT:  All right.  And the
9    evidence, I'm telling you, expressing to you all
10   today, as you all go back there to deliberate, I
11   want you to search your heart.  I want you to look
12   at John Minnifield.  Do I look like an angry man, a
13   desperate man, whom could not release control of
14   that lady right there?  I'm not like that.  I would
15   have been less than a man not to go and find out
16   what was wrong.  Why, baby, can't we make it?  Two
17   people separate.  That's it.  They try to get back
18   together by all means except forcefully because the
19   laws of the land do not let you force nothing or
20   act upon another person.
21       I have did things in this case here constitute
22   nothing no more than harassment.  I admitted that I
23   was wrong and under the influence of alcohol when I
24   went over there and I kicked her door open because
25   John Minnifield knew there was a man in there and

1   we were talking about going back together.  And

2   just that Friday alone, she asked me for

3   communication, a telephone.  I go get it for her.

4   Everybody got the number but me.  When I -- or

5   should I be angry when it got changed on a Monday?

6   Shouldn't I someway be able to contact her and

7   those little girls there?  I didn't have a phone.

8   I had a beeper.  She could page me with our code,

9   and I would have been there for whatever to help or

10  protect my wife and my kids.

11       I didn't call them my stepchildren.  I called

12  them my children.  The boy, Jason, the oldest, he's

13  not here now.  He cared more about John Minnifield

14  than his own father.  But repeatedly, this boy,

15  17 -- this kid come up from here to up there where

16  he at now.  He be getting to love me.  My wife seen

17  that.  He seen her at night --

18              MR. BAILEY:  Judge, I'm going to

19  object.  I don't know who he's talking about, this

20  person --

21              THE COURT:  I'm going to sustain the

22  objection.  Again, Mr. Minnifield -- and I'll

23  remind you that you only have a few more minutes.

24  You can only comment on evidence that was presented

25  in court.

1          THE DEFENDANT:  Okay.  This evidence

2    is.  I won't be bringing that up.

3          You heard Nicholas Washington.  He sat up

4    there and said I was going out of town.  He didn't

5    know whether I worked there or not because this has

6    been rehearsed.  You heard Karen Blanch, that stay

7    next door to me -- excuse me.  I'm a little off on

8    my balance and stuff, but I'm not drinking -- but

9    she stay next door to us, me and my wife.  She was

10   friends to the both of us.

11         July, I was released from the county on bail.

12   I live in Alex City --

13                THE COURT:  Again, Mr. Minnifield,

14   you can't comment on those matters.

15                THE DEFENDANT:  You heard what she

16   said, Ms. Blanch.  She said -- and I quote -- This

17   woman did come down to my house, followed me in,

18   turned around, parked next door.  I went to come

19   out, and she had the street blocked.  I might not

20   called a restraining order not to go within a

21   thousand yards of her.  Then that works both

22   ways --

23                THE COURT:  Mr. Minnifield, again,

24   I'm going to caution you not to comment on things

25   that were not admitted into evidence.  And you have

1    about three or four more minutes to complete your

2    argument.

3                    THE DEFENDANT:  You heard Ashley and

4    Dana Cook's statement.  They wasn't afraid of me

5    because they know I was their stepfather.  You

6    heard Pete Rose statement.  He was an angry man

7    because I caught him there.  Clemmitha Petace, the

8    sister.  You heard what she said.  It didn't say I

9    was following Vonciel.  It never came up and said

10   that I was following her or stalking her.

11        Lawanda, you heard her statement.  And her

12   statement sitting right there, you know where she

13   is.  Even though I'm scared of you.  Because she

14   knew how much I loved this woman and those children

15   because she was there a lot.  She felt, and I felt,

16   if I caught my wife cheating, I probably would do

17   something to her.  We never know until we cross

18   that bridge, and it goes vice versa.  Since more

19   women on the jury than men, it goes vice versa, if

20   you caught your spouse that way.

21        But, ladies and gentlemen, as you go back to

22   deliberate, I want you to search your heart.  You

23   can send John Minnifield to prison today or you can

24   come back with a lesser charge.  The Judge will

25   instruct you of that.  But I cannot get in your

1    mind.  I can only tell you what's in my heart.  I

2    don't know either one of y'all, but if you all want

3    to send me to prison --

4                    THE COURT:  And, Mr. Minnifield,

5    that's not proper argument.  And it's something the

6    jury should not take into consideration, any

7    possible punishment.

8                    THE DEFENDANT:  Okay.  Well, I'm

9    going to close this.  And we, along with the State

10   and Vonciel, appreciate you all being here

11   listening to this.  It never, never should have

12   gotten this far.  Thank you.

13                   MR. BAILEY:  Just briefly, but may I

14   respond, Your Honor?

15                   THE COURT:  Yes.

16                   MR. BAILEY:  Ladies and gentlemen,

17   Mr. Minnifield has tried throughout the course of

18   this trial through his testimony, through his

19   questioning of witnesses, and through his argument,

20   tried to convince you, as citizens of this

21   community, that this is a normal relationship.

22   This is the way normal people behave and react in

23   these type situations.

24        Ladies and gentlemen, I present to you, and

25   the evidence has shown, that normal people do

1    not -- who are in love with another person, do not

2    threaten to kill that person, do not repeatedly

3    follow and harass that person, do not repeatedly

4    try to control that person's life.

5        Mr. Minnifield has made a statement on several

6    occasions during the course of this trial of all

7    the things that he's bought Vonciel, all the things

8    that he's paid for for Vonciel and the children, as

9    if all the money that he's thrown her way, she's

10    his property.  He can do what he wants to with her,

11    and she's supposed to be at home behaving like she

12    should and doing what he says.

13        Ladies and gentlemen, Vonciel Minnifield is a

14    person.  She's a human being.  She has a right.  If

15    she does not want John Minnifield near her, she

16    doesn't want John Minnifield talking to her, she

17    has a right to tell him not to, and she did.  But

18    he didn't get the message, and that's what this

19    case is all about.  That's what this case is all

20    about.

21        You heard the testimony, and I'm not going to

22    go through all the testimony.  But I do want to

23    bring out some highlights of some of the things

24    that were said during the course of this trial.

25    First of all, let me tell you, the defendant said

1    in his opening statement, he promised you a lot of

2    things that he did not deliver on, ladies and

3    gentlemen.  He promised he was going to bring in

4    all of these witnesses that was going to prove

5    John Minnifield was innocent.  He promised you he

6    was going to bring in all of these witnesses that

7    were going to say that Vonciel Minnifield was

8    having an affair that would somehow justify his

9    actions, and he didn't.

10        And let me comment just one small amount on

11    all these allegations about Vonciel Minnifield

12    having an affair and cheating on John Minnifield.

13    Ladies and gentlemen, there was absolutely not one

14    shred of evidence that that occurred.  I considered

15    putting Vonciel back up and letting her answer

16    those allegations.  I wanted to, but no.  I didn't

17    want to highlight his defense, highlight these

18    lies, because that's all that they were.  He didn't

19    bring in anybody, ladies and gentlemen, that proved

20    that.

21        But let's just say for just a second that that

22    occurred.  Let's buy his argument, not to highlight

23    it or give it any credibility.  Does that give him

24    a right to do the things he did?  Absolutely not.

25    Why?  Because it's against the law.  It's against

1  the laws of the State of Alabama to do the things

2  that he did.

3       Witnesses that we had that came in and

4  testified -- we had Tim Brown, who was her

5  neighbor's son, that came in and testified about

6  the time that John Minnifield ran them off the

7  road.  Rosebud Brown, who was a next-door neighbor,

8  Tim Brown's mother, said that in October of '98 she

9  saw Mr. Minnifield come into a rage and knock down

10  Mrs. Minnifield's door.  We had the children who

11  came and testified mainly about the October

12  incident.  About one of her daughters -- I can't

13  remember.  I think it was Dana that was hit by

14  John Minnifield.  Both of the children testified

15  that when John Minnifield crashed in the door with

16  the hatchet, he started choking Vonciel.  Is that

17  the way a normal human being should be treated?

18  Then chasing his family that he loves so dearly

19  through the house with a hatchet, that's something

20  out of a horror movie, ladies and gentlemen.

21  That's not something that you would expect a decent

22  citizen of this community to behave.

23       And then his testimony before you when he was

24  testifying.  Do You remember him sitting here and

25  saying, Yeah, I was out to get her.  That may send

1    me to the prison for the rest of my life -- that

2    was his words -- but I was out to get her.

3        Ladies and gentlemen, over and over again,

4    Lester Glaxton, hired by whomever, whether it was

5    Mrs. Minnifield or the company, to come and

6    protect -- I think that was apparent from all the

7    testimony, Vonciel included -- that he was there to

8    protect this woman.  Does a normal human being have

9    to hire someone to protect them from someone who's

10   supposed to love and care for them?  Is that the

11   way someone should have to act?  No.  Why?  Because

12   it's against the law to behave like he was

13   behaving.

14       Lawanda Benson, the babysitter, ladies and

15   gentlemen, testified that the defendant came to her

16   house on numerous occasions all times of the night.

17   One night he came, he had a gun in his pants, made

18   a threat, going to kill her.  That's something that

19   just about every witness that testified, with the

20   exception of a few, heard this defendant threaten

21   her life.  Is that normal?  I suggest not.

22       Nicholas Washington, dishwasher for RSA Plaza,

23   tell Vonciel she's not going to live to see

24   Thanksgiving.  I'm fixing to go out of town.  Just

25   tell her she better watch out.  I'm not going to go

1   through all of the witnesses, but another probably

2   very important witness for the State of Alabama --

3   the defendant has made an allegation that this is a

4   big conspiracy against him, that all these

5   witnesses have been rehearsed and come in here and

6   told what to testify, I guess.

7        There's one important witness, G. L. Sisson,

8   police officer with Montgomery Police Department.

9   You say probably the most impartial witness

10  throughout this whole proceeding.  He didn't know

11  either one of these parties.  What did he testify

12  about, ladies and gentlemen?  He testified about

13  going to those apartments that night.  When he

14  drives up, he sees this man right here chasing his

15  wife around the parking lot with a hatchet making

16  threats, "I'm going to kill you.  If I get you, I'm

17  going to kill you."  And you remember the defendant

18  when he was questioning G. L. Sisson, you know,

19  making a big deal, "Well, are you sure you saw me

20  chasing her around?  Are you sure you saw me doing

21  this and that?"

22        Ladies and gentlemen, he admits to it in his

23  statement.  And let me get to that, the defendant's

24  statement.  I could probably have made this case a

25  lot simpler and a lot easier and a lot of time

1      saved --

2                      THE DEFENDANT:  I'm going to object

3      to the statement, you can go back.  It was never --

4                      THE COURT:  What is your objection?

5                      THE DEFENDANT:  My objection is he

6      said that Mr. Sisson said I was chasing her with a

7      hatchet, and I object.

8                      THE COURT:  Wait just a moment.  I'm

9      going to sustain your objection, but the jury has

10     heard the evidence, and you can recollect what the

11     evidence was or was not in that regard.  Go ahead.

12                     MR. BAILEY:  In the defendant's own

13     statement, I could have probably saved us a lot of

14     time in this case and just admitted the defendant's

15     statement.  I mean, sure, it's a lot of

16     self-serving stuff in this, ladies and gentlemen,

17     but yet, there's a lot of stuff in this statement

18     that the defendant admits to that's enough to

19     convict him of the crime.

20         He admits to talking to Washington at RSA

21     Plaza, even though he does deny the threats.  He

22     admits, ladies and gentlemen, going to Lawanda

23     Benson's house.  He admits to going to Auburn

24     University.  Ladies and gentlemen, he also admits

25     to tampering with Mrs. Minnifield's car.

1          Why does a person do that?  Is that the way a

2     person who loves and cares for someone acts?  What

3     do you have?  All of these events have been

4     testified about.  What do you have?  You have a

5     pattern of following, and then you have a pattern

6     of harassing.  Why else would you go and tamper

7     with someone else's car unless you were harassing?

8          And then you have Vonciel Minnifield, who

9     testified about all the events that happened, the

10    notes that were left on her car.  Look at these,

11    "Tonight, be at home.  Now, the war is on, germ

12    carrying pictures.  Do not lie."  Testified about

13    him coming to her church.  Testified about all the

14    numerous threats that were placed on her life.  She

15    was constantly having to run from house to house

16    trying to avoid this man.

17          Ladies and gentlemen, the point is, the reason

18    that we have a stalking law across the country and

19    especially in the state of Alabama in this case is

20    so that women, particularly, do not have to keep

21    running and fearing for their lives because of a

22    man's ability to stop his own actions, to not

23    control, not to let go.  That's the whole reason

24    that we have a law that prevents that type of

25    behavior.

1    The defendant said in his closing argument,

2  "I've done some things that constitute no more than

3  harassment." He, not only admits, according to

4  G. L. Sisson in front of the Judge, "If I would

5  have gotten her that day, I would have used that

6  hatchet on her." He says that in his statement as

7  well. But he sits here in front of the jury that's

8  considering his faith in this case and tells you,

9  Yeah, I probably did some things that constituted

10  harassment. Well, what is stalking, ladies and

11  gentlemen? It's pattern of harassment. He sat

12  here and told you that. I'm not going to belabor

13  the point anymore, ladies and gentlemen.

14    When Mrs. Minnifield took those vows with

15  Mr. Minnifield, they each promised to love and to

16  hold and to cherish one another. Is that what

17  happened? I think not. Mrs. Minnifield decided

18  that she could not live in his house under his

19  control, and she decided -- felt fearful and

20  decided to get out, and she did. And he couldn't

21  accept that. So he, for the last two years, has

22  terrorized her life. She told you, made her fear

23  of her life, her children's life. Is that any way

24  for anybody to have to put up with?

25    You've heard the evidence, ladies and

1    gentlemen.  The Judge is going to instruct you on

2    the evidence.  And you have to follow the Judge's

3    instructions.  But one thing this Judge cannot take

4    away from you, the one thing that I cannot take

5    away from you, the one thing that John Minnifield

6    cannot take away from you, the one thing the State

7    of Alabama cannot take away from you when you go

8    into that jury deliberation room is your God gift

9    of common sense.  You get to take that back there

10   with you.  And I want each and every one of you to

11   use that God-given common sense and look at the

12   testimony presented in this case.  Look at the

13   pattern presented in this case and ask yourselves,

14   Did this man commit the crime of stalking?  And

15   then after all the consideration of the evidence, I

16   feel confident that you will come back and return a

17   verdict of guilty.

18        And then I want to end with this.  One of the

19   very last things that the defendant said in his

20   statement to the Montgomery Police Department,

21   Cassandra Williams.  You -- "Question:  You would

22   lie  to save your neck?  Answer:  Would I lie to

23   save my neck?  Question:  Yes, sir.  Answer by Mr.

24   Minnifield:  It all depends on the situation that

25   I'm in."  He's in a situation.  What did he do?

1    Thank you.

2                    THE DEFENDANT:  Your Honor, may we

3    approach the bench?

4                    THE COURT:  Okay.

5                    (Attorneys approach the bench.)

6                    THE DEFENDANT:  Would you consider

7    the lesser included case due to the fact --

8                    THE COURT:  I've already ruled on

9    that, Mr. Minnifield.

10                    MR. HARTLEY:  Judge, he's pointing

11   out in his argument that this is a matter of series

12   of what makes stalking --

13                    THE COURT:  I've made my decision,

14   and you can note that again at the end of the

15   trial.

16                    (Attorneys return to their seat.)

17                    THE COURT:  It's now my duty to

18   explain to you the law that will guide you in your

19   deliberations -- and I apologize for my voice.

20   It's going and coming.  I'm going to try to go very

21   slow because I will be covering quite a few legal

22   definitions.  And, unfortunately, in the state of

23   Alabama, you're not permitted to have a copy of my

24   charge to take with you.  I disagree with the law

25   in this respect and think you should, but I must

1   follow it and so must you.

2      Now, this case is brought to you by an

3   indictment which charges John Minnifield with

4   stalking. I want you to understand from the

5   beginning that the indictment has no bearing

6   whatsoever on the guilt or innocence of any person.

7   It is not evidence in the case. It's merely the

8   paperwork or legal process by which a case is

9   presented for trial.

10      Now, as to this charge, the defendant has pled

11   not guilty. A plea of not guilty places the burden

12   on the State of Alabama to prove by the evidence

13   presented the guilt of defendant beyond a

14   reasonable doubt. So before a conviction can be

15   had, each of you must be satisfied beyond a

16   reasonable doubt of his guilt. Otherwise, he's

17   entitled to an acquittal.

18      Furthermore, the defendant is presumed to be

19   innocent, and that presumption attends him until

20   his guilt is established from the evidence beyond a

21   reasonable doubt. This presumption of innocence is

22   evidence in the case and is to be considered by you

23   along with all the other evidence. It is a fact

24   which is to be considered by you and goes with the

25   defendant to your verdict unless the evidence

1    convinces you beyond a reasonable doubt of the

2    proof of each and every element of the offense

3    here.

4         Now, we've all mentioned reasonable doubt.

5    And it's a relative term, and it's not always easy

6    to define.  Basically, a reasonable doubt, it's a

7    fair doubt.  It's based upon reason and common

8    sense and arising from the evidence.  In short,

9    it's a doubt for which you can assign a reason that

10   comes from the evidence.  A reasonable doubt may

11   arise not only from the evidence produced, but also

12   from a lack of evidence or any part of the

13   evidence.  Again, the burden is on the State to

14   prove the defendant guilty beyond a reasonable

15   doubt.       Now, the law tells us this about the

16   term, "reasonable doubt."  It's not just a mere

17   possible doubt.  In other words, it's not a mere

18   guess, surmise, or capricious doubt.

19        Now, the doubt which would justify an

20   acquittal must be an actual doubt.  The reasonable

21   doubt which would entitle an accused to an

22   acquittal is not fanciful, vague, conjectural, or

23   speculative, but is a reasonable doubt arising from

24   the evidence and remaining after a careful

25   consideration of the testimony, such as reasonable

1    fair-minded and conscientious men and women such as

2    you would consider under all the circumstances.

3        Now, the State is not required to convince you

4    of defendant's guilt beyond all doubt or to a

5    mathematical certainty. Again, it's simply beyond

6    a reasonable doubt.

7        I told you earlier that you were the sole

8    judges of the evidence, and I'm going to explain to

9    you or remind you what is and what is not evidence.

10   First, as I just said, the indictment here, it is

11   not evidence. In addition, the arguments,

12   statements, or assertions of the attorneys or the

13   parties during the course of the trial is not

14   evidence. Rulings by the Court during the course

15   of the trial, that is not evidence. Evidence is

16   simply the testimony of witnesses under oath from

17   the witness stand, any exhibits that were actually

18   admitted, and any presumptions of law that I've

19   given you such as the presumption of innocence.

20       Just as you're the judges of the evidence,

21   you're also the sole and exclusive judges of the

22   credibility of witnesses and the weight that should

23   be given their testimony. In passing on the

24   credibility of witnesses, you have the right to

25   consider such things as any bias, interest, or

1  prejudice that may have been exhibited to you while

2  that person was testifying. You also can consider

3  the demeanor of the witness on the stand; that is,

4  how did they appear to you while they were

5  testifying? You also can consider the basis for

6  their testimony; that is, how did they know the

7  facts to which they testified? Did they have an

8  opportunity to see, hear, learn? Just how did they

9  know those facts?

10  Finally, you may accept or reject any part of

11  the testimony of a witness and may accept only the

12  testimony you consider worthy of belief.

13  Now, the defendant in this case has testified

14  in his own behalf, and he has a perfect right to do

15  so. And you cannot capriciously disregard his

16  testimony any more than that of any other witness.

17  The law is that you must take his testimony in the

18  case and consider it along with all the other

19  testimony. But while you are considering his

20  testimony, you may also take into consideration his

21  interest in the outcome of the case.

22  Finally, I want to point out to you, at this

23  time, that I am not permitted to express my opinion

24  or to comment on the fact of the evidence or the

25  credibility of any witness. Therefore, any

1   rulings, statement, or even expression that may

2   have been made by me during the course of the trial

3   is not to be considered by you as any effort on my

4   part to convey to you any feeling or opinion about

5   the facts in the case or the credibility of any

6   witness.

7   Now, with regard to this particular charge,

8   the defendant is charged with stalking. A person

9   commits the crime of stalking if he intentionally

10   and repeatedly follows or harasses another person

11   and makes a credible threat, either expressed or

12   implied, with the intent to place that person in

13   reasonable fear of death or serious bodily harm.

14   Thus, in order to convict, the State must

15   prove beyond a reasonable doubt each of these

16   following elements: First of all, that the

17   defendant, John Minnifield, followed or harassed

18   Vonciel Minnifield; second, that he made a credible

19   threat, either expressed or implied; third, that he

20   did so repeatedly or more than once and that in so

21   doing, he acted with intent to place Vonciel

22   Minnifield in reasonable fear of death or serious

23   bodily harm. Intent is defined under the law as

24   when a person acts intentionally with respect to a

25   result or to conduct when his purpose is to cause

1    that result or to engage in that particular

2    conduct.  A credible threat is a threat expressed

3    or implied made with the intent and the apparent

4    ability to carry out the threat so as to cause the

5    person who is the target to fear for her own safety

6    or the safety of a family member and to cause

7    reasonable, mental anxiety, anguish, or fear.

8        Harasses, as used here, is when one engages in

9    an intentional course of conduct directed at a

10   specified person which alarms or annoys that person

11   or interferes with the freedom of movement of that

12   person in which serves no legitimate purpose.  The

13   course of conduct must be such as would cause a

14   reasonable person to suffer substantial emotional

15   distress and must actually cause substantial

16   emotional distress.

17       A course of conduct, as used here, is a

18   pattern of conduct composed of a series of acts

19   over a period of time, which evidences a continuity

20   of purpose.  If you find from the evidence that the

21   State has proved beyond a reasonable doubt each of

22   these elements of stalking, then you would find the

23   defendant guilty as charged.  On the other hand, if

24   you find that the State has failed to prove one

25   of -- one or more of the elements beyond a

1    reasonable doubt, you would find the defendant not

2    guilty.

3        In a moment, you will be beginning your

4    deliberations.  In passing on the evidence, you

5    have the right to use your knowledge of people and

6    their affairs.  This is the tool that is given you

7    in which some of us simply call your common sense.

8    In arriving at your verdict, you must not permit

9    sympathy, emotion, or prejudice to influence you.

10        Furthermore, you must not base your verdict

11    upon any preconceived idea of what would be a

12    popular or unpopular verdict.  In other words, your

13    verdict must strictly be based on the evidence

14    presented and the law that applies.

15        Also, before you reach a verdict, all twelve

16    of you must reach the same verdict.  In other

17    words, it must be unanimous.  It can't be a split

18    verdict.  In a moment, you'll be going back to the

19    jury deliberation room, and one of the first things

20    you need to do is to select one person to act as

21    your foreperson or spokesperson.  Now, that person

22    will have no greater weight in your deliberations

23    than anyone else, but will simply act as your

24    spokesperson.  You need to discuss the case, and if

25    you have any questions, there's paper and pencil

1    back there.  Have the foreperson write out the

2    question, sign it.  And if it's a question of law,

3    I will answer it.  However, if it's a question of

4    fact, I cannot assist you, as you're the sole and

5    exclusive judges of the facts.

6        Once you have reached a verdict, have the

7    foreperson sign it, knock on the door -- and we'll

8    let you know.  There are two doors.  There's one

9    here and one back there.  There are also

10   restrooms -- and you'll be brought back into the

11   courtroom, and the verdict will be read in the

12   court.

13       I've prepared a verdict form, and it will go

14   back with you as well as the exhibits that were

15   actually admitted.  It's a very simple verdict

16   form.  You have a choice of either we, the jury,

17   find the defendant guilty of stalking as charged in

18   the indictment or we, the jury, find the defendant

19   not guilty.

20       In a moment, I'm going to have the court

21   reporter take you back to the jury deliberation

22   room.

23       But let me ask if the -- either side has any

24   objections other than what you've already noted as

25   your objection, Mr. Minnifield, to the Court's

1    charge?  Do you have anything in addition?

2                    THE DEFENDANT:  Nothing other than

3    the motion.

4                    THE COURT:  And we'll discuss that

5    in just a moment.

6                    MR. BAILEY:  The State of Alabama is

7    satisfied.

8                    THE COURT:  I'm going to get you to

9    take them back there -- and if you want to take a

10   break, for instance, if you want to go get cokes or

11   something, we can let you go down and do that.  So

12   that may be something else you want to discuss.

13   Your time -- you are in charge of your time now.

14   I'm not any longer.  So it's what you want to do

15   with regard to that.  Okay.

16                    (Out of the presence of the jury.)

17                    THE COURT:  For the record,

18   Mr. Minnifield, you said you were satisfied with

19   the Court's charge except in the regard -- I think

20   you want to renew your motion about not giving the

21   lesser included harassment?

22                    THE DEFENDANT:  Right.

23                    THE COURT:  Okay.  And that is noted

24   for the record.  And I'm going to overrule your

25   objection, and your exception is noted on the

1      record.

2                    THE DEFENDANT:  Thank you.

3                    (In the presence of the jury.)

4                    THE COURT:  Okay.  I have your

5      questions, and I hope I can help you out.  The

6      first one is:  Was there a restraining order

7      mentioned in any testimony?  Was any length

8      mentioned, and if so, how long was it in affect?

9           The Court cannot comment on what evidence was

10     produced or not produced.  But I -- it's up to you

11     to recollect the testimony.  I will remind you that

12     evidence is only sworn evidence from the witness

13     stand and any exhibits.  Anything said in closing

14     argument is not evidence.

15          Now, with regard to can you get a transcript,

16     just as I told you, you're not permitted to have a

17     copy of my charge.  In Alabama, there's no

18     provision for the jury to have a transcript.

19     However, if there is a particular witness or a

20     particular part of someone's testimony that you

21     want the court reporter to read back, she can do

22     that.  She needs -- sometimes it takes a few

23     minutes to get that together.  But if there is a

24     particular witness's testimony that you want read

25     back or a portion of anyone's testimony that you

1    want read back, we can do that.

2          So why don't y'all go back there and see if

3    you -- and if you do want someone's testimony,

4    bring that out, and it will still take a few

5    minutes for her to get that together.

6                          (Out of the presence of the jury.)

7                          THE COURT:  What says the State?

8          MR. BAILEY:  Satisfied.

9                          THE COURT:  What says the defendant?

10                         THE DEFENDANT:  Satisfied.

11                         (In the presence of the jury.)

12                         THE JUROR:  Ma'am, can I ask a

13   question?

14                         THE COURT:  Sure.

15                         THE JUROR:  One of the jurors need

16   to leave at five --

17                         THE COURT:  We'll be sure that the

18   juror does.

19                         THE JUROR:  Okay.  Thank you.

20                         THE COURT:  Let me and it may be --

21   and one thing y'all may need to decide is when to

22   come back.  It's up to you in the morning.  It's

23   not -- five will be here soon.

24          Let me ask one thing -- and are you the

25   foreperson?

1          THE JUROR:  Yes, ma'am.

2          THE COURT:  You can just stay where

3     you are.  You asked can we hear David Johnson's

4     testimony again.  Let me ask this.  There was

5     reference during the course of the trial to David

6     Johnson, Mr. Minnifield's friend, is that who you

7     have in mind?

8          THE JUROR:  We don't know who's who.

9     We don't know if he testified.

10         THE COURT:  He did not testify, a

11    David Johnson.

12         THE JUROR:  Was there another David

13    that you gave us testimony from?

14         THE JUROR:  Is he the boss of

15    Mr. Minnifield?

16         THE COURT:  Wait just a minute.

17    Okay.  Now, I did -- there was a Don Thomason that

18    I gave you, and I'll read to you again the

19    stipulation.  Okay.

20         The parties stipulated that if Don Thomason

21    was here, this would be his testimony, and you're

22    to consider it as any other testimony and as if he

23    had been here as a witness under oath.  Don

24    Thomason was John Minnifield's employer.  And in

25    mid October of 198 -- '98, after Mr. Minnifield was

```
 1    arrested on a reckless endangerment charge,

 2    Mr. Minnifield told Mr. Thomason that if

 3    Vonciel Minnifield would have divorce papers drawn

 4    up, he would sign the divorce papers and

 5    Mr. Thomason agreed that he would notarize them.

 6    That was the stipulation.  Is that what --

 7                    (Jurors nod.)

 8                    THE COURT:  I don't know how long

 9    it's going to take to read this and -- but she's

10    going to now read back to you.  And if it's close

11    to five, we may just have to stop.  And this is the

12    testimony, and it's Lawanda Benson.

13                    (Court reporter reads back.)

14                    THE COURT:  Let me interrupt.  Is

15    this the testimony you wanted, because there was

16    some confusion of names?

17                    (Jurors nod.)

18                    THE COURT:  Go ahead.

19                    (Court reporter continues to read

20                    back.)

21                    THE COURT:  Okay.  What time do

22    y'all want to come back in the morning?

23                    THE JUROR:  Is nine o'clock okay?

24                    THE COURT:  Nine o'clock.  We'll get

25    you in the jury assembly room and bring you back
```

1    here because we'll being doing some things.  If you

2    have any notes, if you will leave them, we'll pick

3    them up.  The court reporter will keep them and

4    hand them back out tomorrow morning.  No one will

5    look at them.  I'm going to caution you, again, not

6    to discuss the case, and we'll see you in the

7    morning.  We'll try to have some coffee.

8                        (Out of the presence of the jury.)

9                        (In the presence of the jury.)

10                  THE COURT:  Good morning.

11   Yesterday, we had finished -- or the court reporter

12   reading back to you the testimony.  But you had

13   another question about do all of the elements of

14   stalking have to be present at each incident?  I'm

15   going to go back over with you the elements of

16   stalking and give you a little further explanation

17   that I hope will be helpful.

18        Now, with regard to stalking, the State must

19   prove three elements.  First of all, that the

20   defendant, John Minnifield, intentionally and

21   repeatedly followed or harassed Vonciel Minnifield.

22   The State must also prove beyond a reasonable doubt

23   that defendant made a credible threat, either

24   expressed or implied.  And finally, the State must

25   also prove that the defendant intended to place the

1    victim in reasonable fear of death or serious

2    bodily harm.

3        Now, I'm going to go back to each of them and

4    give you a little fuller definition.  With regard

5    to the first one, that the defendant -- the State

6    must show that the defendant intentionally and

7    repeatedly followed or harassed Mrs. Minnifield.

8    Repeatedly means on more than one occasion.  So

9    under this element, the State must show that the

10    accused either followed the victim on more than one

11    occasion and/or that the accused harassed the

12    victim on more than one occasion.

13        Now, follows is really self-explanatory, and

14    it has its ordinary meaning.

15        With regard to harassment, under this statute,

16    the State must prove that the accused engaged in an

17    intentional course of conduct directed at

18    Vonciel Minnifield, and that such conduct alarmed

19    or annoyed her or interfered with her freedom of

20    movement and such conduct by the defendant served

21    no legitimate purpose, that such course of conduct

22    would cause a reasonable person to suffer

23    substantial emotional distress, and it must

24    actually cause substantial emotional distress.

25        Now, course of conduct is used here as a

pattern of conduct composed of a series of acts over a period of time which evidences a continuity of purpose.

Now, with regard to the second element, that the State must prove beyond a reasonable doubt that the defendant made a credible threat, either expressed or implied. A threat is credible if it is made with the intent to cause the victim to fear for her safety or the safety of a family member and it does cause the victim to fear for her safety or the member of a family, and that it causes reasonable mental anxiety, anguish, or fear and that the accused had the apparent ability to carry out the threat. In this regard in determining whether a threat occurred, the entire factual context, including all of the surrounding events and reactions, must be considered. In other words, the totality of all the circumstances rather than just isolated incidents must be considered.

Furthermore, in order to constitute a credible threat, it is not necessary for the State to prove that the defendant had the actual intent to carry out the threat. It is enough if the threat causes the victim reasonably to fear for her safety or the safety of her family, and that the accused made the

1    threat with intent to cause the victim to feel such

2    fear.

3        Finally, the State must prove beyond a

4    reasonable doubt that the defendant intended to

5    place the victim in reasonable fear of death or

6    serious bodily harm.  Again, a person acts

7    intentionally under the law with respect to a

8    result or to a conduct when his purpose is to cause

9    that result or to engage in that particular

10    conduct.

11        The question of intent is hardly capable of

12    direct proof, and whether or not the defendant

13    intended to cause the victim here,

14    Vonciel Minnifield, to feel fear is a jury question

15    for you to decide.  It's also a question for you to

16    decide whether or not the defendant followed and/or

17    harassed the victim on more than one occasion.

18    That's also a jury question for you to decide.  And

19    it's also a question for you to decide whether or

20    not there was a credible threat.

21        If you find from the evidence that the State

22    has proved the elements of stalking, that is that

23    the defendant either followed and/or harassed the

24    victim on more than one occasion and that there was

25    a credible threat and that the defendant intended

1    to place the victim in reasonable fear of death or

2    serious bodily harm, if you find that the State has

3    proved all of those elements beyond a reasonable

4    doubt, you would find the defendant guilty as

5    charged. However, if you find that the State has

6    failed to prove one or more of those elements, you

7    will find the defendant not guilty.

8        Does that help you?

9            (Jurors nod.)

10            THE COURT:  If you want something

11    else read back, it does take us a few minutes to

12    get that, but -- or if you have any other

13    questions, I think you know by now what to do.  So

14    I'm going to let you go back there.

15        What says the State and the defendant?

16            MR. BAILEY:  State of Alabama

17    satisfied.

18            THE DEFENDANT:  Satisfied.

19            THE COURT:  Y'all know the way now,

20    so I'm going to let you go back there.

21                (Out of the presence of the jury.)

22                (In the presence of the jury.)

23            THE COURT:  Okay.  You had asked,

24    and at this time, the court reporter is going to

25    read back the testimony of Mrs. Minnifield.  Now, I

1    had excused both Mr. Bailey and Mr. Hartley.  They

2    are in other courtrooms tending to other matters.

3    And Ms. Childs is going to be here on behalf of the

4    State.  And, of course, Mr. Minnifield is here, so

5    they may be in and out.  Okay.

6                    MR. HARTLEY:  Thank you, Judge.

7                    MR. BAILEY:  Thank you, Judge.

8                    THE COURT:  Okay.

9                    (Court reporter read back.)

10                    THE COURT:  I think that's -- does

11    that help?  And I think you know by now that if you

12    need to know anything, just ask, and we'll try to

13    help you out.

14                    (Out of the presence of the jury.)

15                    THE COURT:  I realize this is a

16    serious matter, but this jury has worked very hard,

17    so don't have any comments while they're here.

18    Would you get them?

19                    (In the presence of the jury.)

20                    THE COURT:  I understand you've

21    reached a verdict.  And do you want to read the

22    verdict or do you want the Court to read the

23    verdict?

24                    THE JUROR:  You can read it.

25                    THE COURT:  Okay.  It is the verdict

```
 1    of the jury, we, the jury, find the defendant

 2    guilty of stalking as charged in the indictment.

 3         Mr. Minnifield, you have the right to have the

 4    jury polled, which will mean that I ask each juror

 5    if this is their verdict.  Do you want them polled?

 6              THE DEFENDANT:  Yes, I do.

 7              THE COURT:  And I'm going to ask

 8    each of you.

 9              (Jury polled.)

10              THE COURT:  And in accordance with

11    the jury verdict, the Court will adjudicate the

12    defendant guilty as charged.  I know it's been a

13    long few days, but I do just want to make a couple

14    of comments because I don't know when I have seen a

15    jury more dedicated to their duty.

16         I know this was a difficult decision, and you

17    obviously took it very seriously and talked through

18    the process, and we certainly appreciate how much

19    you took this into consideration.  I hope you've

20    had a good experience.  I know it's a hard

21    decision, and it can be difficult being a jury --

22    juror.

23         The good news is that you are excused for the

24    rest of the week.  And it's certainly small

25    compensation for what you've been doing, but you
```

1    can go down and get your juror fees.  And, again,

2    thank you for serving.

3                    MR. BAILEY:  Judge, could I say one

4    thing?

5                    THE COURT:  Yes.

6                    MR. BAILEY:  If any of you would

7    like to talk with me, I'll be down on the first

8    floor in just a few minutes.  You certainly don't

9    have to, but I know a lot of you might have some

10   questions or something.

11                   THE COURT:  At this time, it's up to

12   you whether you want to talk with anyone and -- so

13   that's strictly up to you.  Okay.

14                   (Out of the presence of the jury.)

15                   THE COURT:  Mr. Minnifield, I'm

16   going to set sentencing -- and I will have

17   Mr. Hartley stand in with you as well -- and I'm

18   going to set sentencing for February 7th at eight

19   o'clock.  And someone from the probation office

20   will be to talk with you about a presentence

21   report.

22                   THE DEFENDANT:  It wouldn't be

23   necessary.  I would like to give oral notice of

24   appeal.

25                   THE COURT:  Well, you cannot appeal

1    until after you're sentenced, and I can't sentence

2    until after I get that report. And if we get it

3    before then, I'll put your case down as quickly as

4    possible.

5                    THE DEFENDANT:  Thank you.

6                    THE COURT:  Okay.

7

8                    *  *  *  *  *  *  *  *  *  *  *

9

10                   THE COURT:  John Minnifield.

11    Mr. Hartley, I know you're not technically his

12    attorney, but maybe you could just stand up here?

13                   MR. HARTLEY:  Okay.

14                   THE COURT:  Okay.  Mr. Minnifield,

15    you're here today for sentencing. And, of course,

16    you had waived your right to an attorney during the

17    course of the trial. I have asked Mr. Hartley if

18    he would stand up here with you for sentencing.  Is

19    there anything you want to tell the Court before I

20    pronounce sentence?

21                   THE DEFENDANT:  Can I say it after

22    the sentencing?

23                   THE COURT:  Well, no. You need to

24    say it before the sentencing.

25                   THE DEFENDANT:  Well, this Court is

1    aware -- they are very well aware that I am not

2    guilty of the case of stalking.  I will not bow

3    down on my knees for something I didn't do.  I

4    was -- illegal evidence was used in this case.

5              THE COURT:  Well, you can, you

6    know -- you had already indicated before sentencing

7    you were going to appeal, and you certainly can

8    raise such matters on appeal.  But a jury heard the

9    evidence, and the Court did also, and the jury

10   found you guilty as charged.

11             MR. HARTLEY:  Judge, there's one

12   issue.  Can I tell her about that report,

13   Mr. Minnifield?

14             THE DEFENDANT:  It's up to you.

15             MR. HARTLEY:  Judge, quite

16   interestingly, I think Ms. McCarty was the first

17   person to tell me about it.  Apparently, last week

18   about the time you interviewed Mr. Minnifield, it

19   seems as though Dr. Carl Kirkland must have gone up

20   and seen him in regard to an issue involving Social

21   Security.  And I would believe, then, that

22   Dr. Kirkland probably generated a report, and I

23   would think that the Court might benefit from

24   seeing --

25             THE COURT:  At whose request?

1      MR. HARTLEY:  I think it's got

2 something to do with Social Security.

3      THE COURT:  Well, I don't know that

4 he will be eligible.

5      MR. HARTLEY:  But there may be

6 matters in that report that might be significant

7 that --

8      THE COURT:  I'm just concerned that

9 I did not think that they initiated that type thing

10 on their own.

11      MR. HARTLEY:  I asked Mr. Minnifield

12 on it, and he said he saw Dr. Kirkland because of

13 Social Security matters, right?

14      THE DEFENDANT:  Right.  I had went

15 to Mental Health when I was out.  And then Social

16 Security, they sent this man to see me.  Evidently,

17 they didn't use mental health thing, you know --

18      THE COURT:  Well, certainly, I would

19 consider that.  When did you talk to him?

20      THE DEFENDANT:  What day that you

21 came to see me?

22      THE COURT:  Well, it's been recent.

23      MS. MCCARTY:  Last week.

24      MR. HARTLEY:  Middle of the week.

25      THE COURT:  Well, you're here today,

1    and I will certainly give him the benefit of

2    looking at the report.

3        If -- anyone here, if you want me to hear from

4    them today, or have them come back, that's up to

5    you, but --

6                    MR. BAILEY:  Would the Court

7    consider going ahead and sentencing him, and if

8    something does come up, you can hear a motion to

9    reconsider based on that?

10                   THE COURT:  Well, the only problem

11   is if I don't get -- sometimes they're behind on

12   the reports, and I -- I think there would be a way

13   though that I could reserve jurisdiction.  So I'll

14   go ahead, and I may do that since everyone is here.

15   Is there anything --

16                   MR. BAILEY:  Yes, Your Honor.  The

17   State's here present with Ms. Vonciel Minnifield,

18   the victim in the case, and also her counsel with

19   the Family Sunshine Center, Lashanda Seals, and

20   Mrs. Minnifield's children are both present in the

21   courtroom.  And I believe Mrs. Minnifield would

22   like to address the Court at this time.

23                   THE VICTIM:  Do I need to read this?

24                   THE COURT:  No.  You just need to

25   tell me whatever.  Of course, I was present during

1    the trial and heard the evidence.

2              THE VICTIM:  Your Honor, basically,

3    I don't want anything bad to happen to anyone,

4    first of all, myself and my children, and my

5    husband, John.  However, several preservation is

6    something that we're all born with.  And my

7    children looked to me and to God for safety.  And

8    right now I'm just looking for the Court for safety

9    because I do fear for my life.

10             MR. BAILEY:  Judge, I think -- does

11   one of your children want to speak?

12             THE VICTIM:  Both.

13             MR. BAILEY:  Okay.  Would y'all come

14   on up?

15             MR. BAILEY:  Just have one at a

16   time.

17             MR. BAILEY:  Okay.  One at a time.

18   Whichever is fine.

19       If you could, state for the record your name.

20             DAUGHTER:  Ashley Cook.

21             MR. BAILEY:  You need to speak up.

22   Okay.

23             DAUGHTER:  Ashley Eliza Cook.

24             MR. BAILEY:  And could you tell the

25   Judge what you want to say?

1          DAUGHTER:  I just want to say that I

2    don't want anything bad to happen either.  But I

3    just want to live like everybody else, and I know

4    if he gets out, he might kill us.

5          MR. BAILEY:  Okay.  If you could,

6    please state your name for the record.

7          DAUGHTER:  Dana Cook.

8          MR. BAILEY:  Tell the Judge what you

9    would like to say.

10          DAUGHTER:  Like my mama and my

11    sister, I don't want anything bad to happen.  It's

12    not that I fear for myself, just my mom and my

13    sister because I see what they're going through.

14    But I know if he gets out, something else is going

15    to happen.  So I'm just fearing for my mom and my

16    sister right now.

17          MR. BAILEY:  Judge, the State would

18    add along with that, I've been prosecuting these

19    crimes for three or four years now, and this is

20    probably one of the more serious crimes that I have

21    seen.  The repeated threats for Mrs. Minnifield's

22    life, threats that were made in front of judges,

23    threats that were made in front of law enforcement

24    officials, and even in his own statement, him

25    saying that if he had caught her on that particular

1    day with that ax, he would have used it on her.   I

2    just think that type of evidence cannot be ignored.

3        And we would also, at the proper time, be

4    moving to invoke the habitual offender act.

5    According to the defendant's NCIC, he does have

6    thirty-three prior felonies.   Unfortunately,

7    because they're spread out all over the place, we

8    were only able to get eleven of those priors as far

9    as certified, and we have those here today.

10               THE COURT:   One of my concerns is

11   in, you know, sometimes it can be at least a month

12   before I get a report, and I don't know that I

13   would have jurisdiction over the matter after

14   thirty days to -- if I needed to take that --

15               MR. HARTLEY:   Judge, I think we

16   could probably contact Dr. Kirkland and ask him to

17   prioritize that one, and it might get here in a

18   short time frame, because I imagine they could,

19   since they've already had a week on it.

20               MR. BAILEY:   For that matter, we

21   could have Dr. Kirkland come in if he --

22               MR. HARTLEY:   In fact --

23               MR. BAILEY:   -- if worse came to

24   worse.

25               THE COURT:   He does have quite a

1  number -- do you have your certified priors?

2            MR. BAILEY:  Yes, Your Honor.

3            THE COURT:  I will say this.  Most

4  of them were in 1981 or before.  They're

5  certainly -- there haven't been any recent in

6  almost twenty years.  And I'm certainly going to

7  take that into consideration.  It really may be

8  helpful to me to have -- but I don't know that that

9  assessment for Social Security -- if it's going to

10  enlighten the Court.  And, you know, if he's

11  incarcerated, I don't think he'll be eligible to

12  receive Social Security.

13            MR. HARTLEY:  Of course, Judge, I'm

14  not -- that's not my worry, whether he gets Social

15  Security.  I just hope that the Court would have as

16  much information as possible about his possible

17  mental state or mental condition.

18            THE COURT:  Well, as -- you know,

19  during the trial, of course, the Court went over a

20  number of things and found he was competent to

21  represent himself.  He certainly -- and I will say

22  he, during the course of the trial, certainly was

23  able to do that.  And I don't want everyone to come

24  back.  I'm thinking if I did a split, at least I

25  could reserve jurisdiction and then reconsider.

1    That was --
2                    MR. HARTLEY:  Sounds reasonable.
3                    THE COURT:  I -- it may be a
4    situation where I determine that the split portion
5    may not be appropriate.
6                    MR. BAILEY:  Judge --
7                    THE COURT:  I'm going to -- what?
8                    MR. BAILEY:  I was just going to
9    suggest that maybe if I could -- or one of us could
10   go back and call Dr. Kirkland.
11                   THE COURT:  Why don't you do that?
12   I would like to have at least some time period
13   because I don't want to lose jurisdiction.  That is
14   my main concern right now.
15                   MR. BAILEY:  I'll do that right now.
16                   THE COURT:  Okay.  I'll get back
17   with him in just a moment.
18                       (Brief recess was taken.)
19                       (Court back in session.)
20                   THE COURT:  John Minnifield.  Okay.
21   Mr. Minnifield -- Mr. Bailey, you were going to
22   contact Dr. Refro's office?
23                   MR. BAILEY:  And I did, Your Honor.
24   And speaking with his secretary, she said that the
25   report would be ready probably about the first of

1    next week.  She left me with the impression that

2    there would have to be some type of order by the

3    Court for them to turn it over because it was

4    ordered by the Social Security Administration.  But

5    anyway, she went on to explain what this was --

6    that was done to Mr. Minnifield.  She said that

7    this was just a history that was done on him.

8    There was no evaluation except an intelligence test

9    was done, and the evaluation was basically to

10   determine if he had any disabilities.  She said

11   this would have no relevance for this court case.

12   And the big difference was this was not a forensic

13   evaluation as the court typically orders.

14            THE COURT:  I would -- I think,

15   though, since it's been raised, it would be a good

16   idea to have it in the record.  And let's get a

17   copy of it for the record, but I think I can go

18   ahead and sentence.

19       Now, is there anything else anyone wants to

20   tell the Court?

21            MR. BAILEY:  I don't think we have

22   anything else to say.  Just in case I didn't do

23   that, we would invoke the habitual offender act

24   based on --

25            THE COURT:  And I think it was

1    eleven?

2              MR. BAILEY:  We do have eleven

3    certifieds there, Your Honor.

4              MR. HARTLEY:  Your Honor, in regard

5    to this matter, I really was in trial sort of to

6    advise Mr. Minnifield and not being lead counsel,

7    but I did note that he made an interesting point

8    throughout the testimony that a great deal of what

9    happened and what he did or what he said were in

10   the course of involving a divorce case.  And, for

11   instance, if you take into as an example the trip,

12   I think, that was to Auburn, some portion of the

13   testimony involved that as being some significant

14   part of this whole series of events.  If you

15   take -- look over what was said, there was no

16   threat there.  There was no problem.  It was just a

17   matter of he was trying to get in touch with his

18   wife to find out what was going to happen in regard

19   to whether they were going to divorce or not

20   divorce.  And I think that the Court looks back

21   over that and takes into account the fact that

22   these people were married.  They had matters they

23   had to resolve.  They had issues that were between

24   them.  Beyond the fact that this case just

25   emphasizes the altercation that they had in

1    October, a lot of it would be justified if they

2    were just in the process of getting a divorce.

3              THE COURT:  Well, there were a

4    number of incidents testified during the trial and,

5    of course, as I said, the jury heard the evidence

6    and did find him guilty.  I am taking into

7    consideration, however, that -- all of these

8    sentences of conviction were approximately twenty

9    years ago.  But this is also a serious matter, and

10    I can't ignore that.

11         With regard to this case, I'm going to

12    sentence him to twenty years.  And, of course, I

13    would recommend that he undergo some type of

14    substance abuse program and some type of anger

15    management.  At any time upon release, he's to have

16    no contact with the victim or the family.

17         What about restitution?

18              MR. BAILEY:  There's restitution in

19    the amount of four thousand three hundred and

20    seventy-eight dollars.

21              THE COURT:  Three hundred

22    seventy-eight?

23              MR. BAILEY:  Yes, Your Honor.

24              THE COURT:  I'm not going to impose

25    a fine because, hopefully, at some point, she'll

1  get the restitution, but that will be mighty slow

2  coming in.  Fifty dollars to the Crime Victim

3  Compensation, court costs.  And, although,

4  Mr. Hartley did not represent you during the trial,

5  he was an attorney of record up until that time,

6  and I think it would also be appropriate to assess

7  attorney fees because he certainly had in more than

8  a hundred-fifty dollars' worth of time in the case.

9  Order one half of any monies earned paid toward

10 your court-ordered monies.

11     You do have a right to appeal.  If you cannot

12 afford a transcript or an attorney, that can be

13 provided for you.  In addition, you will be given

14 credit for any time actually served as allowed by

15 law.  Okay.  I think that takes care of it.

16            THE DEFENDANT:  I want to give oral

17 notice now of appeal and new trial.

18            THE COURT:  I will note that you

19 have given oral notice of appeal.  Let me ask this,

20 Mr. Minnifield.  Do you want the Court to appoint

21 you an attorney to represent --

22            THE DEFENDANT:  No.  I will

23 represent myself.

24            THE COURT:  Well, again, I made

25 determinations that you are competent and capable

1    of representing yourself in trial.  However, for

2    appellant purposes, there's also technical matters.

3    And if you do not comply with the Rules of

4    Appellant Procedure, your appeal could be

5    dismissed.  There are serious consequences.  And it

6    may be helpful to have an attorney to be sure you

7    don't have any problems in that regard.

8              THE DEFENDANT:  It is going to be

9    problem wherefore John Minnifield name appear

10   because of the lies and stuff that has been told,

11   and it doesn't matter no more with me.  That woman

12   know --

13             THE COURT:  Well, I'm going to go

14   ahead and appoint an attorney, and then you can

15   file something.

16             THE DEFENDANT:  She know --

17             THE COURT:  That's all.

18             THE DEFENDANT:  And they know that

19   I'm not going to bother them.

20             THE COURT:  Okay.  That's all.

21             THE DEFENDANT:  And I want a motion

22   for a new trial too.

23              * * * * * * * * * *

24              END OF PROCEEDINGS

25              * * * * * * * * * *

REPORTER'S CERTIFICATE

STATE OF ALABAMA

TALLAPOOSA COUNTY

I, Meridith Newman, Court Reporter and Commissioner for the State of Alabama at Large, hereby certify that on Monday, January 10 and February 7, 2000, I reported the TESTIMONY AND PROCEEDINGS in the matter of the foregoing cause, and that the foregoing pages contain a true and accurate transcription of said proceedings.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 10th day of January, 2000.

This 7th day of February, 2000.

_Meridith Newman_

Meridith Newman, Court Reporter
Commissioner for the State of
Alabama at Large

MY COMMISSION EXPIRES:  12/30/2001

RR-1

1       4                    IN THE CIRCUIT COURT

2                    OF MONTGOMERY COUNTY, ALABAMA

3       STATE OF ALABAMA

4            Plaintiff,

5       VS.                              X   CC-99-327-SMG

6       JOHN MINNIFIELD,

7            Defendant.

8       _____ _____ _____ _____/

9

10                       MOTIONS HEARING

11                   P R O C E E D I N G S

12           The above cause came on to be heard before

13      the Hon. Sally M. Greenhaw, Circuit Judge for the

14      15th Judicial Circuit of Alabama at the Montgomery

15      County Courthouse, Montgomery, Alabama; commencing

16      on March 6, 2000.

17                     *   *   *   *   *

18                   A P P E A R A N C E S

19                      FOR THE STATE:

20                      No appearance.

21                    FOR THE DEFENDANT:

22                         Pro Se.

23                     *   *   *   *   *

24      COURT REPORTER FOR THESE PROCEEDINGS: DUB HARRIS

25                     *   *   *   *   *

RR-1

1    4                 IN THE CIRCUIT COURT

2              OF MONTGOMERY COUNTY, ALABAMA

3    STATE OF ALABAMA

4          Plaintiff,

5    VS.                          X  CC-99-327-SMG

6    JOHN MINNIFIELD,

7          Defendant.

8    _____ _____ _____ _____/

9

10                MOTIONS HEARING

11              P R O C E E D I N G S

12          The above cause came on to be heard before

13   the Hon. Sally M. Greenhaw, Circuit Judge for the

14   15th Judicial Circuit of Alabama at the Montgomery

15   County Courthouse, Montgomery, Alabama; commencing

16   on March 6, 2000.

17                  *   *   *   *   *

18                A P P E A R A N C E S

19              FOR THE STATE:

20              No appearance.

21          FOR THE DEFENDANT:

22              Pro Se.

23              *   *   *   *   *

24   COURT REPORTER FOR THESE PROCEEDINGS: DUB HARRIS

25              *   *   *   *   *

RR-2

1                    PROCEEDINGS

2          BY THE COURT:   All right. Mr.

3    Minnifield, during the trial  you waived your

4    attorney.  Although I had Mr. Hartley sit

5    there, you did not indicate that you needed his

6    services during the trial.  I've appointed you

7    an attorney on appeal.

8          Now, on these motions for new trial, you

9    filed them Pro Se, and I've looked at your

10   motion for a new trial, and also a motion for

11   -- I guess a jury mistrial, and to reconsider

12   the sentence, and I've read all your motions.

13         Now, one thing I need to make clear, I've

14   appointed Mr. Burkhart to represent you on

15   appeal.  If for some reason you don t want him

16   to represent you, you ll have to take that up

17   with the appellate court, not me; do you

18   understand that?

19         BY THE DEFENDANT:   Yes, ma'am.

20         BY THE COURT:   Now, is there anything you

21   have to say that you haven t already said in

22   your written motions, because I've read over

23   them.

24         BY THE DEFENDANT:    I just feel, though,

25   that everything in those motions, that I'm

1    entitled to.

2         BY THE COURT:    It certainly sets out,

3    you know, quite a few factors that happened

4    during the trial, but the Court was there

5    during the trial, and again I'll say for the

6    record, you certainly were well able to

7    represent yourself, and I m going to go ahead

8    and deny these motions for new trial, and your

9    other motions.  So, now, everything can be

10   taken up on appeal.  So, I'm going to deny

11   these motions, and they'll be part of the

12   record as well.

13        BY THE DEFENDANT:    Okay.

14        BY THE COURT:    All right, thank you.

15                   (Court adjourned)

16                *    *    *

17

18

19

20

21

22

23

24

25

RR-4

C E R T I F I C A T E

STATE OF ALABAMA

MONTGOMERY COUNTY


I, Dub Harris, Special Roving Court Reporter and Registered Profesional Reporter of the 15th Judicial Circuit for the State of Alabama, Montgomery, Alabama, do hereby certify as follows:

THAT I reported in shorthand the foregoing proceedings in the foregoing styled cause at the time and place stated heretofore;

THAT I later reduced my shorthand notes to computer-aided transcription, and the foregoing pages contain a full, true and correct transcript of the proceedings and testimony as herein set out;

THAT I am neither of kin nor of counsel to the parties to said cause, nor in any manner interested in the results thereof.

DONE this 8th day of March, 2000.


Dub Harris, Reporter.